**KENNETH E. LYON, III**
Nevada Bar No. 7071
**LAW OFFICES OF KENNETH E. LYON, III**
333 Flint Street
Reno, Nevada 89501
Telephone: 775.786.4188
Facsimile: 775.786.5573
Email:  ken@lyonlaw.net

*Attorney for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

MOHAMMADALI AFSHAR,

                    Plaintiff,

vs.

JEFFREY BUTLER, PATRICK MCCAULEY, SHELBY CRAWFORD, THE CITY OF RENO, a political subdivision of the State of Nevada, and DOES 1-X, inclusive,

                    Defendants.

Case No.  3:24-cv-00110-MMD-CLB

**PLAINTIFF'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT**

COMES NOW, Plaintiff Mohammadali Afshar, by and through his undersigned counsel of record, and hereby responds to Defendants' Motion for Summary Judgment.  Plaintiff's response is based on the accompanying Memorandum of Points and Authorities, all referenced exhibits, and all documents and papers on file herein.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.	INTRODUCTION**

Plaintiff seeks damages for injuries he sustained during his arrest and handcuffing for the misdemeanor crime of obstruction which was based on his failure to obey the verbal commands of Defendants.  Plaintiff asserts a claim of excessive force under 42 U.S.C § 1983, as well as state law claims for battery and negligence.

1

## II.    STATEMENT OF MATERIAL FACTS

On March 16, 2022, at approximately 1:30 a.m., Plaintiff Mohammadali Afshar ("Afshar") had just dropped off his friends at their apartment located at 5250 Villa Verde Drive in Reno, Nevada, with the intent of returning home.  Ex. 1, Dep. of M. Afshar, at 47:9 – 48:6; Ex. 2, Dec. of M. Afhsar at ¶ 3.  As Afshar rounded the corner onto Escalara Way, Afshar was checking his phone for messages and became distracted causing him to crash into the back of a 2010 Subaru parked at 2220 Escalara Way.  Ex. 1 at 48:9 – 50:10; Ex. 2 at ¶ 3.  The collision caused the airbags in Afshar's vehicle to deploy and, unknown to Afshar at the time, caused the Subaru to be pushed into a 2021 Toyota 4-Runner which was parked in front of the Subaru.  Ex. 1 at 52:19 – 53:15.

Immediately following the accident, Afshar began to experience a panic attack which he has described as feeling "like you're dying."  Ex. 1 at 56:5-22; 59:13-16; Ex. 2 at ¶ 4.  Afshar then got out of his vehicle to check on the damage to the Subaru and called his friend about what to do and was advised to leave a note.  Ex. 1 at 57:24 – 59:10.  At that time, Afshar's car was still in the middle of the road.  Ex. 1 at 61:3-19.  Afshar was trying to move his car out of the roadway when the owner of the Subaru came out and began yelling at him.  Ex. 1 at 59:23 – 64:16; Ex. 2 at ¶ 5.  Afshar attempted to calm the Subaru owner down and provided her with his insurance information from his phone which she took a picture of with her phone.  *Id.*  During this time, Afshar's panic attack worsened, and he advised the Subaru owner that he needed to leave and subsequently drove his vehicle back to his friend's apartment at 5250 Villa Verde Dr. believing he had provided the necessary information to the Subaru owner.  *Id.*

Law enforcement was subsequently dispatched to 2220 Escalara based on a call of a "hit and run" accident reported by the Subaru owner.  Ex. 3, Butler Depo. at 66:22 – 70:2.  Four officers from the Reno Police Department responded - Officers Jeffrey Butler ("Butler"), Issac

Meadows ("Meadows"), Patrick McCauley ("McCauley"), and Shelby Crawford ("Crawford"). Ex. 3 at 69:20 – 70:3. At that time, Crawford had just finished the police academy and had only been employed with the Reno Police Department since December 7, 2022. Ex. 4, Crawford Depo. at 14:1-15. As such she was still undergoing phase training and was with McCauley who had been assigned as her training officer. Ex. 4 at 16:16 – 17:7. By way of a fluid trail, Afshar's unoccupied vehicle was subsequently located parked in the parking lot at the Villa Verde apartments approximately one block away. Ex. 5, McCauley Depo. at 50:4-14; 116:17-117:3. Thereafter, Crawford was assigned as the investigating officer under the training and supervision of McCauley. Ex. 5 at 50:25 – 51:20. Crawford and McCauley returned to the location of the accident to continue with the investigation while Butler and Meadows remained with Afshar's vehicle. *Id.*

After parking his vehicle at the Villa Verde apartments, Afshar went up to his friend's apartment to try to calm down from his panic attack. Ex. 1 at 75:16 – 76:17. At approximately 0215 hours, Afshar saw police lights at his vehicle and went down to speak with Butler and Meadows to explain to them what had happened. Ex. 1 at 76:7-12; Ex. 2 at ¶ 6. This encounter was captured on the Butler's body worn camera ("BWC"). ECF 25-7, Butler BWC at 02:15:00 – 02:20:56. In material sum, Afshar provided Meadows with his driver's license. ECF 25-7 at 02:15:54 – 02:16:35. Afshar also confirmed that the damaged vehicle was his and that he had been driving it at the time of the accident. *Id.* Ex. 1 at 79:21 – 80:2. Afshar also advised that he had provided his insurance information to the Subaru owner and that he had left the accident scene due to a panic attack. ECF 25-7 at 02:15:40 – 02:17:20; Ex. 1 at 80:6 – 81:9. Meadows then returned to the location of the accident with Afshar's driver's license and a photo of his insurance information from Afshar's phone while Afshar stayed with Butler pending the outcome of the investigation. ECF 25-7 at 02:16:25 – 02:17:40.

At approximately 02:20:17, Afshar asked if there was anything else he needed to provide. ECF 25-7 at 02:20:17. Butler informed Afshar that "he (Afshar) was going to hang out" until he got a ticket and "some other stuff." ECF 25-7 at 02:20:17 – 02:20:20. Butler subsequently began questioning Afshar on his consumption of alcohol. ECF 25-7 at 2:21:50 – 02:22:45. This is despite Butler's immediate statement to Afshar that "you already ran off, so we are not going to be able to hit you with a DUI." ECF 25-7 at 02:21:55 – 02:22:01. Although Afshar stated he was not impaired at the time of the accident, Butler began to argue with Afshar stating that "he knows" Afshar was drunk. ECF 25-7 at 02:22:01 – 02:22:35.

During his detention, Afshar also asked questions of Butler concerning the situation. ECF 25-7 at 02:33:27 – 02:38:00; 02:55:18 - 02:55:37; 03:01:30 – 03:02:03. Butler repeatedly advised Afshar that Butler was not the investigating officer but that his partner (Crawford) would be the one determining whether he would be cited for "hit and run" and that Afshar would be able to talk with her. *Id.* Ex. 3 at 122:3-25. At that time, Afshar was a student at UNR and applying for United States citizenship and was worried about the impact of the charge on his interview for citizenship, his graduation, and his ability to get a job. Ex. 1 at 123:9-19

During Afshar's detention and prior to Afshar's initial contact with Crawford and McCauley, Butler communicated twice with Crawford and McCauley. Specifically, at approximately 02:46:30, Butler called and spoke with Crawford telling her that Afshar was getting "pretty uncooperative here." ECF 25-7 at 02:47:52. Butler also commented that they "couldn't hit him with a DUI, but …" ECF 25-7 at 02:48:00. Finally, Butler told Crawford that the encounter "might go interesting when you guys get here." 02:48:03.[1] Importantly, prior to this call Butler's BWC shows that Afshar had been either standing quietly or sitting in the back

---

[1] The other end of this conversation was captured on Crawford's BWC. ECF 25-5, Crawford BWC, at 02:47:36 – 02:48:20. McCauley can be heard asking multiple times "what did he say?" to which Crawford responds that Afshar was "starting to get a little uncooperative" and that it is going "to go a little interesting when we get there." *Id.*

of his car for over ten minutes.  ECF 25-7 at 02:38:00 – 02:48:26.  Furthermore, once Butler finished his call, Afshar is seen in the BWC simply standing outside his vehicle talking with his friend which continued through approximately 02:53:00 when Afshar eventually asks about the delay.  ECF 25-7 at 2:52:45 – 02:55:45.  At approximately 02:57:55 Meadows also asks Butler about the delay prompting Butler to again call McCauley and Crawford.  ECF 25-7 at 2:57:55 – 02:59:50.  This time Butler spoke with McCauley and again represented that Afshar was "getting agitated."  ECF 25-7 at 02:59:35.  In addition, Butler represented that Afshar was intoxicated and that there was a "strong possibility" that he would not qualify for a citation.  ECF 25-7 at 02:59:41.[2]

At approximately 03:03:20 McCauley and Crawford made their initial contact with Afshar which was best captured by Crawford's BWC.  ECF 25-5 at 03:03:20 – 03:05:23.  Based on the prior representations of Butler, both McCauley and Crawford were expecting Afshar to be intoxicated, uncooperative and agitated.  Ex. 4 at 47:9 – 49:23; Ex. 5 at 82:3-16.  However, based on their actual interaction with Afshar both officers acknowledged that he was not uncooperative, agitated, or intoxicated.  Ex. 4 at 50:18 – 51:3; Ex. 5 at 83:24 – 84:15.  In fact, after the initial encounter Crawford stated to McCauley that Afshar was acting normal and talking fine and therefore qualified for a citation.[3]  ECF 25-6 at 03:05:23 – 03:05:49.  McCauley testified that he agreed with the conclusions of Crawford and had the authority to supersede her decision to issue the citation if he felt otherwise.  Ex. 5 at 86:14 – 87:7.

Although both officers determined that Plaintiff qualified for a citation, Crawford expressed to McCauley that she did not want to do so.  ECF 25-6 at 3:05:40 – 3:05:43; ECF 25-5

---

[2] The other side of this conversation was captured on McCauley's BWC.  ECF 25-6 McCauley BWC at 02:59:20 - 02:59:46.

[3] Crawford muted her BWC during the first part of this conversation.  ECF 25-5 at 3:05:22 – 3:05:43.  However, it was captured on McCauley's BWC.

at 03:05:42.  In response, Officer McCauley stated "ya – he beat his DUI tonight."  ECF 25-6 at 03:05:45.  When asked about her statement at her deposition, Crawford confirmed she wanted to arrest Afshar although she did not have the legal basis to do so.  Ex. 4 at 58:5-59:3; 61:1-16.  Crawford also confirmed that no DUI investigation was even contemplated under the circumstances.  Ex. 4 at 61:20 – 62:3.

Indeed, a review of the statements and interactions of all the Defendants show a pattern of animosity against Afshar on the belief that Afshar evaded a DUI and therefore evaded an arrest despite no evidence to support such a belief.  Specifically, upon finding Afshar's vehicle, McCauley immediately concluded that Afshar had left the scene of the accident because he was probably drunk.  ECF 25-6 at 2:00:08 and continued with this conclusion despite no evidence to support it.  ECF 25-6 at 02:08:07.  Thereafter, Meadows informed McCauley and Crawford that Afshar had provided his insurance information which was confirmed with the owner of the Subaru prompting Officer McCauley to ask "why the hell would he leave then?"  ECF 25-6 at 02:19:08 – 02:19:50.  Thereafter, there were discussions about whether Afshar even qualified for a 1057 ("hit and run") citation given that he had provided his insurance information.  ECF 25-6 at 02:19:54 – 02:25:10.  Importantly, when asked about this discussion at his deposition McCauley confirmed that at that point in time there had been no decision to cite Afshar for a "hit and run" because they had no other information at that time as to why he left the scene.  Ex. 5 at 58:25 – 61:6.  Nevertheless, McCauley is captured on his BWC minutes later angrily declaring that "we are going to fucking cite him" despite the fact no further information had been obtained.  ECF 25-6 at 02:30:05 – 02:30:12; Ex. 5 at 63:4-24.  This increasing animosity was mirrored by Crawford in discussions she had with McCauley as they were preparing to go over to speak with Afshar.  Specifically, Crawford makes the statement that if he (Afshar) was being an "asshole" she is "OK with taking him to jail tonight."  ECF 25-6 at 03:01:10 – 03:01:40.

When asked about this statement at her deposition, Crawford confirmed she could not arrest Afshar for simply being an "asshole" and that her expectations that Afshar would be agitated and uncooperative had been fueled by the comments from Butler.  Ex. 4 at 47:9-21.

Furthermore, as noted above, even though both McCauley and Crawford agreed that Afshar was not being uncooperative or acting agitated or intoxicated, and that he qualified for a citation, their animosity towards Afshar only increased.  Not only did Crawford express her continued desire to arrest Afshar, she believed he had been "rude" which prompted McCauley to angrily comment that he believed Afshar "was a fucking dick."  ECF 25-6 at 3:07:20 – 3:07:27.  Thereafter, McCauley's anger toward Afshar seemed to increase during a cigarette break.  ECF 25-6 at  03:10:00 – 03:12:28.  During this time he is captured on his BWC talking to himself and stating:  "you beat your DUI - your awesome."  ECF 25-6 at 3:12:19.  McCauley mutes his BWC shortly after that statement.  ECF 25-6 at 03:12:27.  Later when advised by Meadows that Afshar was agreeing to take a PBT that was continuing to being requested by Butler, McCauley's response was that Afshar could "suck his dick."  Ex. 5 at 98:16-25.

At approximately 03:21:30, Officer Crawford returned to Plaintiff's location to issue the citation to Plaintiff.  ECF 25-5 at 03:21:30.  By this time, Meadows had left the scene, but Butler was still with Afshar and his friend.  *Id.*  In addition, while McCauley and Crawford were walking over to Afshar's location, they discovered Crawford had left some papers in her vehicle which McCauley returned to retrieve.  ECF 25-5 at 03:21:20.  This delay caused McCauley to arrive back on scene after Crawford had already begun to engage again with Afshar.  ECF 25-6 at 03:22:00.  Based on the foregoing, this "second encounter" between Afshar, Crawford and McCauley, which includes the arrest and subsequent injury to Afshar, is best captured on Crawford's BWC.  ECF 25-5 at 03:21:30 – 03:25:00.

7

In material sum, during the initial part of the second encounter Afshar attempted to ask Crawford questions about his citation which was met with resistance by Crawford.  ECF 25-5 at 03:22:40.  During her deposition, Crawford confirmed she was the officer in charge during this discussion with Afshar because she was the investigating officer.  Ex. 4 at 63:3-23.  Crawford also confirmed her responsibility under the general orders of the Reno Police Department to provide professional police services to citizens which includes providing an explanation for why she may issue a citation.  Ex. 4 at 28:3 – 31:2.  Furthermore, during her exchange with Afshar, Crawford inadvertently dropped Afshar's driver's license which only served to escalate the tensions between her and Afshar.  ECF 25-5 at 03:22:44 – 03:23:47.  Although Crawford initially told Afshar he could pick his license up when they were done, she subsequently ordered him to step back so she could pick it up.  ECF 25-5 at 03:22:47; 03:23:45.  At that time, Afshar had not raised any issue involving officer safety and the command to step back was not in response to any verbal or physical threat being exhibited by Afshar.  Ex. 3 at 98:15-24; 100:7 – 101:15; 148:22 – 149:3.  There was no explanation provided to Afshar as to why he needed to back up, i.e, for officer safety.  *Id;* Ex. 3 at 139:11-16.  At this point, Afshar questioned the need to back up and McCauley and Butler also ordered him to back up.  ECF 25-5 at 03:23:45 – 03:24:10  Although Afshar took a small step back, he failed to fully comply with the orders resulting in McCauley verbally announcing "O & R."  ECF 25-5 at 03:24:14.

Both McCauley and Butler then immediately grabbed Afshar and began to push him towards his car and place him in handcuffs.  ECF 25-5 at 03:24:15.  At that time, Butler was approximately 5' 11" tall and weighed 245-250 pounds.  Ex. 3 at 169:1-3.  McCauley was approximately 6' 4" tall and 260-270 pounds.  Ex. 5 at 138:10-13.  Afshar immediately stated that he was "sorry" and repeatedly says "OK guys" and "come-on" prior to verbalizing injury which prompted McCauley to call for the paramedics.  ECF 25-5 at 03:24:15 – 03:25:15.

Butler provided deposition testimony concerning the details of Afshar's arrest and the use of force as depicted in the BWC.  Specifically, Butler stated that McCauley announced the "O & R" which means obstructing and resisting.  Ex. 3 at 141:22-24.  Butler confirmed that at that point in time, Afshar was obstructing by not following commands but was not "resisting."  Ex. 3 at 141:25 – 142:13.  Butler also confirmed that once McCauley announced "O & R" that he knew McCauley would be arresting Afshar and that he was going to assist with the arrest which included the decision to immediately put Afshar in handcuffs.  Ex. 3 at 151:13-14; 156:2-12.  Finally, Butler confirmed that Afshar was not warned of the arrest or warned that he would be placed in handcuffs or given an opportunity to comply by voluntarily putting his hands behind his back prior to going "hands-on."  Ex. 3 at 150:10-25; 172:23 – 173:18.

With respect to his actions and the actions of Afshar during the arrest, Butler stated that he used the rear wrist lock technique to secure control over Afshar's left hand/arm.  Ex. 3 at 157:9 – 158:25.  Butler also testified that he believed Afshar initially was "resisting" which he described as feeling Afshar tense up and trying to pull his arms away.  Ex. 3 at 161:20 – 162:3.  With respect to the degree and timing of Afshar's "resistance," Butler testified that as they were moving towards the car Butler had control over Afshar's left arm and that he had stopped "resisting" with his left arm.  Ex. 3 at 165:17 – 166:10.  Finally, Butler confirmed that Afshar's verbal statements represented as verbal submissions to his authority.  Ex. 3 at 163:4-21.

McCauley also provided deposition testimony concerning the details of Afshar's arrest and use of force as depicted in the BWC.  McCauley confirmed that he understood that his decision to call "O & R" represented as a simultaneous decision to go "hands-on" with the arrest and handcuffing of Afshar.  Ex. 5 at 114:15-25.  McCauley also confirmed that he provided no warning to Afshar of his decision to arrest despite the opportunity to do so.  Ex. 5 at 120:3 – 121:20.

With respect to his actions and the actions of Afshar during the arrest, McCauley also testified that he used the rear wrist lock technique to secure control over Afshar's right hand and arm. Ex. 5 at 123:11 – 125:7. As well, although he tactically moved Afshar towards Afshar's vehicle to limit Afshar's mobility he did not need to perform any "takedown procedure." Ex. 5 at 136:8-19. With respect to the degree and timing of Afshar's "resistance," McCauley was able to specifically identify the part of Crawford's BWC that showed Afshar's "resistance" to McCauley's use of the rear wrist lock technique. McCauley testified that "as we went hands-on, you can see, like, kind of a step forward and try to pull away that arm. Ex. 5 at 127:19-21; ECF 25-5 at 03:24:16. However, McCauley also acknowledged that this movement by Afshar could have been a reflexive action. Ex. 5 at 130:7-21  Thereafter, McCauley does not believe he ever lost contact with Afshar's right arm or wrist areas after needing to re-grab Afshar's wrist. Ex. 5 at 130:19 – 131:15. McCauley also acknowledged that Afshar immediately verbalized his contrition and submission to his authority even though McCauley maintains Afshar was continuing to physically resist. Ex. 5 at 135:7 – 136:3. Finally, McCauley testified that while he was performing the rear wrist lock maneuver, he felt what he described as a "wet pop" on Afshar's upper right arm/shoulder region which was consistent with the timing of when Afshar cried out and claimed injury on the BWC. Ex. 5 at 136: 20 – 138:5. Although the audio was muted, McCauley later demonstrated to Butler his application of the wrist lock technique and his use of force upon Afshar which was captured on Butler's BWC. Ex. 5 at 139:3 – 140:  ECF 25-7 at 03:36:00 – 03:35:31.

For his part, Afshar has admitted he was "poorly behaving" prior to his arrest due to his frustration and belief Crawford was not listening to him. Ex. 1 at 88:20 – 89:8; 120:18 – 123:3. With respect to the arrest itself, Afshar confirms that he was not provided any verbal warning that he was going to be arrested or placed in handcuffs and that the speed of the incident took

him by surprise.  Ex. 2 at ¶ 9.  Afshar also confirms he immediately vocalized his submission to the officers and that he never resisted arrest and any movement on his part was reflexive to suddenly being grabbed by McCauley and Butler.  Ex. 1 at 90:5-14; Ex. 2 at ¶ 10.

Afshar sustained a fracture to his right humerus while being restrained by McCauley and Butler.  Ex. 6, Dec. and Report of Dr. Edward Younger, Ex. A at p. 3.  X-rays of Afshar's injury show that the injury is consistent with a rotational force placed on the humerus.  *Id*.  Afshar was required to undergo surgery and post-surgical treatment to address his injury.  Ex. 6 at Ex. A, Medical Record Review of Mohammadali Afshar; Ex. 2 at ¶ 12.  Among other damages, Afshar sustained over $51,000 in medical expenses.  Ex. 2 at ¶ 12.

On October 17, 2022, Afshar accepted responsibility for his failure to follow the officers' instructions to step back and entered a no-contest plea to obstruction under Reno Municipal Code 8.06.010(b)(1) and failing to maintain a lane as required by NRS 484B.223(1).  Ex. 2 at ¶ 13; ECF 25, Ex. 11; ECF 25, Ex. 12.

III.    **ARGUMENT**

A.  **Excessive Force**[4]

"The Fourth Amendment requires police officers making an arrest to use only an amount of force that is objectively reasonable in light of the circumstances facing them."  *Blankenhorn v City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007), citing *Tennessee v. Garner*, 471 U.S. 1, 7-8 (1985).  "[E]ven when some force is justified, the amount actually used may be excessive."  *Id.*, citing *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002).  The "level of force an individual's

_____

[4] Plaintiff's Complaint alleges a claim for excessive force pursuant to 42 U.S.C. §1983 and battery against both McCauley and Butler.  However, Plaintiff now concedes that his initial theory against Butler as a potential "integral participant" as recognized in *Blankenhorn v. Cty of Orange,* 485 F.3d 463 (9th Cir. 2007), is not supported by sufficient evidence and voluntarily withdraws these claims as to defendant Butler.

resistance will support is dependent on the factual circumstances underlying that resistance." *Bryan v. MacPherson*, 630 F.3d 805, 830 (9th Cir. 2010). Furthermore, a plaintiff need not suffer serious injury in order to show excessive force, but the extent of an injury may be one factor in deciding whether a particular use of force was excessive. *Hudson v. McMillian*, 503 U.S. 1, 4 (1992).

The framework within the Ninth Circuit for evaluating a Fourth Amendment claim of excessive force for injuries sustained during arrest and handcuffing was recently articulated in *Johnson v. City of Santa Rosa*, 2024 WL 4859079 (N.D.Cal. 2024) as follows:

> "In evaluating a Fourth Amendment claim of excessive force, [courts] ask 'whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them." *Rice v. Morehouse*, 989 F.3d 1112, 1121 (9th Cir. 2021)(quoting *Graham v. Conner*, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed. 443 (1989). The "analysis must balance the nature of the intrusion upon an individual's rights against the countervailing government interests at state, without regard to the officers' underlying intent or motivation." *S.R. Nehad v. Browder*, 929 F.3d 1125, 1132 (9th Cir. 2019). Courts consider the totality of the circumstances, including "(1) the 'severity of the crime at issue,' (2) whether the suspect 'poses an immediate threat to the safety of the officers or others,' and (3) whether the suspect 'is actively resisting arrest or attempting to evade arrest by flight." *Peck v. Montoya*, 51 F. 4th 877, 887 (9th Cir. 2022) (quoting *Graham,* 490 U.S. at 396). Courts also consider "the availability of less intrusive alternatives to the force employed and whether warnings were given." *Hopson v. Alexander*, 71 F.4th 692, 698 (9th Cir. 2023). Of the factors, "the 'immediate threat to safety' factor is the most important." *Peck,* 51 F.4th at 887. However, the Court "must ultimately consider the totality of the circumstances 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Id.* (quoting *Graham*, 490 U.S. at 396). Therefore, "[o]nly information known to the officer at the time the conduct occurred is relevant." *S.R. Nehad*. 929 F.3d at 1132.

2024 WL 4859079, *8-9.

Summary judgment in excessive force cases should be granted sparingly because an excessive force inquiry nearly always requires a jury to sift through and draw inferences from disputed factual contentions. *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005)(en banc)(overruled in part on other grounds, *Lemos v. Cnty. of Sonoma*, 40 F.4th 1002, 1009 (9th

12

Cir. 2022). See also, *Samuell v. Cipriano*, 2015 U.S. Dist. LEXIS 177056 \*16 (D. Nev. 2015),[5] citing *Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003)(finding summary judgment inappropriate where a police officer grabbed the plaintiff by her arms, threw her to the grounds, and twisted her arms to handcuff her); *Wall v. Cnty of Orange*, 364 F.3d 1107, 1112 (9th Cir. 2004)(finding summary judgment inappropriate where officer grabbed, bent, and twisted plaintiff's arm); *Hansen v. Black*, 885 F2d 642, 645 (9th Cir. 1989)(finding summary judgment inappropriate where officer injured plaintiff's wrist and arm in the process of handcuffing). Where the evidence includes video footage, the Court may properly consider the video evidence and should view the facts as depicted by the video. *Scott v. Harris*, 550 U.S. 372, 380-81, (2007). However, all inferences from the video are still drawn in Plaintiff's favor. See *Williams v. Las Vegas Metro. Police Dep't.*, 2016 WL 1169447 at \*4 (D. Nev. Mar. 22, 2016 ("[t]he existence of the video does not change the usual rules of summary judgement: in general, the court will draw all reasonable inferences from the video in plaintiff's favor")(citing *Blankenhorn v. City of Orange*, 485 F.3d 463, 468 n. 1 (9th Cir. 2007).

Utilizing this framework, a genuine issue of material fact exists as to whether McCauley's use of force to arrest and handcuff Afshar was objectively reasonable under the circumstances.

First, the "severity of the crime at issue" was a misdemeanor for obstruction based on Afshar's failure to obey verbal commands. Ex. 3 at 141:25 – 142:13; ECF 25-9; ECF 25-12. Although Defendants suggest that the circumstances surrounding the accident and Afshar's leaving of the scene somehow increase the severity of the crime, it is undisputed that the citation for "hit and run" and failing to maintain a lane were not arrestable offenses so long as Afshar

---

[5] Only the Lexis citation for this decision is available.

qualified for a citation.  Both McCauley and Crawford determined that Afshar did qualify after their initial interaction with him.  ECF 25-6 at 03:05:23 – 03:05:49; Ex. 5 at 86:14 – 87:7.

Second, Afshar did not pose an immediate threat to the safety of the officers.  Of note, the need for the command for him to step back was only created after Crawford dropped Afshar's license.  ECF 25-5 at 03:22:47; 03:23:45.  The command was not in response to any verbal or physical threat being exhibited by Afshar.   Ex. 3 at 148:22 – 149:3.  It was also never explained to Afshar that he had to back up for safety reasons thereby suggesting his disobedience was with such knowledge.  ECF 25-5 at 03:23:45; Ex. 3 at 139:11-16.  Indeed, prior to Afshar's arrest, Butler had not encountered any issues concerning officer safety.  Ex. 3 at 98:15-24; 100:7 – 101:15.

The lack of a concern for officer safety is also affirmed by Christopher Darcy ("Darcy") in his review of the incident and his assessment of Defendants' conduct in light of standard police practices.  Specifically, Darcy notes:

> Officers displayed no apparent concern for officer safety before the issue with the dropped driver's license retrieval.  The officers' permissiveness of Afshar's actions, including unrestricted mobility with hands in pockets, entry and exit from the vehicle, and secluded conversations with a friend, alludes to a lack of any perceived threat to the officer's safety.  When they transitioned to making him back up so they could pick up the license, they created a situation where they felt they needed to protect themselves from the threat of a kick, which was unwarranted based on Afshar's previous behavior.

Ex. 7, Dec. and Reports of Christopher Darcy, Ex. B at 19.  Darcy also found that any safety concerns were based on a "false perception" created by the officers' inadequate management and insufficient control over Afshar.  Ex. 7, Ex B at 17.  Darcy notes that "[s]afety is accomplished by implementing tactics" such as contact and cover, command and control, and communication.  Ex. 7, Ex. B at 15-17.  Finally, Darcy notes that the officer's frustrations led to an unreasonable inflation of safety concerns, stating:

> During the interaction, Afshar demonstrated no signs of being physically aggressive toward the officers. Afshar's actions were annoying but not aggressive. Additionally, the officers' frustration with his inquiries led to an unreasonable inflation of safety concerns about potential physical harm, particularly regarding retrieving the dropped license.

Ex. 7, Ex. B at 18.

Third, there is a genuine issue of material fact as to whether Afshar was resisting arrest at the time of his injury and whether the level of any "resistance" justified the degree of force used by McCauley. It is undisputed that Afshar never attempted to evade arrest and in fact voluntarily went down to meet with Butler and Meadows after seeing their vehicles. Ex. 1 at 76:7-12; Ex. 2 at ¶ 6. The BWC also confirms that Afshar was never warned of the pending arrest and handcuffing at the time McCauley and Butler went "hands-on." ECF 25-5 at 03:24:15. According to Afshar he was surprised by the speed of the incident, never resisted arrest, and any movement on his part was reflexive to suddenly being grabbed. Ex. 1 at 90:5-14; Ex. 2 at ¶¶ 9,10. McCauley himself acknowledges that the forward movement of Afshar's right hand in the BWC could have been a reflexive action. Ex. 5 at 130:7-21 McCauley also acknowledges that once he re-grabbed Afshar's right hand and arm he never lost control over the right arm. Ex. 5 at 130:19 – 131:15.

Furthermore, as acknowledged by both McCauley and Butler, Afshar immediately vocalized his surrender to their authority by saying he was "sorry," "Ok, Ok," and "come on guys." These statements are consistent with Afshar's representation that he was not resisting and inconsistent with McCauley's representation that even though Afshar was verbally submitting he was somehow still actively resisting. In addition, Butler testified that as they were moving towards the car Butler had control over Afshar's left arm and that he had stopped "resisting" with his left arm. Ex. 3 at 165:17 – 166:10. Again, such testimony is consistent with Afshar's

declaration that he was not resisting as it would be inconsistent to still be "resisting" with the right arm after stopping any "resistance" with the left arm.[6]

Finally, the nature of Afshar's injury is significant and beyond simple pain or bruising. Specifically, he suffered a fracture of the right humerus which was caused by the rotational force placed on the humerus. Ex. 6, Ex. A at 3. Furthermore, warnings and less intrusive alternatives to the use of force were available. On this point, Darcy notes the following:

> Force should be the last resort, particularly when other methods could resolve the situation without the possibility of injury. A reasonably competent police officer acting consistent with standard police practices would not have perceived an immediate threat justifying force and would have used alternatives to quickly grabbing Afshar, twisting his arms behind his back, and handcuffing him. This situation allowed for the deployment of alternative tactics, an opportunity to de-escalate and gain compliance without applying force.
>
> . . .
>
> The officers failed to provide Afshar with an opportunity to comply. Further, they did not issue any force warning to Afshar that if he did not comply, force would be used against him. Officers' use of force was not reasonable, minimal, necessary or carefully controlled.
>
> From making arrests during my career, I know that officers could have secured Afshar and placed him in handcuffs without causing injury. BWC footage reveals that Afshar verbally submitted to their authority once they touched him. At the time of the injury, Afshar appeared to be submitting to their authority. BWC footage reveals Afshar saying words to the effect of "OK, OK, I'm sorry, OK, I'm sorry, OK OK guys, OK guys, I just, come on." Afshar's statements indicating submission provide objective evidence that he was then compliant with officers.
>
> Even in a situation where it is objectively reasonable to place hands on an individual, it is not necessary to cause injury to put a resistant person into handcuffs. The apprehension undoubtedly surprised Afshar, and his passive resistance reflected his surprise. In his deposition (pp 129-130), McCauley conceded that Afshar's initial actions may have been reflexive. Providing a proper warning of an impending use of force, more likely than not, would have

---

[6] Defendants assert that Afshar was "struggling so much" that he knocked off the body cams of McCauley and Butler which are made to "survive typical law enforcement encounters." ECF 25 at 7, fn 16. Defendants offer no admissible evidence for this conclusion. Furthermore, this conclusion is contradicted by the BWC of McCauley and Butler which show that their cameras were knocked off when they placed Afshar's hands behind his back, not from any excessive "struggle." ECF 25-6 at 03:24:15; ECF 25-7 at 03:24:15; ECF 25-5 at 03:24:15.

tempered Afshar's reflexive response to the officer's custody attempt.   Mere bracing or tensing of the arms is not considered active resistance.

Ex. 7, Ex. B at 29-31.

Based on the foregoing, genuine issues of material fact exist as to whether McCauley's use of force was objectively reasonable under the circumstances.

### B. Qualified Immunity

Whether qualified immunity applies requires a two-step analysis.  First, the Court should consider whether the facts, in a light most favorable to plaintiff, show that the officer's conduct violated a constitutional right.  *Saucier v. Katz*, 533 U.S. 194 (2001)(receded from on other grounds in *Pearson v. Callahan*, 555 U.S. 223 (2009).  Second, the Court must determine whether the right was so clearly established that a reasonable officer would understand that his conduct violated that right.  *Id.*  The Court has discretion to consider these two factors in any order.  *Pearson v. Callahan*, *supra.* "When there are disputed factual issues that are necessary to a qualified immunity decision, these issues must first be determined by a jury before the court can rule on qualified immunity."  *Morales v. Fry*, 873 F.3d 817, 824 (9th Cir. 2017)

In *O'Neal v. City of Pacific*, 2012 WL 529439 (Wa., 2012), qualified immunity was denied when plaintiff sustained a broken arm when the arresting officers attempted to place him in handcuffs.  In considering whether the officers' conduct violated a clearly established right, the court assessed Ninth Circuit precedent, stating:

> It was clearly established before January 2008 that "force is only justified when there is a need for force." *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 (9th Cir. 2007) (citing *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).  Indeed, the use of excessive force in effecting an arrest "was clearly proscribed by the Fourth Amendment at least as early as 1985." *Palmer v. Sanderson*, 9 F.3d 1433, 1436 (9th Cir. 1993); citing *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).  Specifically, the application of handcuffs in an abusive manner, so as to cause injury to the arrestee, was held to be excessive force in 1989. *Hansen v. Black*, 885 F.2d 642, 645 (9th Cir. 1989).  The application of handcuffs in such a way as to cause pain and bruising has also been found an unreasonable use of force. *Palmer v. Sanderson*, 9 F.3d at 1436.

> The roughness used here in handcuffing plaintiff, which resulted in a badly broken arm, was more egregious than the force found unreasonable in these cases. The officers thus had fair notice that their conduct violated clearly established law, if the force used was excessive under the circumstances.

*O'Neal v. City of Pacific*, 2012 WL 529439, *14-15  (Wa. 2012).

In *Samuell v. Cipriano*, *supra,* the court denied summary judgment based on issues of fact involving abusive handcuffing and the use of force where a suspect posed no threat to the safety of the officers or others, stating:  "Given this circuit's precedent and the circumstances of plaintiff's arrest, plaintiff has raised a triable issue of fact as to whether a reasonable officer … would have known that his conduct transgressed a constitutional boundary."  2015 U.S. Dist. LEXIS 177056 *19.  See also*, Rice v. Morehouse*, 989 F.3d 1112, 1121 (9th Cir. 2021)(it has long been established that police should know that it is objectively unreasonable to use substantial force against an unarmed man who has committed no serious offense and has been given no warning of the imminent use of a significant degree of force, poses no risk of flight, and presents no objectively reasonable threat to the safety of the officer or other individuals); *Young v. Cty of Los Angeles,* 655 F.3d 1156, 1168 (9th Cir. 2011)(well-established law put reasonable officers on "explicit and unambiguous notice" that the use of intermediate force would constitute an excessive response to a suspect's misdemeanor and disobedience of a police order).

The analysis is similar here.  There is a question of fact as to whether Plaintiff ever resisted arrest and, if so, whether such resistance had abated at the time of the force used to inflict the injury or was otherwise sufficient to warrant the use of force as demonstrated by McCauley.  Furthermore, just as in *O'Neal v. City of Pacific, supra*, Plaintiff's injury was not simply bruising but a badly broken arm.  Given these issues of fact, McCauley is not shielded by qualified immunity.

/ / /

18

### C. **Accrual of Plaintiff's § 1983 Claim**

Generally, a Fourth Amendment claim for excessive force is deemed to arise at the time of the incident. However, where a plaintiff has been convicted of underlying criminal charges, the analysis set forth by the United States Supreme Court in *Heck v. Humphrey*, 512 U.S. 477 (1994), now determines when a claim accrues. Specifically, *Heck* held that a §1983 damage suit that calls into question the lawfulness of an underlying conviction is not cognizable. 512 U.S. at 483. As such, where a prospective §1983 plaintiff has been convicted of a crime, the district court must make a threshold determination regarding whether a judgment in favor of the plaintiff in the §1983 case would "necessarily imply" the invalidity of his conviction. 512 U.S. at 487. If it would, the case does not accrue unless and until the conviction has been invalidated and therefore must be dismissed. If a judgment in favor of the Plaintiff would not imply the invalidity of the conviction, the §1983 action may proceed. *Id.*

In this case, the factual basis of Afshar's criminal conviction for obstruction was separate and apart from any allegation asserted against him for resisting arrest and therefore separate and apart from his claims of excessive force. As such, a civil judgment in favor of Afshar would not invalidate his conviction. More specifically, although Afshar was originally cited for a violation of Reno Municipal Code (RMC) § 8.06.010(b)(2) which states that a person shall not interfere with a peace officer by preventing or attempting to prevent the arrest of himself or another, as acknowledged by Defendants, Afshar's conviction was based on a violation of RMC 8.06.010(b)(1) which states that a person shall not interfere with a peace officer by obstructing or resisting. ECF 25-9; ECF 25-10, ECF 25-11. Obstructing is defined under RMC 8.06.010(a)(1) as physical impeding or delaying a peace officer during the conduct of the officer's official duties. ECF 25-10. In this case, Afshar entered a no-contest plea to a violation of RMC 8.06.010(b)(1) based on his obstruction of the investigation by failing to obey the verbal

instructions of the officers.  ECF 25-10; Ex. 2 at ¶13.  Indeed, as noted in the emails outlining the negotiations, Afshar's plea was clearly based on his delay of the investigation for failing to obey verbal commands and any issue concerning his alleged "resisting" was not being considered.  ECF 25-12.

Even if the factual basis of Afshar's conviction under RMC 8.06.010(b)(1) could somehow be interpreted as including conduct characterized as resisting arrest, the Ninth Circuit has held that a plaintiff can sue under §1983 for excessive force, if the claimed excessive force occurred before or after the conduct on which the conviction was based.  *Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005)(en banc) )(overruled in part on other grounds, *Lemos v. Cnty. of Sonoma*, 40 F.4th 1002, 1009 (9th Cir 2022).  In this case, Afshar's allegation of excessive force is after any "physical" impediment or delay caused by his failure to follow the officers' instructions.

Likewise, Afshar's claim for excessive force does not implicate the doctrine of issue preclusion as suggested by Defendants.  See, ECF 25 at 11, fn 18.  As noted in *Samuell v. Cipriano*, *supra*:

> Under Nevada law, a previously-decided issue will have a preclusive effect if that same issue was "actually and necessarily" litigated in a prior case, there was a final ruling on the merits, and there is privity between the parties.  *Arduini v. Hart*, 774 F.3d 622, 629 (9th Cir. 2014)(quoting *Alcantara v. Wal-mart Stores, Inc.*, 321 P.3d 912, 916-17 (Nev. 2014)).  In addition, the issue's "actual adjudication must be clear from the record."  *Clement v. Airport Auth. of Washoe Cnty.,* 69 F.3d 321, 330 n.9 (9th Cir. 1995).

2015 U.S. Dist. LEXIS 177056 *13.  In this case, the issue of McCauley's justification for his use of force against Afshar was never litigated nor was there a final ruling on the merits concerning this issue.  Nor was McCauley a party to any of the proceedings involving Afshar as he was only a witness for the Plaintiff, City of Reno.  ECF 25-11.

/ / /

### D.  Battery Claim

Under Nevada law the standard for common law battery by a police officer mirrors the federal civil right standard under § 1983 and liability attaches at the point the level of force use by a peace officer exceeds that which is objectively reasonable under the circumstances. *Williams v. City of Sparks*, 112 F.4th 635, 646-47 (9th Cir. 2024); *Ramirez v. City of Reno*, 925 F.Supp. 681, 691 (D.Nev. 1996).  For the reasons previously outlined above, there are genuine issues of material fact as to whether McCauley's use of force was objectively reasonable under the circumstances.

### E.  Negligence Claim

Under NRS 171.1455(1), all peace officers have an affirmative duty to "use de-escalation techniques and alternatives to the use of force whenever possible or appropriate and consistent with his or her training, including, without limitation, advisements, warnings, verbal persuasion and other tactics.  If use of force is necessary only "the level of force that is objectively reasonable under the circumstances to bring an incident or person under control and safely accomplish a lawful purpose is allowed."  NRS 171.1455(b).  The level of force must, to the extent feasible, be balanced against the level of force or resistance exhibited by the person and carefully controlled.  NRS 171.1455(b)(1) and (2).

Nevada also recognizes comparative negligence.  NRS 41.141.  As such, a plaintiff may recover damages if his negligence was not greater than the negligence of the parties to the action against whom recovery is sought.   NRS 41.141(1).  Indeed, when there are concurrent causes the trier of fact will be instructed that more than one person may be to blame for causing an injury if their negligence was a proximate cause of injury to the plaintiff.  See Nevada Jury Instructions – Civil, 2011 Edition Inst. 4NG17.  Proximate cause is defined as "any cause which, in foreseeable and continuous sequence, unbroken by any efficient intervening cause, produces

the injury complained of and without which the result would not have occurred.  It need not be the only cause, nor the last or nearest cause.  It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury."  See Nevada Jury Instructions – Civil, 2011 Edition Inst. 4NG13.  See also, *Goodrich & Pennington Mortgage Fund, Inc. v. J.R. Woolard, Inc.* 120 Nev. 777, 101 P.3d 792 (2004).  Similarly, "legal cause" is defined as a cause "which is a substantial factor in bringing about the injury, damage, loss or harm."  Nevada Jury Instructions – Civil, 2011 Edition Inst. 4NG14.  See also, *County of Clark, ex rel. University Medical Center v. Upchurch*, 114 Nev. 749, 961 P.2d 754 (1998).  Issues of comparative negligence and proximate or legal cause are issues of fact for a jury to determine. See *Campbell v. Maestro*, 116 Nev. 380, 996 P.2d 412 (2000)(comparative negligence an issue of fact); *Nehls v. Leonard*, 97 Nev. 325, 630 P.2d 258 (1981)(negligence and proximate cause are issues of fact).

In this case, as argued above, there are material issues of fact not only as to whether McCauley used a level of force that was objectively reasonable under the circumstances to bring the incident under control and safely accomplish the arrest, but also whether the negligence of Butler and Crawford contributed to McCauley's negligence.

For example, issues of fact exist as to whether Butler and Crawford acted consistent with typical and standard police practices concerning de-escalation, the principles of contact and cover, and command and control measures.[7]  Ex. 7, Ex. B at 12-26.  As noted by Darcy in his expert report:  "During the encounter, the officers' inadequate management and insufficient control over Afshar supports the false perception of safety concerns.  The poor implementation

---

[7] These claims of negligence also apply to McCauley as does the violation of NRS 171.123. However, because of the issues of fact discussed which are associated with McCauley's use of force, the discussion of these additional issues are focused on Butler and Crawford.

of command and control strategies precipitated an environment in which unnecessary force was eventually employed, culminating in the harm to Afshar." Ex. 7, Ex. B at 17-18.

Specific to Butler, he created a false narrative by deferring questions from Afshar and telling him that he would have to ask the questions to Crawford because she was the investigating officer.    Ex. 7, Ex. B at 23; ECF 25-7 at 02:33:27 – 02:38:00; 02:55:18 - 02:55:37; 03:01:30 – 03:02:03; Ex. 3 at 122:3-25.   At the same time, Butler was conveying information to McCauley and Crawford suggesting Afshar was being "uncooperative" and "agitated" and that he was intoxicated to the point he would likely not qualify for a citation. ECF 25-7 at 02:46:30 – 02:48:03; 02:59:30 – 02:59:41.  This is despite the fact that Afshar had been sitting or standing quietly for over ten minutes.  ECF 25-7 at 02:38:00 – 02:48:26.  Butler's subsequent representation that Afshar was intoxicated and likely would not qualify for a citation also served as fuel for McCauley and Crawford's unsubstantiated belief that the accident was caused because Afshar was DUI even though no DUI investigation was ever even contemplated. An issue of fact exists as to whether Crawford, and McCauley in particular, were motivated by the fact that they were upset that they did not have sufficient probable cause to arrest Afshar for a DUI charge.  Ex. 7, Ex. B at 27.  This is supported by Crawford's desire to arrest Afshar after her first encounter with him although there was no legal basis to do so.  ECF 25-6 at 3:05:40 – 3:05:43; ECF 25-5 at 03:05:42.  Butler's influence is also seen in McCauley's apparent ongoing agitation and anger that Afshar had "beat his DUI."  ECF 25-6 at 03:05:45; ECF 25-6 at 3:12:19.

Because of Butler's representations, both McCauley and Crawford testified that they believed Afshar would be uncooperative, agitated and intoxicated when they were preparing to speak with him even though afterwards, they both agreed Afshar was talking and acting fine and qualified for a citation.  Ex. 4 at 47:9 – 49:23; 50:18 – 51:3; Ex. 5 at 82:3-16; 83:24 – 84:15;

ECF 25-6 at 03:05:23 – 03:05:49.  Nevertheless, their respective animosity towards Afshar continued.  ECF 25-6 at 3:07:20 – 3:07:27; 3:12:19; Ex. 5 at 98:16-25.  According to Darcy:

> The incongruent communication between Butler, McCauley, and Crawford laid the foundation for escalating tensions during Crawford and Afshar's interactions.  The false narrative created tension and conflict throughout the encounter.  Crawford perceived Afshar as difficult and uncooperative.  Conversely, given his interactions with officers, Afshar assumed Crawford could and would address all of his inquiries.  When Afshar asked questions, Crawford was dismissive, which caused Afshar to become frustrated.  Afshar candidly admitted during his deposition that he "misbehaved" (Afshar Deposition, p. 120) with officers.

Ex. 7, Ex. B at 26.

Furthermore, during the "second encounter," rather than attempt to deescalate the encounter Butler argues with Afshar as to the sufficiency of his prior interaction with Crawford.  ECF 25-5 at 03:21:30 – 03:25:00.  Nor does Butler provide any warning of the potential for arrest and use of force or other de-escalation tactics such as advising Afshar of the need to step back despite knowing that Afshar suffered from anxiety and left the scene due to a panic attack.  *Id;* ECF 25-7 at 02:15:40 – 02:17:20.  Finally, Butler violated NRS 171.123 commonly known as the "60-minute rule" for detention.  As noted by Darcy, this unlawful detention provided the opportunity and thus contributed to the use of force resulting in the injury to Afshar.  Ex. 7, Ex. A at 16-18.

Crawford's negligence also contributed to the escalation of tensions leading to the use of force.  It is undisputed that Crawford was the investigating officer and in charge during the second encounter with Afshar.  Ex. 4 at 63:3-23.  In this role, she also failed to act consistent with typical and standard police practices concerning de-escalation, the principles of contact and cover, and command and control measures.  Ex. 7, Ex. B at 12-26.  Specifically, she did not position Afshar or otherwise use a vehicle to create a barrier and a workspace. As noted by Darcy:

24

Instead of positioning Afshar in front of a police vehicle, creating a barrier and a workspace, Crawford positioned herself, by standing in front of Afshar in the parking lot without a proper workspace or barrier. During the interaction, Crawford attempted to simultaneously manage the paperwork, input additional information (phone number), and employ her cell phone while conversing with Afshar. Despite asking him twice if he had any questions, Crawford's responses lacked respect, and Crawford failed to address his concerns about providing his version of events during the investigation. Crawford eventually lost her temper with Afshar.

Ex. 7, Ex. B at 16. Crawford also failed to employ de-escalating techniques or warnings of potential use of force. ECF 25-5 at 03:21:30 – 03:25:00. Instead, she employed a hand gesture to quell Afshar's questions while addressing him informally and unprofessionally several times as "dude" which contributed to the devolving situation. *Id;* Ex. 7, Ex. B at 17. As well, the ambiguity created by Crawford instructing Afshar to step back following her prior communication that he could retrieve the license after the officers' departure fostered confusion and contributed to Afshar's hesitance to comply. Ex. 7, Ex. B at 18. A reasonably competent officer acting consistent with typical and standard police practices would have issued Afshar the citation and ended the contact. Ex. 7, Ex. B at 20. Crawford's comments only served to escalate and prolong the encounter which could have been avoided had she simply handed Afshar the citation thereby finalizing the interaction. Ex. 7, Ex. B at 27. Finally, Crawford also violated NRS 171.123 which contributed to the circumstances where the use of force became necessary. Ex. 7, Ex. A at 16-18.

## F. Vicarious Liability of the City of Reno

Afshar named the City of Reno as a defendant based on the principle of vicarious liability. It is undisputed that Butler, Crawford and McCauley are employees of the City of Reno and were acting within the scope of their employment at the time of their encounter with Afshar. The general rule of vicarious liability is that an employer is liable for the negligence of its employees. See *Oehler v. Humana, Inc.*, 105 Nev. 348, 775 P.2d 1271 (1989). Furthermore, an

employer is responsible for the intentional conduct of its employees when it was reasonably foreseeable considering the nature and scope of employment.  NRS 41.745; *Anderson v. Mandalay Corp.*, 131 Nev. 825, 358 P.3d 242 (2015).  Whether the facts and circumstances of a case show the tortious conduct was foreseeable is a question of fact for the jury.  *Id.*

## IV.    CONCLUSION

Based on the foregoing, genuine issues of material fact exist as to whether McCauley's use of force against Afshar was objectively reasonable under the circumstances.  Since the same standard applies for all the claims asserted against McCauley, those being a violation of 42 U.S.C. § 1983, state law battery, and state law negligence, McCauley's request for summary judgment as to each of these claims should be denied.  Furthermore, there are genuine issues of material facts as to whether the negligence of Butler and Crawford contributed to McCauley's negligence and were a proximate/legal cause of Afshar's injuries.  As such, Butler and Crawford's request for summary judgment on the negligence claim asserted against them should also be denied.  For similar reasons, a grant of summary judgment in favor of the City of Reno on the claims of battery and negligence should be denied.  Accordingly, with the exception of the §1983 and battery claims filed against Butler which Afshar concedes are not supported by sufficient evidence,  Afshar requests the Motion for Summary Judgment be denied.

Dated this 21st day of July, 2025.

BY:___/S/ KENNETH E. LYON, III_____

**KENNETH E. LYON, III**
Nevada Bar No. 7071
**LAW OFFICES OF KENNETH E. LYON, III**
333 Flint Street
Reno, Nevada 89501
Telephone: 775.786.4188
Facsimile: 775.786.5573
Email:  ken@lyonlaw.net

*Attorney for Plaintiff*

26

**CERTIFICATE OF SERVICE**

Pursuant to FRCP 5(b), I certify that I am an employee of the LAW OFFICES OF KENNETH E. LYON, III, and that on this date, I am serving the foregoing documents(s) on the party(s) set forth below by:

\_\_\_\_\_    Placing an original or true copy thereof in a sealed envelope placed for collecting and mailing in the United States mail, at Reno, Nevada, postage prepaid, following ordinary business practices.

\_\_\_\_\_    Facsimile.

_X__    CM/ECF electronic service

\_\_\_\_\_    Messenger Service.

\_\_\_\_\_    E-Filing.

Addressed as follows:

Mark A. Hughs, Deputy City Attorney
Po Box 1900
Reno, NV 89505

*Attorney for Jeffrey Butler, Patrick Mcauley,
Shelby Crawford and the City of Reno*

Dated this 21st day of July 2025.

*/s/ Crystal Stevenson*
Crystal Stevenson

27

## <u>EXHIBIT LIST</u>

| Exh. No. | Description | Pages |
|---|---|---|
| 1 | Afshar's Deposition | 30 |
| 2 | Afshar's Declaration | 6 |
| 3 | Butler's Deposition | 30 |
| 4 | Crawford's Deposition | 21 |
| 5 | McCauley's Deposition | 33 |
| 6 | Declaration and Report of Dr. Younger | 22 |
| 7 | Declaration and Reports of Christopher Darcy | 81 |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |