# EXHIBIT 3

## Butler's Deposition

# EXHIBIT 3

## Butler's Deposition

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

---oOo---

MOHAMMADALI AFSHAR,                    )
                                       )
            Plaintiff,                 )
                                       )
    vs.                                ) #3:24-cv-00110-MMD-CLB
                                       )
JEFFREY BUTLER, PATRICK                )
McCAULEY, SHELBY CRAWFORD,             )
THE CITY OF RENO, a political          )
subdivision of State of               )
Nevada, and DOES I-X,                  )
inclusive,                             )
                                       )
            Defendants.                )
_____)

DEPOSITION OF JEFFREY RYAN BUTLER

10/07/2024

Reno, Nevada

REPORTED BY:                JOHN MOLEZZO
                            NV CCR #267, CA CSR #7791

JOB LVR 6883830

Page 1

APPEARANCES OF COUNSEL:

For the Plaintiff:          LAW OFFICES
                            Attorneys at Law
                            By: Kenneth E. Lyon, III, Esq.
                                Kay Lyon, Esq.
                            432 Court Street
                            Reno, Nevada 89501


For the Defendant:          RENO CITY ATTORNEY'S OFFICE
                            Attorneys at Law
                            By: Mark Hughs, Esq.
                            One East First Street
                            P.O. Box 1900
                            Reno, Nevada 89501

Page 2

You had never worked with her prior to this event involving Mr. Afshar?

A    She was in training with Officer McCauley, so I have been on other calls for service with her while she was in training.                                    10:36AM

Q    Can you give me an estimate of how many calls you may have encountered with Officer Crawford?

A    Not a good one.  I don't remember what phase of training she was, so she may have been with us for a couple of weeks by then.  So a handful of calls for          10:36AM service.

Q    Okay.

A    Sorry, I --

Q    That's okay.

A    Just a rough --                                        10:36AM

Q    How about Officer Meadows?

A    Yes, I've worked with him before.

Q    Okay.  Have you worked with him or do you -- are you friends with him outside of the workforce as well, similar to Officer McCauley?                              10:36AM

A    No, sir.

Q    When you arrived on scene then what was your responsibilities?

A    I just started investigating a hit-and-run accident.                                                    10:37AM

Page 66

Q    Was there anybody that was assigned to be in charge or in supervising the investigation?

A    It was -- Officer Crawford took over that lead.

Q    How did that come about?

A    Officer McCauley had her in a training    10:37AM
environment, so they took the call for training purposes to start working it.

Q    If she had not been there, would it have been Officer McCauley's responsibility to investigate and lead the investigation?    10:37AM

A    It would've been either his or I's, we kind of split it up depending on who was -- (inaudible) -- on paper.

Q    Okay.  How was that determined?

THE REPORTER:  Wait.  You split it up depending what?

THE WITNESS:  Depending on who was down reports or what not.

BY MR. LYON:

Q    What do you mean by that?    10:37AM

A    So if I had three reports and he had no reports, he would have likely taken the case.  If it was vice versa, I would have likely taken the case just to kind of spread the workload.

Q    When you say "down on reports," meaning the    10:38AM

number of reports that you had to log in to Tiburon for your shift or --

A     Yes, sir.

Q     Okay.  All right.  And was Officer McCauley, was he a sergeant at that time?                                    10:38AM

A     No, sir.

Q     He was just an officer?

A     Yes, sir.

Q     Did he have more seniority than you did?

A     Yes, sir.                                                10:38AM

Q     So it sounds like seniority doesn't play a role in determining who is going to be -- take the lead on any particular investigation?

A     No.  We have beats and typically you handle your assigned beat district area, some of them kind of              10:38AM overlap.

Q     Okay.  And so it's just really at the discretion of the responding officers as to who is going to be -- take the lead in the investigation?

A     Yes, sir.                                                10:39AM

Q     Okay.  And that would be true in factoring in Officer Meadows into the equation?

A     Yes.

Q     Okay.  Out of -- so as far as seniority goes, was Officer McCauley, was he more -- had more seniority   10:39AM

Page 68

than Officer Meadows or vice versa?

A    Officer McCauley is the most senior officer.

Q    How about between Officer Meadows and yourself?

A    I believe Officer Meadows was one academy ahead of me.                                                    10:39AM

Q    Okay.  And it sounds like obviously Officer Crawford had just -- was just beginning, so she had the least seniority?

A    Yes, sir.

Q    Were there any other officers that responded to    10:39AM this scene that you recall?

A    Not that I can recall.  I mean, sometimes an officer will get -- (inaudible) -- and preempted before they get on scene.

        THE REPORTER:  Whoa.  Sometimes an officer what?    10:40AM

        THE WITNESS:  Sometimes they'll get preempted, so they get dispatched to the call, they clear it before even arriving on scene and respond to a secondary call.

BY MR. LYON:

Q    Because I haven't seen any other reports or body    10:40AM cam, I just want to make sure that my understanding of who was involved with the incident involving Mr. Afshar is complete.  So your understanding is McCauley, officer -- Officers McCauley, Meadows, yourself and Crawford were the four responding officers to the incident involving    10:40AM

Page 69

Mr. Afshar?

A    Yes, sir.

Q    And then at some point in time, Officer McCauley put Officer Crawford in charge of the investigation?

A    Yes, sir.                                      10:40AM

Q    And what does that mean, in charge of the investigation?  So if he had put you in charge, just kind of walk me through what the understanding -- what your understanding is of the responsibilities that come with that designation?                                     10:41AM

A    Essentially you're the main case agent, so for me if I was in charge of that, I would have went back to the two victim vehicles that were struck, got their statements, their information, got whatever I could of on that scene and would have come back, started the     10:41AM investigation with Mr. Afshar and then made my determinations on what we were doing from there as the case agent.

Q    I assume you've acted in that role on incidents prior to this involving Mr. Afshar, I assume you've acted  10:41AM as an investigating officer?

A    Yes, sir.

Q    Okay.  When you're in that role, do you get input from the other officers as to what they may have observed or what they may have investigated?  Do you take  10:42AM

Page 70

argue with you about your conclusions?

A    Yes.

Q    In fact you received training on how to deal with people who are argumentive?

A    Yes, sir.                                          11:29AM

Q    And just walk me through what that training encompasses?

A    We tried to be patient, we tried to talk him through it, I tried to explain the situation, which I did to Mr. Afshar for quite sometime, explaining -- trying to    11:29AM explain the situation while he continued to argue with me about multiple things, but we do our best to verbally explain it to him, a lot of times they don't like our explanations.

Q    Would you say he was very agitated that entire    11:29AM time that you were with him?

A    There were a few periods he was not agitated. But the majority of the time I was in contact with him, he was, I would say agitated, yes.

Q    His agitation did not include any verbal threats    11:29AM of harm to you or other officers, fair statement?

A    Yes.

Q    Did not -- he did not engage in any physical threats to you or any other officer, correct?

A    Not until resisting.                              11:30AM

Veritext Legal Solutions
Calendar-NV@veritext.com 702-314-7200

A    Yes, sir.

Q    When did that transition take place?

A    When he was asking if he was -- I don't remember his exact words, but when he was asking if he could go back up to his apartment, I told him no, we physically    11:31AM told him he was detained at that point.

Q    During the encounter, whether it was under the consensual part or the detention part, did you ever pat him down for weapons?

A    No, sir.    11:32AM

Q    Is that because you never felt the need to pat him town for weapons?

A    Correct.

Q    Because he never offered any sort of physical or verbal threat to you or the other officers?    11:32AM

A    Among other things, yes.

Q    What are the other things?

A    I didn't see like a bulge in his pocket, anything like that, concealed weapons, things like that, he didn't initially have his jacket on, he got that from    11:32AM his car --

Q    In --

A    -- just some observations.

Q    In fact in looking at the body cam, it looks like he was free to go in and out of the car?    11:32AM

Page 100

A    Yeah.  We allowed him to go in and out of the car, but we were triangulated on him, watching what he was grabbing from the vehicle.

Q    Sure.  He was able to grab his coat, put his coat on?                                        11:32AM

A    Yes, sir.

Q    I think at one point in time he got out like it looked like some seltzer water or something like that that he was drinking while you were all waiting for officers Crawford and McCauley to come back to that    11:32AM location?

A    Yes, sir.

Q    During this time, never felt there was any issues of officer safety?

A    No, sir.                                        11:33AM

Q    Now, your report really doesn't go through -- it doesn't go through kind of the narrative of that period of detention as to what there may have been -- what he may have been doing, may not have been doing.  Was that because you were relying on body cam for kind of the blow    11:33AM by blow, so to speak as to what was going on at that time?

A    Yes, sir.

Q    Because your report talks about you informed him that he would be receiving a traffic citation for the hit    11:33AM

Page 101

information that may need to be important for an investigating officer, in your training and experience is it -- before a citation is actually issued, would the investigating officer want to get all information, not only from the defendant, but the other officers that may have been with the defendant?    12:00PM

A    Depending on the circumstances.

Q    Okay.  Is that judgment call -- is that with the investigating officer?

A    Yes.    12:01PM

Q    Do you also have some discretion with that, if you felt that there was information she needed to know one way or the other, did you have the ability to go talk to her and provide that information?

A    Yes.    12:01PM

Q    Do you recall doing that, other than on I guess in person rather than on the phone, I know you provided information on the phone --

A    Not in person.  I figured that was relayed by Officer Meadows when he met with them on scene.    12:01PM

Q    And what's your understanding of when the 60 minutes expires, what needs to happen?

A    The citation issued and/or an arrest.

Q    And what happens if neither of those occur?

A    Then we kick them loose.  We release them.    12:01PM

Page 122

just let me know.  If there's any part that's probably going to need to be played, it's going to be at this point forward.

At one point, Officer Crawford does I guess before this -- Officer Crawford asks if Mr. Afshar has            12:22PM any questions, and he makes some sort of statement because he knows it's being captured on the body cam.

Do you recall that part?

A     Some part of that.  I don't remember exactly what was said or anything like that.            12:22PM

Q     Okay.  Was it explained to Mr. Afshar why he needed to back up?

A     I don't believe so.

Q     Why not?

A     We didn't have to give him a reason necessarily,            12:22PM we just needed him to back up for safety reasons.

Q     Okay.  But you talked about de-escalation, and part of de-escalation is informing an individual of, you know, facts and circumstances why you would be asking something, doing something, why not tell him, you know,            12:23PM "We're worried that you're going to do" -- you know, "you're too close to Officer Crawford, take a step back." Why not offer that --

MR. HUGHS:  Are you asking him to speculate now as to what he was thinking two years ago or --            12:23PM

Page 139

A    I didn't deem it relevant at that point in time. We needed him further back and we gave him a definitive location because that half step wasn't further back and he was given several more commands that he didn't obey after that one.    12:24PM

Q    And then at some point in time, there became a decision to -- a signal from Officer McCauley O and R.

Do you recall seeing that on body cam?

A    I do.

Q    Do you have an independent recollection of the    12:25PM events that transpired once Officer McCauley did O and R?

A    Yes, sir.

Q    What I'd like to do is just go off of your recollection first and if you don't have a clear recollection, we can go to the video.  But I want to get    12:25PM a sense of what you remember at this point in time. Okay?

I assume Officer McCauley had the authority to make the determination that Mr. Afshar was obstructing and resisting, correct?    12:25PM

A    Correct.

Q    And that's what O and R means, obstructing and resisting?

A    Yes, sir.

Q    At that point in time, was -- in your assessment    12:25PM

Page 141

was Mr. Afshar obstructing?

A    Yes.

Q    How so?

A    He was not following the commands to move back so we could pick up the license and issue him a citation.    12:26PM
He was prolonging our investigation obstructing us from completing it.

Q    Was he resisting?

A    He was obstructing it at that point.  Resisting comes later.    12:26PM

Q    Okay.  So up until that point, it was just the obstructing, correct?

A    Correct.

Q    And so when Officer McCauley does the verbal command O and R, that's just law enforcement language you    12:26PM for obstructing and resisting, correct?

A    Correct.

Q    Doesn't mean that resisting is taking place at that time?

A    Not necessarily.    12:26PM

Q    Well, in this case, had there been any resisting before you guys went hands on with him?

A    Well, in the terms of resisting, I mean, he was resisting the commands to move backwards.  If you want to go as that for the resisting, but he was obstructing our    12:27PM

Page 142

A    Because they're under arrest at that point.

Q    Okay.  Did you or any of the other officers tell Mr. Afshar that he was under arrest?

A    Not at that point in time.

Q    Why not?                                          12:33PM

A    Because in the moment of taking somebody into custody, we don't always tell them that they're getting taken into custody.  It's the most dangerous part of our job, is that moment you take them into custody.

Q    Okay.  Well, did you feel like that was a        12:33PM dangerous part of the encounter with Mr. Afshar?

A    Yeah.

Q    Why?

A    Because any time somebody fights us or resists us, as soon as we go hands on or touch them, that's     12:34PM usually when the fight occurs.  It's not the time I'm going to try to talk and explain things.  I'll explain things after the fact, like I did to Mr. Afshar.  Sorry if I mispronounced it.  But that's the most dangerous time, we're going to get him into custody and get him       12:34PM detained before we start explaining things at that point.

Q    Okay.  He had made no verbal threats up to that point in time, correct?

A    Correct.

Q    No physical threats up to that point in time?     12:34PM

Page 148

A    Correct.

Q    Had just refused the commands to step back?

A    Correct.

Q    And actually complied at least partially with one of those commands, correct?                    12:34PM

A    Partially with one maybe.

Q    Okay.  And I guess the question I have is why not just say, "Okay, we've had enough, you're under arrest, put your hands behind your back."

Why not approach the arrest in a verbal fashion   12:34PM rather than going hands on?

A    We have been on scene with him for quite some time at that point, we had been trying to communicate with him, everything we communicated was in some sort of rebuttal or argumentive point, I had no reason to believe   12:35PM that trying to discuss it further was not going to end in further arguing and stuff like that, so we believed it was safer for everybody on scene to take him into custody at that point.

Q    When you say we believe, this is --         12:35PM

A    I'm assuming --

Q    -- this is a split second decision, I understand?

A    Yes.

Q    And I assume you can only speak for yourself as   12:35PM

Page 149

far as what was going through your mind at that particular moment in time, true?

A    True.

Q    I understand you may have talked with the officers after the fact --                                    12:35PM

Do we need to take a break, John?

THE REPORTER:  Finish your question.  I'm just concentrating on keeping up with ya'll.

BY MR. LYON:

Q    Up to that point, okay.  So you felt he would          12:36PM not have complied with that order to -- you know, if he was advised he was under arrest, you thought he would not accept that?

A    Not after he had refused all the verbal commands to back up, no, I did not believe he would.                12:36PM

Q    Okay.  But you never gave him the opportunity?

A    I did not, no.

Q    Is that a common practice to just go hands on on a defendant without giving them a warning of arrest?

A    It depends on the circumstances, but, yes, I've          12:36PM done that numerous times.

Q    And I have used the term "hands on," I think you understand what that means, but for the record can you -- what do you understand that terminology to mean?

A    Physically touching another individual.                 12:36PM

Page 150

Q      All right.  This may be a good point to take a break.

(Recess.)

BY MR. LYON:

Q      All right.  When we had left off, we were    12:47PM
talking about the terms hands on, that's basically when you make physical contact with the defendant or a subject, correct?

A      Correct.

Q      And in this situation with Mr. Afshar, it was    12:47PM
Officer McCauley's decision to go hands on or did you play a role in that decision-making, as well?

A      As soon as he said he was going O and R, he was arresting, so I was going to assist in the arrest.

Q      So it sounds like if I'm understanding you    12:48PM
correctly, there were a lot of decisions, at least in my assessment, that were being made, there was a decision regarding the citation, correct?

A      Correct.

Q      That was Officer Crawford's decision?    12:48PM

A      Crawford and McCauley, yes.

Q      Crawford and McCauley.  The decision whether he qualified for the citation, we discussed that, correct?

A      Correct.

Q      And then there's the decision to -- is it a    12:48PM

Page 151

instances.

Q    How about the timing of when you put on handcuffs?  It seems like, and we'll play the video in a minute, but it was pretty apparent that it was -- the attempt to put handcuffs on Mr. Afshar was immediate.    12:54PM

Is that a fair statement?

A    Yes.

Q    Okay.  Why that decision?

A    Because he was under arrest, he goes in handcuffs, fairly --    12:54PM

Q    Immediately?

A    Yes.

Q    Now, you wouldn't expect him to understand what O and R means, would you?

A    No.    12:54PM

Q    Was there any attempt to communicate with Mr. Afshar as to why you guys went hands on with him?

A    Yes.

Q    In what way?

A    After he was detained and in handcuffs, while we were waiting on paramedics, I explained to him why we were in the situation we were in.    12:55PM

Q    How about before you went hands on, was there any attempt to communicate with him or as you were going hands on to let him understand what was happening?    12:55PM

Page 156

A    No.

Q    Why not?

A    Again, it's for safety reasons, if someone is going to choose to fight after they've been argumentive with us, if they're aware that we're arresting them, that's their kind of fight or flight response, it's the most dangerous part for us, so if we can avoid that portion, we will.    12:55PM

Q    You grab Mr. Afshar's left hand?

A    Yes, sir.    12:55PM

Q    And you, I think in your report you used the term rear wrist lock?

A    Yes, sir.

Q    Can you just explain what that is?

A    I'll do my best to explain.  It's usually easier to demonstrate.    12:56PM

Q    And I will have you demonstrate and I'll try to put on the record as best we can, but yeah, I would like both kind of a verbal explanation and then a demonstration.    12:56PM

A    Normally I'll grab someone's arm, it's in POA, it's usually two overhand grips, or an underhand/overhand --

THE REPORTER:  Whoa.

THE WITNESS:  Sorry.    12:56PM

Page 157

THE REPORTER:  A little slower.

BY MR. LYON:

Q    What is POA?

A    Position of advantage.  Then I take, since I was on his left arm side, trying to bring his arm back behind him, I'm usually grabbing biceps, elbow area because I bring that arm up and get it in a position to where we can facilitate handcuffing.    12:56PM

Q    If you were on the right side, it would be the same technique, same, it would just be from the right side rather than the left?    12:56PM

A    Yeah, it would be reversed, obviously, so I'd had my -- if I was on the right side, it would be my left arm, my right arm near his wrist, and my left arm would slide down near the biceps as I fold the arm back and into the wrist lock for handcuffing behind the back.    12:57PM

Q    And so you're demonstrating both hands, so you use both hands, one grabs the elbow biceps area, and the other hand would grab the wrist area of the defendant?

A    Typically, yeah, in a perfect world that is how it would work, obviously when people are resisting and stuff, hands slide around.    12:57PM

Q    And the purpose of this technique is both to control the defendant?

A    Is to control and facilitate handcuffing.    12:57PM

Page 158

hours of the morning.

Q    Again body cam would capture and call records and other things would capture the more accurate time of the event, true?

A    True.                                                                01:01PM

Q    So your report says again, "Refused commands, at which point Officer McCauley and I went to arrest for obstructing and resisting, as well as the traffic violations."

So I just had a question about that, was that --    01:02PM he was being arrested on the traffic violations at that time, as well?

A    Yes, he was being arrested on the O and R, the citation would turn into the charges and be accompanied on the PC.                                                             01:02PM

Q    You grabbed defendant's left arm, Officer McCauley grabbed his right arm, again similar to what you described earlier, correct?

A    Correct.

Q    Now, your report says that, "Defendant       01:02PM immediately pulled away from Officer McCauley trying to free his arms."

Did you see that occur within the video?

A    Yeah, you can see when I grab him, he leans forward, it's hard to see in the video, but I could feel    01:02PM

Veritext Legal Solutions
Calendar-NV@veritext.com 702-314-7200

him tensing up and trying to pull his arms away from us as we had him in the POA attempting to go to rear wrist locks.

Q    Is that common in your experience that you feel that tension?                                                    01:03PM

A    Not unless somebody is resisting.  Usually they just -- their hands go behind their back, we handcuff them, that's the end of it.

Q    Even without warning?

A    Yes, without warning usually people don't -- in    01:03PM my experience I don't have a ton of resistance once I go hands on usually.

Q    And it's your testimony that he was resisting?

A    Yes, sir.

Q    You hear him in the video say fairly quickly,    01:03PM "I'm sorry."

Do you recall him saying that he was sorry very soon after you go hand on?

A    Yes, sir.

Q    And then he's saying, "Okay, okay, okay."    01:03PM

You heard that on the video?

A    Yes, sir.

Q    Neither of -- none of his statements are in your written report, and I guess the question is why?

A    At the time I didn't deem them relevant,    01:04PM

Page 162

apologizing for not following commands or anything like that. I thought the fact that he hadn't followed commands was going to be captured on body cam.

Q   Well, obviously if he's saying I'm sorry, that's a sign of contrition at that point, would you agree?    01:04PM

A   I don't understand that word.

Q   A sign that he's submitting to your authority?

A   Yes, sir.

Q   Okay. And by saying "Okay, okay, okay," was that -- would you -- is that a verbal submission to your    01:04PM authority, as well?

A   Verbal, yes.

Q   But it's your testimony that he was physically resisting, even though he was verbally submitting to your authority?    01:04PM

A   A lot happens there in those two minutes when I first grab him, he is resisting, he is pulling away. Right here where I have his arms behind his back and he starts saying, "I'm sorry, I'm sorry, I'm sorry."

The physical resistance has stopped at that    01:05PM point because we're placing handcuffs on him.

Q   Did the physical resistance stop by the time he had made contact with the car?

A   It was -- it's hard to say a definitive point, as we were turning him towards the car, he was still kind    01:05PM

Page 163

Officer Crawford that took the handcuffs out.

Q    Okay.

A    I'm not a hundred percent on that, but that's what it appears.

Q    Did she actually place the handcuffs on    01:06PM
Mr. Afshar or was that a joint effort by all three of you?  How did that come about?

A    Kind of a joint effort, like I kept control of the let arm, Officer McCauley had the right arm, and then we made sure there was spaces there putting the handcuffs    01:07PM
on.  I don't remember who exactly placed the handcuffs.

Q    And it sounds like, I'll just represent, I don't know if it shows up on this portion, but it sounds like handcuffs fell to the ground, do you know if your handcuffs fell to the ground at any time?    01:07PM

A    I don't remember.

Q    When do you -- do you feel you have control over Mr. Afshar before he made contact with the car?

A    We were gaining control, he was in the process of moving towards that car and then his left arm, he    01:08PM
stopped resisting me with his left arm and it went behind his back.  I can't speak for Officer McCauley or what control he had.  I had control of an arm, his left arm.

Q    And I appreciate that distinction.  I'm just asking from your perspective, your -- you know your    01:08PM

Page 165

experience with him when you felt you had control of
Mr. Afshar's left arm then?

A    Yeah.

Q    So that would have been before he made contact
with the car?                                           01:08PM

A    Yeah.  It was right in that -- as soon as you
see me get his left arm behind his back, that's when I
would say that I felt I had control of him.

Q    But the handcuffs were not on at that point?

A    Not yet.                                           01:08PM

Q    Okay.  Because at the end of that paragraph on
your report, you said, "At this point we were able to
safely place handcuffs on the defendant."

And given the claim of injury, you're use of the
word safely place handcuffs, I guess what did -- when you    01:09PM
wrote that, what did you mean by that?

A    Safely for officers, so hands are typically
behind the back when we handcuff and you're typically not
going to throw a handcuff on an outstretched arm or
anything like that.  We lose control of that arm and    01:09PM
turns into a weapon that can be used to hit myself or
other officers on the scene.

Q    When you use the word safely, it's in context of
you and officers McCauley and Crawford?

A    To the best of our ability, typically the        01:09PM

Page 166

A    Five-foot 11 roughly.

Q    And how much do you weigh?

A    Right now I'm 245, 250.

Q    And any estimation of Officer McCauley's height and weight?                                                    01:12PM

A    He's taller than me.  I have no idea of his weight.

Q    How about Officer Crawford?

A    Smaller than me and a lot less weight wise.

Q    Did Officer McCauley -- I'm sorry.                01:12PM

Officer Crawford, did she go hands on, as well?

A    I don't remember off the top of my head, I believe she might have assisted in the handcuffing, but I don't -- I couldn't tell you for sure.  I believe she did help with the handcuffing at some point.                          01:13PM

Q    Okay.  And I'll represent I know in some of the body cam Officer McCauley reports that he felt or heard a pop with Mr. Afshar's right arm, did you hear any pop or did you hear anything that would suggest injury from your perspective?                                                      01:13PM

A    Not from my perspective.  I only had the left arm, granted, I didn't feel anything abnormal in the left arm when I put it in the rear wrist lock, but that was when Officer McCauley had denoted.

Q    And we heard on the video Mr. Afshar yell out,     01:14PM

Page 169

parking lot which seems to be where the location was chosen to serve the citation.

Would you agree with that representation?

A    Yes, sir.

Q    Okay.  Is there any training that you go through    01:17PM
when serving a citation as to, you know, the location of where that should occur or is it just really a case-by-case basis?

A    It's more of a case-by-case basis.  Usually the citation is going to be served where we contact that    01:17PM
specific subject, we don't typically transport people around for citation purposes.

Q    And generally the citation is served by handing a copy to the defendant?

A    Correct.    01:17PM

Q    And if I'm understanding you, it just never got to that point because of the arrest that we saw on the video?

A    Yes, sir.

Q    And it was Officer Crawford that was going to be    01:17PM
serving the citation?

A    Correct.

Q    Was Mr. Afshar ever warned that he would be charged with obstructing if he did not comply with the orders?    01:18PM

Page 172

A    I don't believe so.

Q    Why not?

A    We typically don't -- it's hard -- I didn't necessarily know we were going the obstructing route initially.  I can't perceive every crime that's going to     01:18PM happen on scene.  It would be in my opinion impossible to warn everybody about what crimes they could have charged based on any given scenario.

Q    But in this case, as we've talked about, there were multiple requests to step back, correct?     01:19PM

A    Correct.

Q    And obviously Mr. Afshar had his explanation as to why he felt he did not need to comply with those commands.  There was an opportunity at least to be able to say, "Listen, if you don't comply, you're going to be     01:19PM arrested for obstructing."

Could have said something like that?

A    There was the opportunity, yeah.

Q    Okay.  Just as if -- as there was the opportunity to say once the decision to go O and R, that     01:19PM he was obstructing, there was the opportunity to say, "You are now under arrest, put your hands behind your back."

There was an opportunity there to take that course of action?     01:19PM

Page 173