# EXHIBIT 4

Crawford's Deposition

# EXHIBIT 4

Crawford's Deposition

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

--oOo--

MOHAMMADALI AFSHAR,

Plaintiff,                  )

                            : No. 3:24 CV 00100 MMD
      -vs-                  ) CLB

                            :

JEFFREY BUTLER, PATRICK     )

McCAULEY, SHELBY CRAWFORD,  :

THE CITY OF RENO, a         )

political subdivison of the :

State of Nevada, et al.,    )

                            :

            Defendants.     )

DEPOSITION OF

SHELBY RAE CRAWFORD

December 18, 2024

Reno, Nevada

Reported by:      Karen Bryson

                  Certified Court Reporter #120

                  Nevada Firm Lic #053F

Page 1

APPEARANCES


For the Plaintiff:

LAW OFFICES OF KENNETH E. LYON III
Attorneys at Law
By:   KENNETH E. LYON III
333 Flint Street
Reno, Nevada 89501


For the Defendants:

MARK A. HUGHS
Reno Deputy City Attorney
One East First Street, Third Floor
P.O. Box 1900
Reno, Nevada 89505


Also Present:

KATHERINE LYON, ESQ.

Page 2

A    December 7th.

Q    December 7th?

A    Uh-huh.

Q    Okay.  When I deposed Officers McCauley and Butler they talked about phases of training, that when someone comes out of the academy, they're usually in a training phase, and there's phase A, B, C, and D.

Is that familiar to you?

A    Yes, sir.

Q    Were you in a training phase at the time of the incident involving Mr. Afshar on March 16th, 2022?

A    Yes.

Q    What phase were you in?

A    I believe C phase.

Q    Okay.  So my understanding is you would have gone through phase A and B, and then had like a midterm evaluation?

A    Yes, sir.

Q    Is that your -- is that what happened with your training?

A    Yes, sir.

Q    So who was your training officer for phase A, do you recall?

A    Officer Durio.

Q    Durio.

Page 14

Do you remember first name?

A    Matt.

Q    And how long were you in phase A?

A    Three weeks.

Q    And was Officer Durio your training officer for phase B as well?

A    Yes, sir.

Q    And was that a three-week phase as well?

A    Yes, sir.

Q    And then was he the one that did the midterm evaluation for you?

A    No, sir.

Q    Who -- which officer performed that?

A    Ashley Harms.

Q    And can you just go through what that involved?

A    A lot of it is just evaluating, making sure I am understanding what is expected of me in my first six-ish weeks of being an officer. Making sure I'm tracking. Understanding the program. She's still there to guide me if needed but for the most part you do a lot of it on your own.

Q    And when you say tracking, is this something where you're doing like written evaluations, or is it an interview process? Just -- can you give me a little more information about how the evaluation actually is

Veritext Legal Solutions
Calendar-NV@veritext.com 702-314-7200

accomplished?

A    Yeah.  It's called CCLs.  I don't recall what that stands for.  But you have certain like core competencies that you have to meet and/or learn if you made the mistake on it, and you would write out everything that you did that day.  What you learned from it.  What you did well.  What you didn't.

And the training officer would also respond to that, and say, yes, they did this well.  Yes, they're very aware of their mistake.  Or if I wasn't they would say this is one thing that they clearly are not grasping.  And move on.

Q    So this process is going on as you're going through phase A and B it sounds like?

A    Yes, sir.

Q    Okay.  And then once it's determined you've at least reached a level of competency through your midterms, then you move on to phase C.

Is that an accurate assessment?

A    Yes, sir.

Q    Okay.  And phase C was the phase you were in on March 16th, 2022?

A    Yes, sir.

Q    And how long had you been in phase C at that time, do you recall?

Page 16

A     Maybe a week.  I don't recall a specific amount of time.

Q     And did you have a specific training officer for your phase C work?

A     Officer McCauley.

Q     Have you ever worked with Officer McCauley prior to entering phase C of your training?

A     Not that I recall other than my time at REMSA.

Q     And just give me a little explanation of that.

It sounds like you encountered Officer McCauley as your work as an EMT?

A     Yes, sir, just mostly any type of like uncooperative subject.  If the subject ever got hurt we always had to come evaluate.  And that's not just with Officer McCauley.  That was with most graveyard officers. That's pretty much it.

Q     Can you give me an estimation of how many encounters you would have had with Officer McCauley as an EMT?

A     No.

Q     And sometimes I'll ask for a -- and this goes back to my admonition not to guess at information -- but sometimes I may ask you to provide an estimate.  And that's a fair question given the fact that that was involving your -- you know, your experience.

Page 17

point in time?

A    Yes, sir.

Q    And part of the policy is to -- that officers provide professional police services to the citizens of Reno.

What does that mean to you?

A    Treat everybody with respect. Give them the opportunity to give their side. But also make sure that your safety is paramount.

Q    And would this order have been something you would have reviewed before your encounter with Mr. Afshar?

A    Yes, sir.

Q    And then part of the general procedures that I noted was officers -- it says: Officers will explain the circumstances surrounding the issuance of a citation and explain the citation procedures to the violator.

Do you recall that being part of the general procedures?

A    No, sir.

Q    I could hand this to you and have you review that if you want. It's just highlighted right there at the bottom.

I don't have an extra copy. Apologize.

A    Okay.

Q    Does that refresh your recollection --

Page 28

A    Yes, sir.

Q    -- of the general procedures?

And what does that provision mean to you?

A    Basically do they qualify for a citation. You -- if it's a misdemeanor crime, you have to see if they qualify for a citation.

So there's certain things that make it to where you can't give them a ci -- like propensity to re-offend. Obstructing or resisting charges.  Intoxication level. And there's a few more but I don't recall all of them.

Q    So when this talks about explaining the circumstances surrounding the issuance of a citation, is that simply reviewing whether they're -- they qualify?  Or does that require something on your part when you're actually -- after you've made a determination of -- that a citation will be issued and what your responsibilities are associated with that?

A    Can you repeat that --

Q    Sure.

A    -- question?

Q    Convoluted question.

So part of the procedures says officers will explain the circumstances surrounding the issuance of a citation.

And you described it sounded like the process

Page 29

that you go through in determining whether an individual qualifies for a citation, but once that decision is made, are there certain obligations that you have when actually issuing the citation concerning an explanation?

A    You tell them what they're being cited for. You tell them what their court date is. And you do try to get like their phone number if they're willing to be cooperative and work with you so they can receive a text message reminding them of their court date.

Everything is on the citation. You explain to them, like, hey, show up to court. If you don't show up to go, it will go to warrant.

Q    How about if they're asking questions concerning why they're receiving a citation.

Do you feel it's your obligation to answer those questions?

A    You tell them what they are being cited for.

Q    Okay. And that to me is a little different. You know, just saying what you're being cited for doesn't necessarily explain why that citation's being issued.

Do you feel that that's something that's a responsibility when you're issuing a citation is to provide that explanation as to why if it's asked of you?

A    Yes.

Q    And is that something you tend to try to do

Page 30

when you're issuing a citation?

A     Yes.

Q     And then the lighter part -- and I think you touched on this -- is that you explain the citation procedure, which just means, you know, they're going to get a court appearance and their duty to appear for court.

Is that primarily the procedure that you're talking about?

A     Yes, sir.

Q     Then one of the general orders talks about, you know, basically just procedures and policies surrounding citations.

And the policy reads that RPD will make every effort to issue misdemeanor or traffic citation in lieu of custodial arrest.

MR. HUGHS:  Ken, I'm sorry.

Can you tell me which one you're talking? Which general order?

MR. LYON:  I did.

The citations?

MR. HUGHS:  Oh, okay.  Thank you.

BY MR. LYON:

Q     To suspects who qualify for a citation, is that consistent with your understanding?

A     Yes.

Page 31

Q    And that's consistent with your understanding?

A    Yes, sir.

Q    And that's consistent with -- or, that's -- it's your understanding that information is coming from Officer Butler?

A    Yes, sir.

(Video played.)

BY MR. LYON:

Q    So I want to stop there.

Were you expecting him to be an asshole?

A    Just given the information that he was getting agitated and irate.

Q    And can you arrest somebody for being an asshole?

A    No, you cannot.

Q    And would you attribute that comment to kind of your newness on the job?

A    One hundred percent.

Q    You probably don't hold that same feeling as you sit here today having some years under your belt?

A    No, I don't.

MR. HUGHS:  I'm -- I'm going to -- objection. I'm not sure what you're asking there.

Can you rephrase the question?

MR. LYON:  She's already answered it.

MR. HUGHS: Okay. But she's answered a question -- okay.

Well, I'm going to object to it because it's unclear. Ambiguous. Confusing. I don't know if you're talking about arresting someone for being an asshole or --

MR. LYON: That's exactly what I'm --

MR. HUGHS: -- a bigger context.

MR. LYON: -- talking about.

That's exactly what I'm talking about.

MR. HUGHS: Okay. So the question was that she would not what?

MR. LYON: She wouldn't make those same comments and hold that same sentiment as she sits here today as an experienced officer.

MR. HUGHS: For -- if you're talking about arresting someone for being an asshole outside of the context of the -- what else is going on, then I object.

Same objection. Confusing. Ambiguous. Don't know what you're talking about.

MR. LYON: Okay. Well, she already answered the question.

MR. HUGHS: Okay. Well, do you -- based on this conversation, do you think you understand what he was asking you?

THE WITNESS: Yes.

Page 48

MR. HUGHS:  You do?  Okay.

MR. LYON:  I don't think it was that confusing.

(Video played.)

BY MR. LYON:

Q    Now I'll stop there because it sounded like Officer McCauley was bringing you back to this concept of issuing a citation, and whether, you know, making an assessment as to whether Mr. Afshar would qualify to be issued a citation.

Is that a fair characterization of the discussion we heard?

A    Yes.

Q    And it came back to one of the last criteria, had to do with intoxication, correct?

A    Correct.

Q    And we had talked about general order that set the standard for intoxication as whether or not they would qualify for a citation.

Were you expecting Mr. Afshar to be intoxicated?

A    Yes.

Q    And based on what?

A    Just the leaving the scene.  The hitting two vehicles.  Not wanting to stick around for officers.  With my training and experience that's a pretty common thing is

Page 49

they're usually intoxicated.

Q    So that was certainly on your radar as far as what information you were looking for during that initial encounter?

A    Correct.

Q    Is that a fair statement?

A    Yes.

Q    All right.  And for the record, I had stopped it at 1:10:56.  And I'll just start it again from here.

(Video played.)

BY MR. LYON:

Q    I'm going to stop it there.  And we're at -- stopped it at 1:12:27.

And you heard Mr. Afshar say that he had had a panic attack.

Did you hear him say that in the video?

A    Yes.

Q    Did you take that into consideration that night when you were -- during that first encounter that he had had a panic attack?

A    I don't recall.

Q    Did Mr. Afshar appear agitated to you in this encounter -- in this initial encounter?

A    No.

Q    Did he appear uncooperative?

A    No.

Q    Did he appear intoxicated?

A    No.

Q    He had referred to -- that he had provided his insurance information?

Does that refresh your recollection of the -- as far as your investigation goes that he had in fact provided insurance information to the owner of the Toyota, I believe?

A    Yes.

Q    And I'm going to show you what's been marked as Plaintiff 381 in discovery, and just -- it's my understanding this is a screen shot of what he provided. And I don't know if you've ever seen that before or recognize that.

So the first question is:  Do you recognize that?

A    I do not.

Q    Do you recall seeing it that night?

A    I do not.

Q    And I won't mark it in.  I just wanted to get your thoughts on it.

Did you ever make any determination as to what information he had provided on scene while he was there?

A    Not that I recall.

Page 51

BY MR. LYON:

Q    You can answer it if you understand it.  If you don't, I'll rephrase.

A    Rephrase.

Q    Were you -- was this a situation where you did not want to issue a citation?

A    Correct.

Q    You wanted to arrest him.

A    I don't know.

Q    Well, if you don't -- there's only two choices, right?  You issue a citation or you arrest, correct?

A    Or you do neither.

Q    Or you do neither.

Was that on the table?  Were you going to let him off with a warning and not issue a citation or arrest?

A    No.

Q    So you were either going to issue a citation or arrest him, correct?

A    Correct.

Q    And you did not want to issue a citation.

A    According to my body cam, yes.

Q    So that would leave the final action as you wanted to arrest him.

A    Correct.

Q    For what?

Page 58

A    For hit-and-run.  And whatever else I charged him with.  I don't remember everything that I charged him with.

Q    Well, let's look at that.

This was the final complaint.  And it's Plaintiff's 0012.  And it includes the obstructing charge later on.

But the first two are -- my understanding are what was at issue as far as citation at this point in time in the encounter.

MR. HUGHS:  And you're asking her what was at issue at what is shown as 1:13:34 on the video.  At that point in time you're asking her what was at issue?

MR. LYON:  No.  The question goes to her intent to arrest for what charges she could not recall.  That's to refresh her recollection on the charges where she was considering at that time.

MR. HUGHS:  Okay.  What time?  That's where I'm confused.

MR. LYON:  The time that we're at on the video.

MR. HUGHS:  Okay.  That's what I asked.  And you said no.

Okay.  So it was at this point in time right after she talked to Butler at 1:13:34, not whatever is shown right on -- in a document in front of her.

Page 59

Q    And what is that other charge?

A    Failure to maintain lane.

Q    Can you arrest somebody for failure to maintain a lane?

A    No.

Q    Can you arrest somebody for hit-and-run?

A    No.

Q    So you wanted to arrest him although legally you did not have the capability of arresting him?

A    Correct.

Q    And that is based on the encounter we just saw on the body cam, correct?

A    Correct.

Q    And based on whatever information had come from Officer Butler through Officer McCauley to you, correct?

A    Correct.

Q    Is it fair to say that Officer McCauley shared your feelings?

A    I do not speak for Officer McCauley's feelings.

Q    Do you recall any discussions with Officer McCauley about his belief as to whether or not he thought Mr. Afshar was driving while intoxicated?

A    I do not recall.

Q    And, again, at this point I think you indicated that there was no DUI investigation even contemplated

Page 61

because the time that had elapsed between the accident and the encounter; is that correct?

A    Correct.

Q    Okay.  I'm going to -- we've been going about an hour 15 minutes.

You need to take a break?

A    Sure.

(Recess taken.)

MR. LYON:  We'll go back on the record.

BY MR. LYON:

Q    So I want to -- I've advanced the body cam to the second encounter.  And kind of the same thing, I'll just play through and just ask you some questions about this encounter with Mr. Afshar.

And before I start, just to confirm kind of where we left off, going into the second encounter the decision to issue a citation had been made --

A    Yes.

Q    -- correct?

Okay.  And that was the intent was there was going to be an issuance of a citation?

A    Correct.

Q    For the record I am starting at the -- same body cam and -- at 1:29:13.  One hour, 29 minutes, 13 seconds.

Page 62

(Video played.)

BY MR. LYON:

Q    So you hear him asking you questions about what was going to be about -- the citation was going to be about?

A    Yes.

Q    And we talked about before kind of the general order of explaining circumstances, reasons for a citation?

A    Correct.

Q    Did you -- do you recall whether -- and it looked like you were doing -- still doing stuff on your phone.

Do you recall hearing those questions, I guess, coming from him?

A    No.  Other than hearing it now.

Q    Okay.  And before I start it again, so going back, my -- who's in charge of this scene as we're watching it unfold?  Are you in charge at this point in time?

A    Yes.

Q    And that's because you are the investigating officer?

A    Correct.

Q    Were you aware that Officer Butler had told Mr. Afshar that you were the investigating officer?