# EXHIBIT 5

## McCauley's Deposition

# EXHIBIT 5

## McCauley's Deposition

Case No. 3:24-cv-00110-MMD-CLB

UNTIED STATES DISTRICT COURT

DISTRICT OF NEVADA

--oOo--

MOHAMMADALI AFSHAR,

          Plaintiff,

     vs.

JEFFREY BUTLER, PATRICK
McCAULEY, SHELBY CRAWFORD,
THE CITY OF RENO, a political
subdivision of the State of
Nevada, and DOES I-X, inclusive,

         Defendants.

===========================================================

DEPOSITION OF PATRICK McCAULEY

Tuesday, October 8, 2024

Reno, Nevada

Reported by:          LORI URMSTON, CCR #51, RPR, RMR

CALIF. CCR #3217

Page 1

--oOo-- APPEARANCES --oOo--

FOR THE PLAINTIFF:

KENNETH E. LYON, III, ESQ.
KATHERINE H. LYON, ESQ.
Law Offices of Kenneth E. Lyon, III
432 Court Street
Reno, Nevada 89501

FOR THE DEFENDANTS:

MARK A. HUGHS
Deputy City Attorney
P.O. Box 1900
Reno, Nevada 89505

Page 2

terms, that a collision had happened. The other vehicle was no longer on scene?

A    Yes.

Q    You had noticed like a liquid trail from the other vehicle, and you end up following that trail and found what ultimately you came to find out was Mr. Afshar's vehicle parked over in some apartments on Villa Verde Drive?

A    Yes.

Q    Is that a fair summary?

A    Yes.

Q    And Officer Crawford is with you during this portion of the investigation?

A    Yes.

Q    And you get over to Mr. Afshar's vehicle, noticed that the damage to that vehicle is consistent with the damage to the Subaru?

A    Yes.

Q    Can you -- do you recall the nature of the damage to Mr. Afshar's vehicle?

A    Heavy front-end damage, airbag deployment.

Q    Anything else that you noticed about the vehicle?

A    Shattered windshield.

Q    And then at some point in time, there was a

Page 50

determination that Officer Crawford would be the investigating officer?

A    Yes.

Q    Is that the right characterization?  Was she considered the investigating officer?

A    Yes.

Q    Under your training and supervision?

A    Yes.

Q    Okay.  The two of you go back to -- and I'll just call it the location of the Subaru.  Is that -- you understand what I mean by that as opposed to the location where Mr. Afshar's vehicle was located?

A    Yes.

Q    Because there's -- during the course of this investigation, there's really two areas of interest; is that a fair statement?

A    Yes.

Q    And Officers Butler and Meadows remained at Mr. Afshar's vehicle?

A    Correct.

Q    And you and Officer Crawford went and continued with the investigation where the Subaru was located?

A    Yes.

Q    Okay.  And there was another vehicle involved as well, a Toyota 4Runner?

Page 51

A    Yes.

Q    As well as his address?

A    Is that the address for -- it has an address, yeah.

Q    Okay.  And at least in the video at 3230, Officer Meadows is showing you some image.  You believe that is insurance information that he is providing to you as well?  Whether it's the same image as 381, you can't say, but it's your understanding that's insurance information that's being shown to you?

A    Yes.

Q    Do you have an understanding of why he was showing you that?

A    Yes.

Q    Why?

A    It does have Mr. Afshar's name on it.

Q    Now I'm going to continue playing the video.

MR. HUGHS:  Is your answer based on that or what you know was there?

THE WITNESS:  Yeah, I recall there was a name on the insurance card.

MR. LYON:  I'm going to continue playing at 3230.

(Video played.)

BY MR. LYON:

Q    Okay.  So Officer Meadows continued to express

Page 58

his opinion that he did not think it qualified for a 10-57, a hit and run. You disagreed, indicating that you were comfortable with it?

A    Yes.

Q    Okay. And what was the reason you were comfortable with moving forward with the citation?

A    Quite a few factors. She took a picture of an insurance card. He didn't provide a name. It could have been anybody's insurance card at that time. She attempted to take a picture of the VIN. He's attempting to leave. There was no attempt whatsoever to make contact with the other vehicle owner. So quite a few factors went into it.

Q    Were all of those factors on the table at the time you made this decision?

MR. HUGHS: I'm sorry. What decision are you referring to?

MR. LYON: The decision to cite.

BY MR. LYON:

Q    Let me ask it this way: Had you made a decision to issue a citation at this point?

A    No.

Q    Okay. When you say, "I'm comfortable with it, we're good," what did you mean by that, then?

A    I was comfortable with the charge of hit and

Page 59

run.

Q   Okay.  And what would be the next portion of the investigation, then, based on this information?

A   We would still need to complete our accident investigation on scene at the Subaru and then go up to the other vehicle.

Q   Okay.  And talk with Mr. Afshar?

A   Yes.

Q   Was his intent -- was it relevant to your relevant to your inquiry?

MR. HUGHS:  I'm sorry.  Whose intent?  I don't understand your question.  I'm going to object.

BY MR. LYON:

Q   Mr. Afshar's intent when he left the scene of the accident, was that something that you wanted to talk with him about as part of your investigation?

A   Yes.

Q   And at that point in time, you had no other information about Mr. Afshar other than what had been shown to you on his driver's license and the insurance card; fair statement?

A   Yes.

Q   Did you have an understanding of why he left the scene at that time?

A   No.

Page 60

Q    I'm going to -- so it's your understanding, at least at this stage, a decision to cite him had not been determined?

A    Correct.

Q    For the reasons we just discussed?

A    Yes.

Q    I'm going to advance the video, the body cam.

Following the encounter with Officer Meadows, just in general terms, my understanding is he goes back and accompanies Officer Butler at Mr. Afshar's vehicle.  Is that your understanding?

A    Yes.

Q    Okay.  And you and Officer Butler continue with the investigation of the incident?

A    Officer Crawford.

Q    Officer Crawford.  I'm sorry.

And that requires inputting a bunch of information into the system?

A    Yes.

Q    Okay.  Which looks like was a very frustrating process during this dispatch?

A    Brazos is frustrating in general.

Q    And what is Brazos?

A    Brazos is our accident reporting system.  We can also issue citations off of it.

Page 61

A    Yes.

(Video played.)

BY MR. LYON:

Q    So during that exchange -- and I ended at 3801 -- you had made the comment that "We're going to fucking cite him."

A    Um-hum.

Q    So had a determination at that point in time been made about issuing the citation?

A    Yes.

Q    Okay.  What changed between the time of the prior look at the video and the time that you made this decision?

A    I don't recall.

Q    Had you gone back and talked with Mr. Afshar at that point in time?

A    I don't believe we had.

Q    So you had made the decision to cite at that point in time without going back and talking with Mr. Afshar?

A    Yes.

Q    What were you intending to cite him for at that time?

A    It would have been the hit and run.

Q    Now, in your report, if you go to the first

Page 63

A   To make a determination as to whether or not he qualified for a citation.

Q   I'm sorry.

A   No, go ahead.

Q   Were you expecting him to be intoxicated?

A   Yes.

Q   Were you expecting him to be, quote, unquote, an asshole?

A   Uncooperative.

Q   Uncooperative.

Were you expecting him to be agitated?

A   Yes.

Q   And that was based on the conversations that you had had -- both you and Officer Crawford had had with Officer Butler?

A   Yes.

Q   So then you guys -- I'll represent I believe you get out of the car and you go and you have your first encounter with Mr. Afshar. And the reason I call it the "first encounter," just so you and I are clear, my review of the video is that you and Officer Crawford, you go, you make contact with Mr. Afshar. There's questions that are asked. He's responding to those questions.

Then you disengage from Mr. Afshar, go back,

Page 82

continue to fill out paperwork. And then there's the second encounter where Mr. Afshar is ultimately arrested. Is that consistent with your recollection?

A    Yes.

Q    And so if I use the term "first encounter," "second encounter," that's what I'm referring to. Okay?

A    Okay.

Q    So this is -- my understanding is you're coming up to talk with him for the first encounter.

(Video played.)

BY MR. LYON:

Q    I'm going to stop it at 1 hour, 13 minutes, 11 seconds.

Before we get into the conversation, it looks like you make some sort of hand signal on the body cam. Was that an intentional hand signal to Officer Butler?

A    Yes.

Q    What was the purpose of that?

A    That would be pulling Officer Crawford back and --

Q    For him to keep contact with Mr. Afshar?

A    Yes.

Q    Okay. Did Mr. Afshar appear uncooperative in that exchange?

Page 83

A    No.

Q    Did he appear very agitated in that exchange?

A    No.

Q    Did he appear intoxicated in that exchange?

A    Not grossly, no.

Q    Were there objective signs of intoxication that you noted during that exchange?

A    Yes.

Q    What were those?

A    May I?

Q    Absolutely.  I think it's at the bottom of the first page.

A    At the bottom of the first, top of the second.
Yeah.  Yeah, so there was the odor, red, watery eyes and a little bit of a slur.

Q    Let's take each of those in turn.
And, again, we're talking intoxication for purposes of qualifying or being disqualified for a citation, not impairment for a DUI; correct?

A    Correct.

Q    Okay.  Your investigation concerning a DUI, is it fair to say it had ended by the time of this encounter with Mr. Afshar?

A    Yes.

Q    Okay.  And really the -- so the issue of

Page 84

A    Yes.

Q    And so it may be a combination of the accent in what you're taking as slurred words as one of the signs of intoxication that's noted?

A    Yes.

Q    I'm going to back the video up just a bit just to make sure we capture the conversation that you engage in with Officer Crawford once you both leave the scene.

And for the record, that's 1 hour, 13 minutes and 2 seconds.

(Video played.)

BY MR. LYON:

Q    So during that exchange you were discussing with Officer Crawford her observations and whether she felt he qualified for a citation?

A    Yes.

Q    And she indicates that he was talking fine; he was acting normal?

A    Yes.

Q    Any disagreement with those conclusions from Officer Crawford?

A    No.

Q    If you did disagree with those conclusions, did you have the ability to, you know, again supersede her

Page 86

decision-making?

A    Yes.

Q    So if you felt he did not qualify for a citation, you could you have overrode her decision?

A    Yes.

Q    Okay.  And you chose not to?

A    Correct.

Q    I'm going to just continue to play it.

(Video played.)

BY MR. LYON:

Q    I'm going to end it at 1 hour, 13 minutes, 36 seconds.

And you make the statement:  "Yeah, he beat his DUI tonight."

A    Um-hum.

Q    Why make that statement?

A    Because we could not pursue a DUI at this time.

Q    Okay.  Again, it makes it sound like you felt that he -- that the collision was caused by a DUI and that he had somehow beat that charge.  Is that how you felt?

A    I felt that we were an hour into it when we made contact, and we had a time frame which was unaccounted for, so we would not have been able to pursue a DUI charge.

Page 87

context like we just saw, you know, where you muted your body cam and Officer Meadows I'll represent did not mute his body cam so it was able to capture those comments, is that a policy violation in your understanding?

A    No.  No.  I mean -- no.  We've gotten a lot better, too, with body cams in general.  There's been -- you know, obviously, they were introduced, and then we upgraded and kind of tweaking the general order as we went to better suit what we do.  But, no, I wouldn't say a violation.

Q    Okay.  I'm going to start the video at 1:27:34.

                    (Video played.)

BY MR. LYON:

Q    I'll stop it at 1:28:04.

So Officer Meadows comes up to you and advises you that Mr. Afshar does want to do a PBT; correct?

A    Yes.

Q    Your response was, "He can suck your dick."

A    Yes.

Q    Why did you say that?

A    We were already mid-citation.  We're not going to stop what we're doing to go up and then administer a PBT, which we've already determined at this point is not necessary.  He qualifies for a citation.  So we're

Page 98

that discretion and authority to call O&R?

A   Yes.

Q   And he had not made that call up to that point?

A   No.

Q   So next is going to go into the actual what I call hands-on.  When I use that term "hands-on," do you understand what that means?

A   I do.

Q   Is that a kind of a terminology within law enforcement?

A   It is.

Q   What does that mean to you?

A   That you're actually putting hands on another person.

Q   And my understanding is once you made the decision to call O&R, essentially simultaneous with that decision would be -- simultaneous with that decision for O&R would be the decision to arrest?

A   Yes.

Q   And simultaneous with that decision to arrest would be the decision to handcuff?

A   Yes.

Q   So essentially by calling O&R, you understood that there would -- you would need go hands-on and handcuff Mr. Afshar?

Page 114

THE WITNESS:  I still got to run home and grab my uniform and let my dog out before we start.

MR. LYON:  Let's take a break.  I'll load it up in the meantime.

(A recess was taken.)

MR. LYON:  Okay.  Back on the record.

BY MR. LYON:

Q    Hopefully, this is the final part of this.  I appreciate your patience, Sergeant.

I've queued up the video.  Again, this is Officer Crawford's video.  It is Plaintiff's Exhibit 371.  It's Body Cam X6031627D.  And I've queued it up to 1 hour, 31 minutes, 53 seconds, which is just a few seconds before the decision that you called O&R.  So it's kind of the continuation of where we left off with your video.

Before I start playing it, I want to just touch on a couple of things.  This location, this is near Mr. Afshar's vehicle; correct?

A    Yes.

Q    How far away was that from where the collision had actually occurred?

A    Up the street and just around the corner. Trying to estimate off of memory, it would be difficult.

Page 116

Q    Whether it's blocks or feet, whatever you're most comfortable with.

A    We'll say a block.

Q    A block.  Okay.

And the location to serve a citation is that something in your training and experience needs to be considered?

A    Yes.

Q    Tell me about that, that thought process of the location to serve a citation.

A    It just goes into officer safety aspects.  You don't want to put yourself on, like, gravel or uneven surfaces when doing so.  Just basic officer safety. You want to choose the best locale for where you have.

Q    Okay.  As we discussed, you weren't necessarily present when Officer Crawford made contact with Mr. Afshar, but it appears that point in contact is where the location ended up being where the citation was going to be served?

A    Yes.

Q    Any concerns about the location as you sit here today that you wish in retrospect you could have managed differently had you been there at the time?

A    Not really.  I mean -- no, not really.

Q    The manner of service of a citation, generally

Veritext Legal Solutions
Calendar-NV@veritext.com 702-314-7200

handcuff Mr. Afshar; correct?

    A    Yes.

    Q    Was there an opportunity here for a cooperative arrest?

    A    From what he had demonstrated, no.

    Q    Why not?

    A    When you announce that you're going to arrest, that gives anybody the opportunity to fight or flight. He's already demonstrated an agitated demeanor, uncooperative. We're not going to compound that by saying, "Oh, and by the way, you're going to go to jail now. Can you please turn around and place your hands behind your back." That is opening up more opportunity for him to do something bad.

    Q    In light of those concerns, was there an opportunity to provide him with a warning that if he did not -- that if he continued to fail to comply, he would be arrested?

    A    He had already ignored numerous verbal commands at this point.

    Q    Understood. My question is a little bit different, though.

    Was there an opportunity to provide a warning to him that if he failed to -- continued to be uncooperative, he would be subject to arrest?

Page 120

A   We could have issued a warning, but, again, you're putting yourself into that position of, "Hey, if you don't do this, you're going to go to jail." He's already ignored the verbal commands. He understands or should understand that failing to follow those verbal commands during a lawful detention can result in arrest.

Q   Why do you say he should have known that or understood that?

A   I feel like it's -- if you are being detained and you're being given verbal commands and you're just blatantly saying no and refusing to follow those verbal commands, it should be expected --

Q   So your --

A   -- that that is a potential consequence.

Q   Okay. So for those reasons, you made the decision not to provide a warning or not to advise him he was under arrest at the time you made the decision to call the O/R?

A   Yes.

Q   All right. This is the video. It's starting at 1:31:53. I'm just going to play it through. You call the O/R, and then go hands-on. And then I'll ask you questions on the other side of this.

(Video played.)

Page 121

MR. LYON: Yeah, I want him to read the paragraph. Is it consistent with what we saw on the body cam?

THE WITNESS: So, I mean, it's -- so I got into the rear wrist lock as we were getting to the vehicle. So, I mean, the way it reads, it says -- it's kind of vehicle wrist lock, but they were almost -- almost the same time getting that wrist to the rear.

BY MR. LYON:

Q Okay. And I appreciate that, because that's what I want to do.

Essentially, to the best of your recollection, based on what's in your report, based on what we just saw on body cam, just walk me through step by step of what you recall happening with your encounter with Mr. Afshar starting with -- it appears that you grab Mr. Afshar with one of your hands. Or would it be both hands at the same time?

A About the same time, but, yes, both hands.

Q So you're taking both of your hands and grabbing what parts of his body?

A It would be wrist and upper arm.

Q And when you say "upper arm," is that the portion between the elbow and the shoulder?

A Usually right about -- yeah. Yes, between elbow and shoulder.

Page 123

Q    Okay.  What arm of yours is on his wrist?

A    Right wrist, left arm.

Q    Okay.  So your right hand is on his right wrist?

A    Yes.

Q    Your left hand is on his right arm?

A    Yes.

Q    Okay.  And you were attempting at that point in time to do a rear wrist lock?

A    Yes.

Q    Okay.  Describe or tell me what is a rear wrist lock maneuver.

A    So you grab the wrist.  You maneuver it to the small of their back to facilitate handcuffing.  When you have -- when you have the wrist, you're holding it -- like I said, you maneuver it to the back, and you kind of just cant the hand at about a 90-degree angle, so 90-degree from the wrist to the hand so that you have that lock-out and it's ready for handcuffing.

Q    Okay.  And so you're attempting to move the hand and the arm behind the individual with the hand facing towards the sky or facing up to facilitate handcuffing?

A    So from the rear, it would be hand facing -- the palm of the hand would be facing outward.

Page 124

Q    Okay.  So it's not -- the hand isn't up with the palm facing to the individual's back?

A    No.  It would be facing outward, from the center of the back facing outward the palm of the hand would.

Q    Okay.  I think that's clear enough from my perspective.  I appreciate that.

Your report indicates that he locked his arms in a straight position.

A    Yes.

Q    Was that -- I did not notice that in the video. Did you notice that in the video?

A    I can show you if you want to go back a few frames.

Q    Just let me know when you --

A    Okay.  Go ahead and play.

(Video played.)

THE WITNESS:  So there it is.  He tried to pull it to the front.  It gets moved back to the rear again.

Continue playing.

(Video played.)

THE WITNESS:  Right -- well, go back a couple frames, please.

BY MR. LYON:

Q    And like we talked about, I can go back like

Page 125

BY MR. LYON:

Q    The sweep is roughly at this point in the video, maybe a second or two before we stopped it?

A    Yes.

Q    So we've stopped it at 1:32:16.  So it was just before that.  What you characterize as the sweep, that's where you're indicating he had his arms in a straight position?

A    Yes.

Q    Okay.  Is that a fair characterization of -- the best we can do with this video and that particular statement in your report?

A    Yes.

Q    Okay.  And then you also include, "He was attempting to pull away."

A    Yes.

Q    And was that at the same time he's holding his hands straight?

A    So right as we went hands-on, you can see, like, kind of a step forward and try to pull away that arm.

Q    Are you trained to distinguish between voluntary actions on the part of the person you're trying to handcuff and like reflexive actions?

A    Not particularly.  I mean, there's a lot of

Page 127

because you do see in the video kind of that hand coming forward. You previously had said you had both hands on his arm, your right hand on his right wrist, your left hand on the upper part -- or the part of his arm between his shoulder and his elbow. Correct?

A    Yes.

Q    Then did your grip on his wrist come off, and that's what we see when his arm comes forward?

A    Yes, as he was trying to continue to pull away and -- yeah.

Q    So it's your understanding he was trying to pull away when we see his hand come out in front of him?

A    Yes.

Q    Okay. Because before I thought you said that was probably reflex.

A    It could have been reflex, but the continuation of it would be the active.

Q    Regardless, you then had to re-grab his wrist --

A    Yes.

Q    -- at some point; correct? Was that, again, with your right hand?

A    It should have been, yes.

Q    Did you ever lose contact with his arm, the

Page 130

part of his arm that you were holding with your left hand?

A   I don't believe so.  I may have transitioned once -- you know, once the wrist starts going to the rear, transitioned.  No, that wouldn't make sense.  No, I believe that did stay.

Q   So best you can recall, your left hand, once you grabbed his right arm between the elbow and the shoulder, it remained there up until the time the handcuffs were placed on him?

A   The best I can recall, yeah.

Q   Okay.  And once you grabbed the wrist the second time, did your hand come off the wrist again at any point in time?

A   I don't believe so.

Q   So at least once you were able to grab his wrist the second time, you had full contact with Mr. Afshar as far as your left hand on his arm and your right hand on his right wrist?

A   Yes.

Q   And you used the terminology -- the sweeping motion when we were talking with the -- about the video.  Is that the equivalent of what you've also said is placing the hand behind the back so you can apply the handcuffs?

Page 131

hands-on?

A   It looked like she tried, tried to get in there.

Q   Do you recall her ever having contact with Mr. Afshar physically?

A   No.

Q   You hear Mr. Afshar almost immediately say, "I'm sorry."  Do you recall that?

A   After hands-on?

Q   After you go hands-on, almost immediately he says, "I'm sorry," and then words to the effect -- or, "Okay, okay, okay," as the technique is being applied.

A   I do remember the "I'm sorry," but what's coming out of his mouth isn't matching what his body is doing.

Q   And that's part of my question is usually if someone says, "I'm sorry," that's a sign of contrition, not resistance; would you agree with that?

A   Yes.

Q   The same with "Okay, okay, okay," that seems to be submitting to authority rather than resisting authority?

A   Yes.

Q   And it's your testimony that even though he may be saying things that are in submission to authority,

Page 135

it's your testimony his physical behavior was not --
was resisting?

A    Yes.

Q    In the manners that we've already discussed?

A    Correct.

Q    You did not have to take him to the ground?

A    No.

Q    Were there any takedown procedures that you
attempted during this encounter?

A    No.  Our location, it makes more sense to go to
the vehicle to limit mobility than going to the ground.
In fact, in this case going to the ground would
probably be a bad idea because we were in between
vehicles, so it would limit our ability to maneuver
also.

Q    So that was -- was that -- could it be
called -- that was a tactic or strategy on your part to
maneuver him to the vehicle?

A    Yes.

Q    In your report you say that, "I moved his right
arm into a rear wrist lock.  While doing so, I felt a
wet pop."

A    Yes.

Q    What do you mean by "wet pop"?

A    I would describe it like the wet pop you get

Page 136

when -- it's almost like a joint popping out.  When you do chest compressions, you hear a wet pop, and that's all -- the whole sternum, like, popping.  I mean, that's the best way to describe it is a wet sounding like "pop."

Q    Within the body --

A    Yes, like an internal pop.

Q    Where did you feel this wet pop?

A    Upper right arm, shoulder.

Q    So I assume you felt that with your left hand?

A    Well, once you get the -- yeah, maybe.  Yeah, that would be about right.

Q    Okay.  And, again, I'm just trying to understand how you felt it, where you felt it.

So it would have been his upper right arm, and you would have felt it with your left hand that was in that position?

A    Yes.

Q    Okay.  Was he in handcuffs at that time?

A    No.

Q    When did he -- when was he placed in handcuffs?

A    Following the wet, he immediately stopped resisting, and he was placed in handcuffs.

Q    We hear on the video he cries out and says he's been injured.  Is that consistent with the timing of

Page 137

when you felt the wet pop?

A    Yeah.

Q    So his verbal account is consistent with what you were feeling with his body?

A    Yes.

Q    Okay.  And so as far as timing goes, you know, when we're trying to coordinate what's in your report with what we see on the video, those are consistent?

A    Yes.

Q    How tall are you?

A    Six four.

Q    How much did you weigh at that time?

A    Probably 270, 260.

Q    And Officer Butler was with you?

A    Yes.

Q    Officer Crawford was with you as necessary or as much as she engaged?

A    Yes.

Q    I don't see any interaction or any attempt to interact by the friend that was on scene.  Was he involved in any of this particular event once the arrest went -- once the O&R was called and the arrest effected?

A    No, he wasn't.

Q    So there's one more piece of video that I want

Page 138

to show you and just get your comment on.  This is going to be Officer Butler's video.

For the record, this is going to be Officer Butler's body-cam video, X6031452Y.  It's Plaintiff's Exhibit 370.

And I'll just represent this is a portion -- this is after the incident.  Body cams are muted.  But it looks like you're demonstrating to Officer Crawford the maneuver that we've just discussed.  And I would just like you to observe this and comment on it, if I can cue it up to the right spot here.

I believe this is -- so this is at 1 hour, 21 minutes, 1 second.

(Video played.)

BY MR. LYON:

Q    So I stopped it at 1:21:35.

And so am I correct, were you kind of recreating or redemonstrating what had taken place with Mr. Afshar?

A    It looks like it, yes.

Q    And it looks like there are two movements.  I just want to make sure it's consistent with what we talked about.  The first movement would be grabbing the arm and the wrist; correct?

A    Yes.

Q    And then the second movement would be the

Page 139

sweeping part of the maneuver; correct?

A   Yes.

Q   And what we see in this video, are both of those components seen in that video?

A   It appears like it, yes.

Q   Okay.  What part of that maneuver did you feel the pop, then?

A   It would have been right about here, right as we were getting to the rear of the back.

Q   Okay.  That's when you felt the pop.  Again, that's consistent with when we hear Mr. Afshar verbalize the injury as well?

A   Yes.

Q   Okay.  If you'll bear with me, I think we're about done but maybe take a quick break.  We'll take a quick break.  Let me just review everything, make sure I've got all my questions, and then we'll finish up.

                   (A recess was taken.)

BY MR. LYON:

Q   I think we can finish up here.  Just a couple of questions.

One may have been one of what you were talking about.  So my understanding is you're indicating your body cam was knocked off of you during the arrest?

A   Yes.

Page 140