# EXHIBIT 7

# Declaration and Reports of Christopher Darcy

## EXHIBIT 7

### Declaration and Reports of Christopher Darcy

## DECLARATION OF CHRISTOPHER DARCY

I, CHRISTOPHER DARCY hereby declare the following:

1. This Declaration is made in support of Mr. Afshar's response to Defendants' Motion for Summary Judgment.

2. I have been retained by the Plaintiff Mohammadali Afshar to provide expert opinions in the matter of Afshar v. Butler, et.al, filed in the U.S. District Court of Nevada, Case No. 3:24-cv-00110-MMD-CLB.

3. A true and correct copy of my Initial Expert Report, dated September 5, 2023, is attached hereto as Exhibit A and incorporated by reference herein.

4. A true and correct copy of my supplemental report, dated December 30, 2024, is attached hereto as Exhibit B and incorporated by reference herein.

5. A true and correct copy of my final supplemental report, dated May 12, 2025, is attached hereto as Exhibit C and incorporated by reference herein.

6. The opinions and conclusions expressed in Exhibits A, B and C are my own and based on my personal review of the referenced materials.

7. If called to testify at trial, I expect to provide testimony and opinions consistent with my reports, attached hereto as Exhibits A, B and C and incorporated by reference herein.

8. I declare under penalty of perjury that the foregoing is true and accurate.

Date: _____07/16/25_____          _____
                                   Christopher Darcy

1

# EXHIBIT A

# EXHIBIT A



## CHRISTOPHER DARCY

UNDERSHERIFF (RET) ∣ EXPERT WITNESS ∣ CONSULTANT
NV PILB LIC #4101

**Presented to:**
**Kenneth E. Lyon III, Esq.**
**432 Court Street**
**Reno, NV 89501**
**Attorney for Plaintiff**
**775-277-6392**

In the matter of Mohammadali Afshar, individual. (PLAINTIFF) v. City of Reno Police Department, (DEFENDANT).                              Case No.: Not Filed

**Mr. Christopher Darcy**
**Principal**
**Fairfax Consulting Group LLC**
**Initial Expert Report**

September 5, 2023

**I. INTRODUCTION**………………………...…….…………….…………..….........3

**II. FOCUS OF ANALYSIS**………...……….…………………….……………….3

**III. BACKGROUND**………………….……………………………………...….2..

**IV. COMPENSATION**…..……………...….……...................................……. 5

**V. REBUTTAL OPINION STANDARDS**…………………..….……………………5

**VI. METHODOLOGY**……………….…………………........................……5

**VII. QUALIFICATIONS AND EXPERIENCE**…………………………………….. 5

**VIII. SUMMARY OF FACTS**……………………………………….…………… 7

**IX. EVIDENCE REVIEWED**………………………….………………………9

**X. ANALYSIS OF PERFORMANCE**…………………………………………9

    **A. OPINION 1**……………………………………………….……..9

    **B. OPINION 2**……………………………………………………12

    **C. OPINION 3**……………………………………………………13

    **D. OPINION 4**……………………………………………………14

    **E. OPINION 5**……………………………………………………16

    **F. OPINION 6**……………………………………………………16

**XI. CONCLUSION**………………………………………………………..18

**XII. RIGHT TO AMEND REBUTTAL REPORT**…………………………………18

I.    **INTRODUCTION**

1.   I am Christopher Darcy, Chief Executive Officer (CEO) of Fairfax Consulting Group LLC (FCG), a professional services company founded in Las Vegas, Nevada. FCG provides policy review, evidence-based evaluations, and produces expert opinions about police and security officer performance.

II.    **FOCUS OF ANALYSIS**

2.   On or about June 29, 2023, I was retained by Kenneth Lyon III, Esq. of the Law Offices of Kenneth Lyon III, to evaluate alleged police misconduct and provide an opinion on the police practices utilized by Reno Police Department officers during a hit-and-run investigation. The police officers' conduct during this investigation resulted in Mohammadi Afshar (Mr. Afshar) suffering severe injuries.

3.   The incident under analysis pertains to Mr. Afshar, an Iranian male, involved in a traffic accident at 2220 Escalera Way in Reno, Nevada, on March 16, 2022. Police quickly located Mr. Afshar near the scene. The subsequent investigation resulted in Mr. Afshar's detainment for a duration exceeding 60 minutes. Police officers employed physical arrest tactics during an arrest for a violation of obstruction and resistance. This involved the inappropriate application of non-deadly force, wherein Mr. Afshar's arm was gripped and twisted as he was pressed against the vehicle during the arrest. During handcuffing, Mr. Afshar received significant injuries to his arm.

4.   The information herein is based solely on available police reports and body-worn camera (BWC) footage documenting the incident. A case has yet to be filed, and comprehensive materials such as policies, procedures, and depositions have not been reviewed. This report offers an evidence-based assessment of police conduct throughout the event based only on the information provided to date. This report is subject to modifications upon reviewing additional information and supplementary data. This report's conclusions are based on a reasonable level of professional certainty and professional experience.

III.    **BACKGROUND**

5.   With an extensive background in law enforcement, I bring a comprehensive understanding of police operations and leadership to this analysis. Following a career spanning 31 years as a commissioned police officer for the Las Vegas Metropolitan

3

Police Department (LVMPD), I retired at the rank of Undersheriff. LVMPD is known as one of the largest and most progressive police departments in the U.S. and has a substantial workforce of over 5,500 civilian and commissioned personnel, operating on a budget exceeding $1.2 billion. As the Undersheriff, I held the pivotal role of Chief Operating Officer, overseeing the department's daily operations, including leadership at the Clark County Detention Center (CCDC). Furthermore, I was entrusted with producing, reviewing, and approving all department policies, encompassing crucial areas such as the use of force, discrimination, harassment, and patrol procedures, before their implementation.

6. My journey in law enforcement began upon graduating from Shippensburg University in Pennsylvania, where I obtained a bachelor's degree in criminal justice in 1989. Initially, I entered the field as a security officer for Strawbridge & Clothier Corporation. I was recruited by the Lower Merion Township Police Department (LMPD) in 1990 after completing the Pennsylvania State Police Municipal Police Academy. I was assigned to the LMPD Patrol Division when I was recruited by LVMPD in 1991. After graduating from the LVMPD Police Academy and successfully completing the Field Training Program, I officially began my full-time career in Las Vegas as a police officer in September 1991.

7. During my 31-year career at LVMPD, I have held the following positions:
   A. Undersheriff (Ret. Dec. 28, 2022), 2021-2022
   B. Assistant Sheriff over the Law Enforcement Investigations Support Group, 2020-2021
   C. Deputy Chief of the Homeland Security Division, 2020
   D. Deputy Chief of the Investigative Services Division, 2017-2020
   E. Captain/Director of the Southern Nevada Counter Terrorism Center, 2015-2017
   F. Captain of the Major Violators and Central Narcotics Bureau, 2013-2015
   G. Captain of the Internal Affairs and Employment Diversity Bureau, 2011-2013
   H. Captain of the Northeast Area Command (Patrol), 2007-2011
   I. Lieutenant of Gang Crimes, 2006-2007
   J. Lieutenant of the Office of Quality Assurance, 2005-2006
   K. Lieutenant at Northwest Area Command (Patrol), 2004-2005
   L. Sergeant assigned to various detective and patrol assignments, 1999-2004
   M. Detective assigned to Robbery Homicide, General Detectives, 1995-1999

4

N.  Detective assigned to Vice, 1994

O.  Police Officer I/II assigned to various area commands, 1991-1994

IV.    **COMPENSATION**

8.  I am being compensated for my work at my usual and customary rate of $375 per hour. My compensation is not dependent on or related in any way to the nature or substance of my opinions or the outcome of this case.

V.    **REBUTTAL OPINION STANDARDS**

9.  The opinions expressed herein are to a reasonable degree of certainty and a reasonable degree of professional experience.

VI.    **METHODOLOGY**

10. The methodology used as the basis of my opinions in this matter consists of content analysis supported by a case study. The facts in this matter were bound by place and time. Further, the methodology included an analysis of the participants' discourse and non-verbal communication and cues. Practices, customs, and all participants' views were considered in the formation of my opinion.

VII.    **QUALIFICATIONS AND EXPERIENCE**

11. I have served in many facets of law enforcement throughout my career, acquiring invaluable expertise. From patrol operations and investigations to detention/corrections and police administration, I have developed my skills in diverse specialties. Additionally, I have gained significant proficiency in criminal intelligence, counterterrorism, vice, narcotics, as well as robbery and homicide investigations. In administrative capacities, I have served as the bureau commander of the Office of Internal Affairs and Employment Diversity, responsible for conducting and reviewing internal investigations involving allegations of police misconduct.  Additionally, I have fulfilled crucial responsibilities in labor relations, recruiting, training, quality assurance, and policy development.

12. Besides my practical experience, I have obtained certifications to enhance my qualifications. I hold certificates in Basic, Advanced, Management, and Executive Nevada Peace Officers' Standards and Training (POST). Furthermore, I maintained a

5

Department of Justice (FBI) Top Secret/SCI (TS-SCI) security clearance for the last ten years of my career.

13. As a certified instructor with LVMPD throughout my career, I have actively contributed to the professional development of fellow officers. I have experience in various subjects, including using force, patrol procedures, vice investigations, counterterrorism, internal affairs, and police/public relations. I have delivered comprehensive training on critical topics. Furthermore, I have had the privilege of presenting at the Bureau of Justice Assistance (BJA), Police Executive Research Forum (PERF), Major Cities Chiefs Association (MCCA) discussions, and the FBI National Academy Associates (FBINAA).

14. I graduated from the FBI National Academy (Class 232) in 2008.

15. In 2014, I earned a Master of Arts in administrative leadership from the University of Oklahoma, which equipped me with advanced knowledge and skills in leadership, organizational management, and strategic decision-making.

16. I completed the Aspen Institute Executive Course on Leadership, Values, and Good Society in 2018 to further enhance my leadership capabilities.

17. Representing Sheriff Joseph Lombardo (Ret.) and LVMPD in various forums, I have had the opportunity to advocate for the department's interests and share our best practices. As Undersheriff, I served as a representative at the Major County Sheriffs Association of America, the MCCA, the Nevada Sheriff's and Chiefs' Association, the FBI, and the Department of Homeland Security. Participating in these organizations has helped foster collaboration and enhance partnerships.

18. Currently, I am a member of the American Society of Industrial Security (ASIS), an association dedicated to advancing the security management practices of people, property, and information. Additionally, I was a member of the Corporate Security Chiefs monthly working group, collaborating with representatives from Las Vegas casinos and law enforcement entities. Together, we assessed ongoing security challenges and worked towards enhancing response strategies for prevalent security issues. These often focused on officer responsibilities concerning state law (NRS 207.200) related to unlawful trespassing, issuing warnings to unruly guests on properties, how to prevent trespassing incidents, and coordinating responses for significant events.

19. During my tenure as Undersheriff, Assistant Sheriff, and Deputy Chief, a significant portion of my responsibilities entailed providing leadership and guidance to LVMPD's

6

Critical Incident Review Process. This encompassed overseeing the Force Investigations Team (FIT) and the Critical Incident Review Team (CIRT). As Chairperson of the LVMPD Use of Force and Tactical Review Board, I was responsible for evaluating FIT and CIRT investigations pertaining to an officer's use of deadly and non-deadly force. Through these roles, I facilitated comprehensive and objective reviews of critical incidents, ensuring transparency, accountability, and adherence to established protocols.

20. Throughout my career, I have examined over 100 incidents involving firearms or edged weapons use or perceived use in deadly force encounters. Additionally, I have conducted evaluations of numerous instances where police officers employed non-deadly force.

21. As a representative of LVMPD, I have been deposed in cases involving OIS incidents, providing insights and perspectives. Additionally, I have participated in federal court mediations concerning use-of-force allegations, advocating for the interests of LVMPD. I have also testified in court proceedings, sharing my knowledge and expertise on police practices. In collaboration with LVMPD's Office of General Counsel and various law firms, I have aided counsel and guided on matters involving allegations of constitutional violations by employees. Most recently, In October 2022, I offered trial testimony on police practices in the Southern Nevada District Court.

22. As a security subject matter expert and consultant, I lend my expertise to Fiore Industries, Inc. My primary focus is developing comprehensive security plans and operations for the highly anticipated 2024 Super Bowl in Las Vegas.

23. As a public safety consultant specializing in police practices, I offer my extensive expertise in service to the Albuquerque Police Department (APD). My role as a subject matter expert encompasses strategic guidance on using force protocols, OISs, incidents involving in-custody deaths, and managing high-profile investigations.

24. Additionally, I have offered my services in providing policy reviews, evidence-based police performance evaluations, and expert opinions to support litigation in cases related to the performance of police officers and security personnel.

VIII.   **SUMMARY OF FACTS**

25. On March 16, 2022, Officers Shelby Crawford, 16528 (Officer Crawford), Jeffrey Butler, 14060 (Officer Butler), and Patrick McCauley, 10987 (Officer McCauley), responded to a hit-and-run incident near 2220 Escalera Way in Reno, Nevada. Their

7

arrival at approximately 0130 hours revealed that a parked 2010 Subaru Outback had been struck, causing it to collide with the rear quarter panel of a 2021 Toyota 4Runner. The scene indicated that the responsible vehicle had fled. Employing investigative techniques, officers successfully traced a fluid trail to discover the suspect vehicle at 5250 Villa Verde Drive. The identified vehicle, a 2003 Lexus sedan bearing Nevada registration NV 113R96, exhibited front-end damage. Officer Butler maintained surveillance of the car, and subsequently, the suspected driver, Mr. Afshar, emerged from an apartment and approached the vehicle. He was engaged by officers and detained for further investigation.

26. Officers then carried out a traffic accident investigation, deciding against the arrest of Mr. Afshar for DUI after he explained that he had momentarily departed the scene to seek refuge in an apartment and utilized alcohol to clean his mouth. While Officer Crawford finalized the necessary documentation and ascertained Mr. Afshar's eligibility for a citation, he remained detained nearby. Mr. Afshar acknowledged sharing information with a vehicle owner, disclosing his involvement in the initial collision before leaving due to a panic attack he experienced.

27. Officer Crawford concluded the citation development process and approached Mr. Afshar within the parking area, holding various items and paperwork and the citation. Positioned a few feet away and directly facing him, Officer McCauley stood to Mr. Afshar's right while Officer Butler stood on his left. While speaking to him, Mr. Afshar's driver's license inadvertently slipped from Officer Crawford's hand, falling near her feet. Despite this occurrence, Officer Crawford notified Mr. Afshar that he could retrieve the license right after officers departed the scene. While the interaction continued, Officer Crawford's demeanor exhibited signs of frustration. After asking if he had any questions, Officer Crawford's conduct turned defensive, leading her to ask Mr. Afshar to step back, a request he promptly complied with. The situation escalated as Officer Crawford and Officer McCauley instructed Mr. Afshar to take another step, prompting him to question the need. Suddenly, without prior warning, Officer McCauley verbally signaled "O and R" to fellow officers, and they rapidly closed the distance to restrain Mr. Afshar by grabbing his arms to apply handcuffs. The handcuff application caused Mr. Afshar intense pain and injury, leading him to vocalize a claim of a broken arm. Following the aggressive restraint, medical assistance was summoned, resulting in Mr. Afshar's transportation to Renown Medical Center. He was

8

subsequently issued citations for Reno municipal code offenses, including obstructing and resisting, hit and run, and failure to maintain a travel lane. A supervisor responded to investigate the employment of force during the incident.

IX.    **EVIDENCE REVIEWED**

28. Axon_Body_3_Video_2022-03-16_0152_X6031246Z.mp4

Body Cam Titled" Axon Body 3 152 X6031246Z": OFFICER PATRICK MCCAULY

29. Axon_Body_3_Video_2022-03-16_0152_X6031627D.mp4

Body Cam Titled "Axon Body 3 152 X6031627D": OFFICER SHELBY CRAWFORD

30. Traffic_Accident_Citation_O_And_R.mp4

Body Cam Titled "TRAFFIC ACCIDENT CITATION O AND R": OFFICER JEFFREY BUTLER

31. Mohammad Afshar - Expert File\Handwritten_Citation.pdf"

32. Mohammad Afshar - Expert File\ORG Report_Ofc Officer Crawford.pdf"

33. Mohammad Afshar - Expert File\Supplemental Report 1_Ofc Officer McCauley.pdf"

34. Mohammad Afshar - Expert File\Supplemental Report 2_Ofc Officer Butler.pdf"

35. Mohammad Afshar - Expert File\Supplemental Report 3_Ofc Officer Crawford.pdf"

36. Mohammad Afshar - Expert File\Traffic Accident_Report.pdf"

37. Mohammad Afshar - Expert File\Axon_Capture_Photo_2022-03-16_035133_9721 (1).jpg"

38. Mohammad Afshar - Expert File\Axon_Capture_Photo_2022-03-16_035133_9721.jpg"

39. Mohammad Afshar - Expert File\Axon_Capture_Photo_2022-03-16_035156_9721 (1).jpg"

40. Mohammad Afshar - Expert File\Axon_Capture_Photo_2022-03-16_035156_9721.jpg"

41. Mohammad Afshar - Expert File\Axon_Capture_Photo_2022-03-16_040532_9721.jpg"

X.    **ANALYSIS OF PERFORMANCE**

A. **Opinion 1- Officers failed to utilize the proper principles of Contact/Cover.**

42. Based on my experience, education, and training, it is my opinion and evident that the officers failed to employ the principles of contact and cover during this incident. The analysis of BWC footage shockingly reveals the officers' inadequate and unsafe management of Mr. Afshar throughout this incident.

43. A standard police practice to ensure the safety of detained individuals and officers

9

during an interaction is by implementing tactics, such as positioning the detained individual at the front of an accessible police vehicle, thereby limiting their freedom of movement. Essential to this practice is that officers provide clear direction, indicating to the individual that they are not free to move around. Using the vehicle offers a barrier to any threats a detained individual may present. A marked patrol vehicle was present at the scene, offering a viable means of subject control. The image below visually depicts the proximity of the police vehicle in question.



44. The omission of measures to limit Mr. Afshar's mobility implies that officers did not perceive him as a potential threat. This observation is reinforced by visuals captured in the BWC footage, which demonstrates officers permitting Mr. Afshar to enter and remain within the vehicle and retrieve an item that appears to be a green water bottle. Moreover, Mr. Afshar was permitted to stand while holding the bottle and frequently allowed to place his hands into his pockets during the interaction. The BWC recording shows that Mr. Afshar was even granted the ability to move to the dimly lit rear of the vehicle and engage in conversation with a friend.







45. Had the officers adhered to the appropriate protocols of contact and cover throughout this incident, the subsequent altercation concerning the dropped driver's license would likely have been averted. Interacting with Mr. Afshar, positioned at the front of a police vehicle, would have effectively mitigated safety concerns related to retrieving the license from the ground.

**B. Opinion 2 – Officers lacked proper command and control measures.**

46. In my opinion, based on my experience, education, and training, Officers failed to implement proper command and control measures. As the senior officer (or training officer), it is evident that Officer McCauley should have assumed greater command over the situation. Ironically, despite the officers' awareness of Mr. Afshar's prior departure from the accident scene, they did not adequately constrain his movements, risking his potential to escape on foot. The BWC evidence underlines Officer Crawford's status as a new officer, demonstrating her reliance on Officer McCauley for support. This dependence is notably observed in her efforts to complete investigative paperwork accurately and ascertain the appropriate charges.

47. Officer Crawford encountered difficulties attempting to issue a paper citation to Mr. Afshar. Instead of positioning him in front of a police vehicle, she positioned herself in front of him in the parking lot without a proper workspace. During the interaction, Officer Crawford attempted to simultaneously manage the paperwork, input additional information (phone number), and employ her cellphone camera while conversing with Mr. Afshar. Despite asking him twice if he had any questions, Officer Crawford's responses to his questions lacked respect, and Crawford failed to address his concerns about providing his version of events during the investigation. She employed a hand gesture to quell his questions while addressing him informally as "dude." Recognizing the situation's inadequate progression, Officer McCauley interjected by urging Officer Crawford to "Issue him the citation."[1] This intervention seemed to stem from a frustration arising from Officer Crawford's ongoing dialogue instead of simply issuing the citation and finalizing the interaction.

48. Officer McCauley could have taken over the contact officer role and completed that aspect of the interaction versus allowing Officer Crawford to escalate the situation

---

[1] **BWC McCauley at 03:22:58.**

regarding retrieving the driver's license that <u>she</u> dropped.

49. Conducting the interaction at the hood of the patrol vehicle would have likely averted the blunder where Officer Crawford dropped the license. This arrangement would have prevented the need for her to manage multiple pieces of paperwork simultaneously. Additionally, the requirement to photograph the citation, possibly as a response to needing to fill it out accurately later, was unnecessary.

50. The inadequate management and insufficient control exerted by officers over Mr. Afshar during the encounter created the officers' safety concerns. The officer's poor implementation of command-and-control strategies, alongside the issuance of contradictory directives, precipitated an environment in which unnecessary force was employed, culminating in harm to Mr. Afshar. The ambiguity created by instructing him to step back (reportedly to safeguard Officer Crawford from a potentially harmful kick) following prior communication that he could retrieve the license after their departure fostered confusion and potentially contributed to Mr. Afshar's hesitance to comply. During the interaction, Mr. Afshar demonstrated no signs of being physically aggressive toward the officers. Additionally, the officers' frustration with his inquiries led to an unreasonable inflation of safety concerns about potential physical harm, particularly regarding retrieving the dropped license. Officer Crawford's prior statement to Mr. Afshar that he could retrieve the license contrasted with their request to step back as a precaution against any perceived threat was confusing. This mixed messaging and the apparent uncertainty surrounding safety protocols contributed to a breakdown in communication and likely led to Mr. Afshar's reluctance and confusion to continue stepping back.[2]

51. Proper command and control, including eliminating conflicting orders, would have likely prevented Mr. Afshar's injuries.

**C. Opinion 3 – Officers failed to employ de-escalatory tactics.**

52. Based on my experience, education, and training, in my opinion, the officers failed to utilize de-escalation techniques to minimize the necessity of force in interactions with Mr. Afshar. Numerous options were available concerning the dropped driver's license. Additionally, the BWC footage reveals a significant omission: the officers' failure to caution Mr. Afshar about the impending arrest for obstruction and resisting charges,

---

[2] BWC Crawford at 03:22:48.

along with the potential application of force without cooperation. The officers neglected to communicate their intent to arrest him on these charges and to direct Mr. Afshar to place his hands behind his back. The opportunity and resources to enact de-escalation strategies were present, yet the officers simply chose not to employ them.

53. Reno's publicly assessable policy indicates that "*Officers shall use de-escalation techniques and alternatives to the use of force whenever possible or appropriate and consistent with his or her training, including without limitation, advisements, warning, verbal persuasion, and other tactics.*"[3] In this situation, it was possible and should have been done.

54. Officers should have used active listening skills while communicating with Mr. Afshar. Officers should have communicated more effectively using a conversational tone. Moreover, the officers did not advise Mr. Afshar that he was disobeying orders and was a potential threat to them, which could have eliminated the need to use force. Even though there was time, no warning was given to Mr. Afshar before resorting to force. Notice should have been given before the use of force. The image below indicates that officers moved to restrain Mr. Afshar without warning or notice.



## D.  Opinion 4 -  Officers did not utilize respect for people.

55. Based on my experience, education, and training, it is my opinion that the officers engaged in disrespectful and unsafe tactics, demonstrated unprofessional behavior, and employed an unjustified obstructing and resisting charge as grounds for arrest, prompted

---

[3] **Reno Police Department General Order P-400-20, July 15, 2021.**

by their emotional response to Mr. Afshar's comments. Instead of employing de-escalation techniques in response to Mr. Afshar's inquiries, the officers displayed impatience. They resorted to an improper use of force, leading to an unwarranted arrest and injury.

56. A more suitable approach for recovering the dropped license could have involved employing an alternate tactic, such as using a foot to reposition it outside of his striking range – bearing in mind that concerns about his safety threat were not ever raised before this. Officer Crawford's recurrent nonverbal cues, like raising her hand, and casual language use, such as addressing Mr. Afshar as "dude," established a context conducive to elevating conflict. Her statement to Mr. Afshar, "You are not arguing with me, or you will go to jail," predicted their intent in the ensuing events.[4] Officer McCauley's less-than-professional remark, suggesting Mr. Afshar should "Take it up with a judge Stud," likely contributed to and prompted his confusion. The officer's actions seemed to orchestrate a scenario of failure inadvertently or perhaps purposefully, despite the apparent resolution of simply answering Mr. Afshar's questions, handing him the citation, and departing the scene.

57. Analyzing the cause behind the unproductive exchanges between Mr. Afshar and Officer McCauley reveals the creation of a false narrative. As Officer Crawford focused on paperwork completion, Mr. Afshar directed questions about the investigation to Officer McCauley, who assured him that Officer Crawford would clarify matters once she conducted the investigation. Concurrently, Officer Crawford alludes to Mr. Afshar becoming uncooperative and agitated, which is false.[5] This behavior, intentional or otherwise, escalated tension during the interactions between Officer Crawford and Mr. Afshar.

58. This false narrative created tension and conflict throughout the encounter because Officer Crawford perceived Mr. Afshar as difficult and uncooperative. Conversely, given their brief interaction, Mr. Afshar assumed Officer Crawford could and would address his inquiries. The ramifications of Officer McCauley's actions extended to adopting inappropriate policing practices and the improper and unreasonable use of force. They ultimately culminated in the wrongful infliction of injuries upon Mr. Afshar.

---

[4] **BWC Crawford at 03:22:05.**
[5] **McCauley BWC at 03:01:19.**

15

**E. Opinion 5 – Officers used unnecessary and inappropriate force**

59. Based on my education, experience, and training, it is my opinion that officers used unnecessary and inappropriate force. Officers must only apply force at a level that conforms to an objectively reasonable standard relative to the circumstances, ensuring effective control and safe attainment of lawful objectives. The guiding precedent of *Graham v. Conner* directs law enforcement's adherence to appropriate force deployment. This assessment of legitimacy is dependent on reasonableness, necessity, and proportionality relative to the specific threat presented by an individual.

60. Specific circumstances must be evaluated to determine if force is objectively reasonable. Again, before the driver's license retrieval incident, the officers displayed no apparent officer safety concerns. The officers' permissiveness of Mr. Afshar's actions, including unrestricted mobility with hands in pockets, entry and exit from the vehicle, and secluded conversations with a friend, alludes to a lack of any perceived threat to the officer's safety.

61. Moreover, Mr. Afshar was not issued a verbal warning when it was feasible before the officers grabbed his wrist and arms and forced them behind his back, causing injury. Had a warning been provided, it is more likely than not that Mr. Afshar would have eventually complied. In this situation, it appears that the excessive force used by officers was intended to punish or retaliate against Mr. Afshar because they lacked patience. They already exhibited no concerns about detaining him for over 60 minutes in violation of NRS when unnecessary and excessive force was applied.

**F. Opinion 6 – Officers violated Nevada Revised Statute 171.123 (60-Minute Rule)**

62. Based on my experience, education, and training, I believe officers in this event violated NRS 171.123, which addresses temporary detentions by police officers. Nevada police organizations commonly call this NRS the '60-Minute rule.'

63. Officers should have taken steps to release Mr. Afshar as they could only detain him for up to 60 minutes, as this has been Reno Police Department policy for many years. "A person must not be detained longer than is reasonably necessary to effect the purposes of this section and in no event longer than 60 minutes."[6] See Reno Police Department policy images below:

---

[6] **Reno PD General Order T-400_04 June 9, 2004**.

**Investigative Detention (Terry Stop)**

NRS 171.123 Temporary Detention by Peace Officer

1. Any peace officer may detain any person whom the officer encounters under circumstances which reasonably indicate that the person has committed, is committing, or is about to commit a crime.

2. Any peace officer may detain any person that the officer encounters under circumstances which reasonably indicate that the person has violated the conditions of his parole or probation.

3. The officer may detain the person pursuant to this section only to ascertain his identity and the suspicious circumstances surrounding his presence abroad. Any person so detained shall identify himself, but may not be compelled to answer any other inquiry of any peace officer.

4. A person must not be detained longer than is reasonably necessary to effect the purposes of this section, and in no event longer than 60 minutes. The detention must not extend beyond the place or the immediate vicinity of the place where the detention was first effected, unless the person is arrested.

The Nevada Statute (NRS 171.123) is based upon the United States Supreme Court case of

Page 1 of 3

---

**LEGAL PROCEDURES**

**Reverence for the Law/Constitutional Requirements**

1. The primary duty of a police officer is to uphold and enforce the law in a fair and equitable manner. The laws of the State of Nevada allow for fair application within the spirit of the law.

2. Peace officers must take an oath of office to enforce the law and uphold the Constitution of the United States and the Constitution of the State of Nevada. In applying the law, officers must exercise mature judgment and discretion within the limits of statutory authority and departmental policy.

3. Criminal investigations are scrutinized by the courts. Employees must keep informed of court decisions that relate to police investigative conduct.

4. Employees will not take any action which they know, or reasonably should know, is not in accordance with established legal precedent or statutory law.

5. Employees will follow established constitutional guidelines and requirements pertaining to interrogation of individuals suspected of criminal activity.

---

64. The analysis of the BWC footage reveals that Mr. Afshar was initially engaged before 0219 hours and subsequently informed by Officers McCauley and Butler that his detainment continued at 0323 hours. At 0324 hours, Officers McCauley and Butler proceeded to apprehend Mr. Afshar, promptly invoking the term "O and R," informally referring to the Reno Municipal Code Section *8.06.010 obstructing or resisting an officer*. The officers' actions intentionally disregard the implications of NRS 171.123. Officer Crawford's comments, as captured by the BWC footage, exemplify this total disregard, as she was heard saying, "Does he think it's gonna get him outta here faster?"

17

and "That's cute,"[7] in response to Mr. Afshar's agreement to a preliminary breath test (PBT).

65. This unlawful detention provided the opportunity and thus contributed to the use of force, which led to the subsequent injury of Mr. Afshar's arm.

## XI.    CONCLUSION

66. The evidence in this case clearly demonstrates that the officers completely disrespected and disregarded Mr. Afshar's rights. Detaining an individual over 60 minutes in violation of NRS and subsequently charging the individual for obstructing due to circumstances they created was unreasonable. The officers are solely responsible for extending the length of time with their lack of knowledge about traffic enforcement activities and NRS pertaining to Terry Stops. Officer manipulation and poor tactics led to a scenario that prompted officers to lose patience and resort to unreasonable and improper force, ultimately causing severe injuries to Mr. Afshar. Not every situation requires police action. If an officer can walk away from a situation and no negative outcome results, as in the case of the dropped license, it is the preferred response rather than creating an arrest and using improper force.

## XII.    RIGHT TO AMEND REBUTTAL REPORT

67. The opinions presented in this report are based solely on the documents and information available as of the date of this report. I recognize that ongoing discovery may produce additional information, and further depositions may provide additional insights. Therefore, I acknowledge the possibility of expanding or revising my opinions in an amended report should any new evidence come to light. If the Plaintiffs submit any rebuttal to my expert report, I retain the right to respond to any issues raised therein. If called upon to testify, I reserve the right to use demonstratives and aids to effectively illustrate my opinions.

---

[7] **BWC Crawford 03:13:34.**

18



September 5, 2023

**Christopher Darcy**

**Principal/CEO, Fairfax Consulting Group LLC**

Date

# EXHIBIT B

# EXHIBIT B



## CHRISTOPHER DARCY

UNDERSHERIFF (RET) I EXPERT WITNESS I CONSULTANT
NV PILB LIC #4101

December 30, 2024

Mr. Kenneth Lyon
Law Offices of Kenneth E. Lyon, III
432 Court Street
Reno, NV 89501

### FRCP 26 (a)(2)(B) Report

In the Matter of:

**MOHAMMADALI AFSHAR,**

**Plaintiff,**

**vs.**

**JEFFREY BUTLER, PATRICK MCCAULEY; SHELBY CRAWFORD; THE CITY OF RENO, a political subdivision of the State of Nevada; and DOES 1–X, inclusive,**

**Defendants.**

**Case No. 3:24-cv-00110**

Pursuant to Federal Rule of Civil Procedure 26(1)(2), I hereby submit my report that contains a complete statement of preliminary opinions to be expressed and the bases and reasons therefor; the data and other information I considered in forming the preliminary opinions the exhibits or list of references I used as a summary of or support for the opinions; my qualifications, including a list of all publications authored within the preceding ten years; the compensation to be paid for the review and testimony time; and a listing of any other cases in which I have testified as an expert at trial or by deposition within the preceding four years.

Submitted by:
Mr. Christopher Darcy
Fairfax Consulting Group, LLC
PO Box 371748
Las Vegas, NV 89137
(702) 419-9792
www.chrisdarcy.com

# Table of Contents

TABLE OF EXHIBITS..................................................................................................ii

INTRODUCTION ..................................................................................................... 1

FOCUS OF ANALYSIS ........................................................................................... 1

BACKGROUND ...................................................................................................... 1

QUALIFICATIONS AND EXPERIENCE FOR REVIEWING THIS INCIDENT ............... 3

COMPENSATION ................................................................................................... 5

OPINION STANDARDS/DEGREE OF CERTAINTY..................................................... 6

FACTS AND DATA CONSIDERED/DOCUMENT REVIEW......................................... 6

OPINION METHODOLOGY & PROCEDURES .......................................................... 7

SUMMARY OF INCIDENT ...................................................................................... 8

SUMMARY OF OPINIONS ..................................................................................... 11

OPINIONS AND BASIS FOR OPINIONS................................................................. 12

   Opinion 1 - A reasonably competent police officer acting consistent with typical and standard police practices would have reduced the likelihood of using force by de-escalating, using the principles of contact cover, command and control, and proper handcuffing tactics. .................................................................................. 12

   Opinion 2 - A reasonably competent police officer acting consistent with typical police practices would have informed Afshar that he was under arrest, provided an opportunity to comply, and issued a force warning before using force. ........................................ 19

   Opinion 3 - A reasonably competent police officer acting consistent with typical and standard police practices would have issued Afshar the citation and ended the contact. .......................................................................................................................... 20

   Opinion 4 - A reasonably competent police officer acting consistent with standard and typical police practices would not have used force upon Afshar.............................. 27

RIGHT TO AMEND REPORT ................................................................................. 31

## Table of Exhibits

Exhibit 1, Butler Dep. Excerpt 112:3–25 ........................................................................ 23
Exhibit 2, McCauley Dep. Excerpt 82:5–16 .................................................................... 24
Exhibit 3, McCauley Dep. Excerpt 90:2–24 .................................................................... 25
Exhibit 4, McCauley Dep. Excerpt 98:15–25 .................................................................. 26

## INTRODUCTION

As the Chief Executive Officer (CEO) of Fairfax Consulting Group, LLC (FCG), a professional consulting services company based in Las Vegas, Nevada, I am responsible for providing policy reviews, evidence-based evaluations, and expert opinions about police practices, security protocols, and public safety performance.

## FOCUS OF ANALYSIS

On June 29, 2023, I was retained by Mr. Kenneth Lyon, III, Esq., who asked me to examine and evaluate the facts and circumstances involving alleged police misconduct and to provide an opinion on the police practices utilized by Reno Police Department officers during a hit-and-run investigation. The police officers' conduct and tactics used during their investigation resulted in Mohammadali Afshar (Afshar) suffering severe injuries. I was requested to review the case materials and produce a report identifying my opinions on the reasonableness of the force used and my opinion on whether the force used was excessive. Further, I was asked to review the tactics and police practices employed by officers and the impact of their tactics on their decision to employ force.

## BACKGROUND

With an extensive background in public safety, I bring a comprehensive understanding of police practices and operations to this analysis. My extensive background, which includes a career spanning 31 years as a commissioned police officer for the Las Vegas Metropolitan Police Department (LVMPD), provides me with a unique and in-depth perspective on this subject. In 2022, I retired at the rank of Undersheriff, overseeing the department's daily operations, including the safety and security of the Clark County Detention Center (CCDC).

Throughout my career, I produced, reviewed, and approved numerous department policies. These policies, which encompassed using force, internal investigations, and

interactions with the public, were instrumental in shaping the police department's operations and practices.

My journey in law enforcement began upon graduating from Shippensburg University in Pennsylvania, where I obtained a bachelor's degree in criminal justice in 1989. My experience in security operations began in 1989 when I entered the field as a security officer for Strawbridge & Clothier Corporation. I was then recruited by the Lower Merion Township Police Department (LMPD) in 1989. I completed the Pennsylvania State Police Municipal Police Academy. I was assigned to the LMPD Patrol Division when I was recruited by LVMPD in early 1991. After graduating from the LVMPD Police Academy and completing the Field Training Program, I officially began my full-time career in Las Vegas as a police officer in September 1991.

During my 31-year career at LVMPD, I have held the following positions:

A.     Undersheriff (Ret. Dec. 28, 2022), 2021–2022

B.     Assistant Sheriff over the Law Enforcement Investigations Support Group, 2020–2021

C.     Deputy Chief of the Homeland Security Division, 2020

D.     Deputy Chief of the Investigative Services Division, 2017–2020

E.     Captain/Director of the Southern Nevada Counter Terrorism Center, 2015–2017

F.     Captain of the Major Violators and Central Narcotics Bureau, 2013–2015

G.     Captain of the Internal Affairs and Employment Diversity Bureau, 2011–2013

H.     Captain of the Northeast Area Command (Patrol), 2007–2011

I.     Lieutenant of Gang Crimes, 2006–2007

J.     Lieutenant of the Office of Quality Assurance, 2005–2006

K.     Lieutenant at Northwest Area Command (Patrol), 2004–2005

L.     Sergeant assigned to various detective and patrol assignments, 1999–2004

M.     Detective assigned to Robbery Homicide, General Detectives, 1995–1999

N.     Detective assigned to Vice, 1994

2

O.     Police Officer I/II assigned to various area commands, 1991–1994

## QUALIFICATIONS AND EXPERIENCE FOR REVIEWING THIS INCIDENT

To support my expertise, during my three decades in policing, I have served in many facets of law enforcement. From patrol operations to investigations, area command management, and police administration, I have developed my skills in reviewing critical incidents and evaluating circumstances. Additionally, I have fulfilled crucial responsibilities in policy evaluation and policy development.

I have obtained many certifications to enhance my qualifications. I hold certificates in Basic, Advanced, Management, and Executive Nevada Peace Officers' Standards and Training (POST). Furthermore, I maintained a Department of Justice (FBI) Top Secret/SCI (TS-SCI) security clearance for the last ten years of my career.

As a certified instructor with LVMPD throughout my career, I have actively contributed to the professional development of fellow officers. I have delivered comprehensive training on critical topics such as leadership, de-escalation, and the use of force. Furthermore, I have had the privilege of presenting at esteemed institutions such as the Bureau of Justice Assistance (BJA), where I presented the concepts of Place Network Investigations (PNI). PNI focuses on the core causes of crime and disorder in communities, often multi-family housing complexes, and ways to reduce the occurrence of criminal activity.

In 2014, I earned a Master of Arts in administrative leadership from the University of Oklahoma. This equipped me with advanced knowledge and skills in leadership, organizational management, and strategic decision-making.

In 2018, I completed the Aspen Institute Executive Course on Leadership, Values, and Good Society to enhance my critical thinking and evaluation capabilities.

3

During my tenure as Undersheriff, Assistant Sheriff, and Deputy Chief, a sizable portion of my responsibilities entailed providing leadership and guidance to LVMPD's Critical Incident Review Process (CIRP). This encompassed overseeing the Force Investigations Team (FIT) and the Critical Incident Review Team (CIRT). As Chairperson of the LVMPD Use of Force and Tactical Review Board, I evaluated FIT and CIRT investigations pertaining to the use of deadly and non-deadly force.

As the Chief of Detectives, I evaluated and provided leadership and guidance on criminal case strategies and investigative methods. Through these roles, I facilitated my competence in completing comprehensive and objective reviews of critical incidents, ensuring transparency, thoroughness, and adherence to established protocols.

As a representative of LVMPD, I have been deposed in cases involving officer-involved shootings as the person most knowledgeable (NRCP 30(b)(6)) on the use of force. Additionally, I have participated in federal court mediations concerning allegations of the inappropriate use of force by police officers. I have also testified in court proceedings, sharing my knowledge and expertise on police practices. In collaboration with LVMPD's Office of General Counsel and various law firms, I have aided and guided on matters involving allegations of constitutional violations by employees.

I am a member of the American Society for Industrial Security (ASIS) International, an association dedicated to advancing the security management practices of people, property, and information. I am a member of the FBI National Academy Alumni Association, the Nevada Society of Professional Investigators, the International Association of Chiefs of Police (IACP), and the Association of Threat Assessment Professionals (ATAP).

I am a licensed private investigator (PI) NV PILB #4101 and security consultant in the State of Nevada per NRS 648.0155, which defines a security Consultant as "a person

licensed as a private patrol officer or private investigator who engages in the business of furnishing advice on the proper methods and equipment for providing security and protection for persons or property."[1]

As a consultant, expert witness, and CEO of Fairfax Consulting Group, LLC, I have delivered comprehensive policy review services and authored evidence-based evaluations of police performance for the Albuquerque Police Department. In my capacity as an independent Monitor of the Use of Force for the City of Albuquerque, New Mexico, I provide analysis and strategic guidance as a subject matter expert (SME) in police use of force. My expertise includes evaluating use-of-force protocols, officer-involved shootings (OIS), in-custody death incidents, training programs, and managing high-profile investigations. Additionally, I have consulted with the Anchorage Police Department on officer-involved shootings and served as an external supervisor for internal investigations related to such incidents.

I have provided numerous expert opinions on police and security practices and have been deposed to support the trier of fact in litigation related to the performance of police officers and security personnel. I have been retained by counsel in Nevada, California, Washington, D.C., and Texas. I last provided police practice trial testimony in 2022.

## COMPENSATION

I am being compensated for my work at my usual and customary rate of $400 per hour. My compensation and professional fee structure are outlined in my 2024 Fee Schedule and are not dependent on or related in any way to the nature or substance of my opinions or the outcome of this case.

---

[1] NRS 648.0155

5

## OPINION STANDARDS/DEGREE OF CERTAINTY

The opinions expressed herein are to a reasonable degree of scientific certainty and/or to a reasonable degree of professional certainty.

## FACTS AND DATA CONSIDERED/DOCUMENT REVIEW

I utilized the materials listed below to assist in forming my opinion:

1. Deposition of Jeffrey Butler
2. Deposition of Mohammadali Afshar
3. Deposition of Patrick McCauley
4. Citation
5. Officer Crawford's Report ORG
6. Officer McCauley's Supplemental Report #1
7. Officer Butler's Supplemental Report #2
8. Officer Crawford's Supplemental Report #3
9. Traffic Accident Report
10. Axon_Body_3_Video_2022-03-16_0152_X6031246Z
11. Axon_Body_3_Video_2022-03-16_0152_X6031627D
12. Traffic_Accident_Citation_O_And_R
13. Traffic_Accident_O_AND_R
14. Axon_Body_3_Video_2022-03-16_0433_X6031246Z
15. Axon_Body_3_Video_2022-03-16_0423_X6031627D
16. Axon_Body_3_Video_2022-03-16_0338_X6031570Y
17. Axon_Body_3_Video_2022-03-16_0145_X6030597V
18. Accident_Investigation
19. Axon_Capture_Photo_2022-03-16_035133_9721(1)
20. Axon_Capture_Photo_2022-03-16_035133_9721
21. Axon_Capture_Photo_2022-03-16_035156_9721(1)

6

22. Axon_Capture_Photo_2022-03-16_035156_9721

23. Axon_Capture_Photo_2022-03-16_040532_9721

## OPINION METHODOLOGY & PROCEDURES

The opinions expressed in this report were based on an analysis of the specific case information provided, using methodologies and policy standards widely accepted in police practice and critical incident reviews. Such standards' benefits included providing consistency of services, codifying best practices and policies, and sharing lessons learned. Any cited resources supported these methodologies.

In evaluating the facts of this case, I utilized a case study methodology because this incident was bound by time, location, and specific events. I employed qualitative and quantitative content analysis alongside my specialized knowledge, skills, education, experience, and training. Further, I reviewed the case information to understand the facts. I conducted a document review, examined all documents for relevance, and established facts related to the issues at hand. I reviewed all available video evidence. The video was examined, and any pertinent information relevant to the issue was used to analyze and compare officer statements about the incident. I reviewed and analyzed the officer's actions based on all relevant evidence, relevant testimony of witnesses, departmental and/or external investigations, physical evidence, and any other relevant information to determine the actions taken by officers, their justification for their actions, and why they took them.

I utilized a comparison with widely and nationally accepted police training and practices. This step in the methodology involved comparing what the officers did and why, then applying the objective standard with various police training and accepted police practices. Nationally accepted training and practices included relevant Supreme Court cases, departmental policies and procedures, training, and research. I focused on understanding

7

the participants' perspectives when evaluating this incident; however, my opinions were based upon the facts presented by the material and avoided explicitly drawing conclusions based on the credibility issues of the parties.

In summary, I formed my opinions by reviewing all case-specific materials, relying on my extensive experience in law enforcement, and adhering to consensus-based police practices, procedures, and typically accepted standards in producing my opinions.

## SUMMARY OF INCIDENT

The details of this incident are primarily present within all of the body worn camera footage. Below is a summary, or overview, of salient points extracted from the body worn camera footage.

On March 16, 2022, at approximately 1:30 a.m., City of Reno Police Department (RPD) Officers Shelby Crawford, #16528 (Crawford), Jeffrey Butler, #14060 (Butler), and Patrick McCauley, #10987 (McCauley), Isaac Meadows (unk#) (Meadows) responded to a hit-and-run incident at 2220 Escalera Way in Reno, Nevada, reported under event number 22-5060. Crawford was a new officer whom McCauley was training. RPD Officers determined that a 2010 Subaru Outback had been struck while legally parked on the roadway, causing it to collide with the rear quarter panel of a 2021 Toyota 4Runner lawfully parked in a driveway. Evidence at the scene indicated that the responsible vehicle had fled. Officers had activated their body-worn cameras on arrival.

Officers traced a fluid trail to discover the suspect vehicle parked by the apartments at 5250 Villa Verde Drive. The identified involved vehicle, a 2003 Lexus sedan bearing Nevada registration NV 113-R96, exhibited front-end damage and double airbag deployment. At approximately 0157, Butler joined McCauley and Crawford at the Lexus's location. Officer Butler maintained surveillance of the Lexus. Crawford was tasked as the primary investigator of the accident, working under the supervision of McCauley. At

8

approximately 0200, McCauley and Crawford returned to the original accident scene. Butler maintained surveillance on the suspected Lexus vehicle, and subsequently, at approximately 0214, Officer Meadows joined Butler at the location of the Lexus. At approximately 0215, the driver and owner, Mr. Mohammadali Afshar (Afshar), emerged from an apartment and approached the vehicle. He was engaged by officers and subsequentially detained for investigation of a hit and run.

Officers investigated, and Afshar indicated that he had inadvertently struck the Subaru while using his cell phone. At approximately 0216, Meadows asked Afshar for his driver's license and proof of insurance and registration, which he provided.

At approximately 0219, while Butler detained Afshar, Meadows returned to the original accident scene, provided Crawford and McCauley with Afshar's driver's license, and advised them of Afshar's claim that he had provided his insurance information to the Subaru owner.

At approximately 0228, Meadows again joined Butler at Afshar's vehicle, where they continued to detain him pending Crawford and McCauley's investigation. BWC reveals that Afshar informed Meadows early on in this investigation, "I have an anxiety disorder."

At approximately 0303, Crawford and McCauley made their first contact with Afshar. At that time, Afshar was talking and acting "***normal***," as Officer Crawford subsequently acknowledged to McCauley.

After this first brief interaction, Crawford went to her vehicle and continued to process the paperwork, intent on serving Afshar with a citation for the accident and leaving the scene.

At approximately 0320 hours, Meadows departed the scene.

9

At approximately 0321, Crawford and McCauley reengaged with Afshar to serve, or issue, him a citation.

Afshar questioned Crawford's decision to issue a citation for "hit-and-run" because he believed he had provided the Subaru owner (Rose Wolterbeek) with his insurance information. Afshar had previously told officers that he allowed Wolterbeek to photograph his cell phone showing his name and insurance information. Crawford stood in front of Afshar in the apartment parking lot, she was slightly adjacent and in front of their patrol vehicles.

While speaking with Afshar, Crawford inadvertently dropped his driver's license. When Afshar requested that Crawford pick it up, Crawford responded that he could retrieve it after the officers had departed. While the interaction continued, Crawford's demeanor exhibited signs of frustration with the Afshar for asking her questions.

While the interaction with Crawford continued, Butler and McCauley also exhibited frustration, prompting McCauley to forcefully tell Crawford to serve the citation. However, rather than handing Afshar the citation, Crawford, in an apparent effort to continue with the investigation, asked Afshar for his telephone number and other identifying information, which Afshar advised had already been provided.

At approximately 0322, Crawford informed Afshar about the citation, his court date, and the consequences of missing the court date. At that time, Crawford asked whether Afshar had any more questions, and Afshar responded by asking Crawford if her BWC was on and to include in her report that he felt she had not been helpful in answering his questions.

Crawford then asked Afshar to back up, so she could pick up his license. Afshar questioned the command to back up, at which point Butler and McCauley informed Afshar that he was still being detained.

10

After being told again to back up by McCauley, Afshar complied by taking a step backward.

Crawford and McCauley instructed Afshar to take another step back, prompting him to question the command again.

Suddenly, without any warning to Afshar, McCauley verbally signaled "O and R" (obstruction and resisting), and he and Butler immediately and without warning grabbed Afshar by the arms to apply handcuffs. Butler grabbed the left arm, and McCauley grabbed the right arm. When McCauley and Butler grabbed Afshar by both arms, they appeared on BWC attempting to utilize a wrist lock and gain control of his arms. Their application of force caused a significant injury to Afshar's right arm, and Afshar asserts that McCauley, Butler, and Crawford used inappropriate and unnecessary force.

Following the application of handcuffs, medical assistance was summoned, resulting in Afshar's transportation to Renown Medical Center. Afshar was subsequently issued citations for Reno Municipal Code offense, obstructing and resisting, NRS violations of duty upon damaging vehicle, and failure to maintain a travel lane. A supervisor, Sergeant Blount, responded to investigate the employment of force during the incident.

I was not provided a copy of the Blue Team use of force report or a copy of any internal affairs investigation as part of my review.

## SUMMARY OF OPINIONS

**Opinion 1. A reasonably competent police officer acting consistent with typical and standard police practices would have reduced the likelihood of using force by de-escalating, using the principles of contact cover, command and control, and proper handcuffing tactics**

11

**Opinion 2.  A reasonably competent police officer acting consistent with typical police practices would have informed Afshar that he was under arrest, provided an opportunity to comply, and issued a force warning before using force**

**Opinion 3. A reasonably competent police officer acting consistent with typical and standard police practices would have issued Afshar the citation and ended the contact**

**Opinion 4. A reasonably competent police officer acting consistent with standard and typical police practices would not have used force upon Afshar**

## OPINIONS AND BASIS FOR OPINIONS

**NOTE:** *My report and testimony are intended to provide professional, fair, objective, and nonpartisan opinion evidence. My opinions are intended to inform the trier of fact, assist the court as reasonably required, and support and respect the jury's responsibility to determine the matter.*

**Opinion 1 - A reasonably competent police officer acting consistent with typical and standard police practices would have reduced the likelihood of using force by de-escalating, using the principles of contact cover, command and control, and proper handcuffing tactics.**

In my opinion, based on my experience, education, training, and specialized knowledge and considering the totality of circumstances, a reasonably competent police officer acting consistent with typical police practices would have reduced the likelihood of using force by de-escalating, using the principles of contact cover, command and control, and proper handcuffing tactics.

I base my opinions on my 32-year law enforcement career. As a police officer and supervisor, I investigated, supervised, and reviewed hundreds of dynamic critical

12

<u>incidents involving the use of force. I further base my opinions on the facts and information below.</u>

RPD General Order - **<u>USE OF FORCE</u>** (p.1–5) indicates, "***it is the Policy of the Reno Police Department to protect human life and human rights. Officers must use only the amount of force that is <u>Objectively Reasonable</u> to effectively bring an incident under control, while protecting the safety of the Officer and others. Officers must only use that force that a <u>reasonably prudent Officer would use</u> under similar circumstances. Officers are expected to apply force in accordance with departmental training.***

And "***Objectively Reasonable: This term means that, in determining the necessity for force and the appropriate level of force, Officers <u>shall evaluate each situation in light of the known circumstances, including, but not limited to, the seriousness of the crime, the level of threat or resistance presented by the subject</u>, and the danger to Officers and/or the community***."

And "***Non-Deadly Force: Force other than that which is considered deadly force. This includes any physical effort used to control or restrain another, or to overcome the resistance of another***."

And "***A. Use of Force in General -Pursuant to NRS 171.1455, if it is necessary for an Officer to force, the Officer must:***

    1.    ***If it is possible to do so safely, identify himself or herself as a peace officer through verbal commands, visual identification, including, without limitation, a clearly marked uniform or vehicle, or other reasonable means; and***

    2.    ***Use only the level of force that is Objectively Reasonable under the circumstances to bring an incident or person under control and safely***

13

> *accomplish a lawful purpose. The level of force used by the Officer must, to the extent feasible:*
>
> a.     *Be <u>balanced against the level of force or resistance</u> exhibited by the person; and*
>
> b.     *Be <u>carefully controlled</u>.*"

Further, the General Order indicates that "***De-escalation: Verbal or non-verbal tactics or strategies employed during a potential force encounter in an attempt to stabilize the situation and <u>reduce the immediacy</u> of the threat so that <u>more time, options and resources can be called upon</u> to resolve the situation <u>without the Use of Force or with a reduction in the force necessary</u>.***

And further, covers de-escalation by stating, "***De-escalation - Pursuant to NRS 171.1455, Officers <u>shall</u> use <u>de-escalation techniques and alternatives to the use of force whenever possible</u> or appropriate and consistent with his or her training, including, without limitation, <u>advisements, warnings, verbal persuasion</u> and other tactics. Officers are <u>required</u> to utilize <u>de-escalation techniques,</u> crisis intervention and other alternatives to force when feasible. Officers are also required to utilize de-escalation techniques for responding to persons with mental illness or experiencing a <u>behavioral health crisis</u>.***"

Officers must consider that non-compliance, resistance, or non-responsiveness may stem from factors like medical conditions, impairments, language barriers, drug effects, or emotional crises rather than criminal intent. Afshar is an Iranian male student at the University of Nevada-Reno who told officers that he suffered from anxiety. While these factors don't eliminate potential danger, they may require adjusted tactics to de-escalate and slow the momentum of the situation.

14

Officers failed to properly utilize de-escalation techniques to minimize the necessity of force in interactions with Mr. Afshar. As previously indicated, numerous options concerning the dropped driver's license were available. Additionally, the BWC footage reveals a significant omission: the officers' failure to caution Mr. Afshar about the impending arrest for obstruction and resisting charges, along with the potential application of force without cooperation. The officers neglected to communicate their intent to arrest Afshar on these charges and to direct or order him to place his hands behind his back. The opportunity and resources to enact de-escalation strategies were available, yet the officers chose not to employ them. De-escalation was entirely possible, and de-escalatory tactics should have been employed.

Further, officers failed to employ the basic principles of contact and cover during this encounter. The analysis of BWC footage reveals the officers' inadequate and unsafe management or control of Mr. Afshar's movements throughout this incident.

Ensuring the safety of detained individuals and officers by containing them during an interaction is a typical police practice. Safety is accomplished by implementing tactics, such as positioning the individual at the front or hood of an accessible police vehicle, thereby limiting their freedom of movement. Essential to this practice is that officers provide clear directions, indicating to the individual that they are detained and not free to move around. The use of a vehicle as a barrier offers a simple response to any threats a detained individual may present. A marked patrol vehicle was present at the scene, offering a viable means of subject control and limiting the potential of officers dropping any paperwork.

Conducting the interaction at the hood of the patrol vehicle would have likely averted the blunder where Crawford dropped the license. This arrangement would have prevented the need for her to manage multiple pieces of paperwork simultaneously.

15

The omission of measures to limit Afshar's mobility implies that officers did not perceive him as a potential threat to their safety. This observation is reinforced by the BWC footage, which demonstrates officers permitting Afshar to enter and remain within the vehicle and retrieve an item that appears to be a green water bottle. Moreover, Afshar was permitted to stand while holding the bottle and frequently allowed to place his hands into his pockets during interactions. The BWC recording shows that Afshar was even allowed to move to the dimly lit rear of the vehicle and engage in conversation with a friend.

Officers failed to implement proper command and control measures. As the senior officer (in this case, a training officer), it is evident that McCauley or even Butler should have assumed more command and control over the situation. Ironically, despite the officers' awareness of Afshar's prior departure from the accident scene, they did not adequately constrain his movements, risking his potential to escape on foot. The BWC evidence highlights Crawford's status as a new officer, demonstrating her reliance on McCauley for assistance. This dependence is notably observed in her BWC, demonstrating her efforts to accurately complete investigative paperwork and ascertain the appropriate charges and asking McCauley, "***Are we ok***?" after Afshar's injury (McCauley BWC – 03:43:41)

Instead of positioning Afshar in front of a police vehicle, creating a barrier and a workspace, Crawford positioned herself by standing in front of Afshar in the parking lot without a proper workspace or barrier. During the interaction, Crawford attempted to simultaneously manage the paperwork, input additional information (phone number), and employ her cell phone while conversing with Afshar. Despite asking him twice if he had any questions, Crawford's responses to his questions lacked respect, and Crawford failed to address his concerns about providing his version of events during the investigation. Crawford eventually lost her temper with Afshar.

16

RPD General Order - *__Community Oriented Policing Procedures__* (p. 3, subsection 2) indicates that "***Employees will be courteous to the public. They will be tactful in performance of their duties, control their tempers, exercise patience and discretion, and not engage in argumentative discussion. When citizens or visitors request assistance or advice, or lodge a complaint, either by telephone or in person, pertinent information will be obtained in a professional and courteous manner and properly and judiciously acted upon consistent with established departmental procedures.***"

RPD General Order - *__Code of Conduct and Values and Ethics__* states, "**2. *Employees will be courteous to the public. They will be tactful in performance of their duties, control their tempers, exercise patience and discretion, and not engage in argumentative discussion. 3. When citizens or visitors request assistance or advice, or lodge a complaint, either by telephone or in person, pertinent information will be obtained in a professional and courteous manner and properly and judiciously acted upon consistent with established departmental procedures***."

Crawford employed a hand gesture to quell his questions while addressing him informally several times as "***dude***." Recognizing the situation was devolving, McCauley verbally urged Crawford to "***Issue him the citation***" (BWC - McCauley at 03:22:58). His verbal intervention seemed to stem from a frustration arising from Officer Crawford's ongoing dialogue instead of simply issuing the citation and finalizing the interaction. McCauley was a senior police officer (now Sergeant) with approximately 18 years of experience. I believe he made that statement because he could tell that Crawford was losing her temper in the interaction with Afshar. As the senior officer on the scene and responsible for Crawford's training, McCauley should have intervened.

During the encounter, the officers' inadequate management and insufficient control over Afshar supports the false perception of safety concerns. The poor implementation of

17

command-and-control strategies precipitated an environment in which unnecessary force was eventually employed, culminating in harm to Mr. Afshar.

The ambiguity created by Crawford instructing him to step back (reportedly to safeguard Crawford from a possible kick) following her prior communication that he could retrieve the license after their departure fostered confusion and contributed to Afshar's hesitance to comply.

During the interaction, Afshar demonstrated no signs of being physically aggressive toward the officers. Afshar's actions were annoying but not aggressive. Additionally, the officers' frustration with his inquiries led to an unreasonable inflation of safety concerns about potential physical harm, particularly regarding retrieving the dropped license. Officer Crawford's statement to Afshar that he could retrieve the license after they left (BWC Crawford at 03:22:48) contradicted her request to step back as a precaution against any perceived threat, which was contradictory and confusing. This mixed messaging and the apparent uncertainty contributed to a breakdown in communication and influenced Afshar's reluctance and confusion to continue stepping back. He had already stepped back once, which indicates that he likely would have again if more time had been permitted or more communication had taken place. BWC indicates that Crawford began losing her temper. As the newer officer, she may have been trying to impress the senior patrol officers with her sudden change in behavior and instructing Afshar not to disrespect her partners.

BWC indicates that the officers moved quite rapidly to handcuff Afshar. Had McCauley and Butler slowed the momentum and not rushed in, they could have gained compliance, applied a handcuffing armlock or similar tactic, and gained an advantage to handcuff him without injury. By utilizing a less hasty handcuffing tactic, officers would have been able to control Afshar's arms more carefully and avoid the possibility of injury versus just grabbing them and twisting them behind his back.

18

**Opinion 2 - A reasonably competent police officer acting consistent with typical police practices would have informed Afshar that he was under arrest, provided an opportunity to comply, and issued a force warning before using force.**

In my opinion, based on my experience, education, training, and specialized knowledge and considering the totality of circumstances, a reasonably competent police officer acting consistent with typical police practices would have informed Afshar that he was under arrest, provided an opportunity to comply, and issued a force warning before using force.

I base my opinions on my 32-year law enforcement career. As a police officer and supervisor, I investigated, supervised, and reviewed hundreds of dynamic critical incidents involving the use of force. I further base my opinions on the facts and information below.

BWC indicates that officers did not advise Mr. Afshar that he was disobeying orders and a potential threat to them, which could have eliminated the need to use force. Even though there was time, Afshar was not warned before resorting to force. Notice should have been given before the use of force. Officers did not announce their intent to detain him for obstructing, attempt to search him, or advise Afshar he was under arrest before using force.

Officers displayed no apparent concern for officer safety before the issue with the dropped driver's license retrieval. The officers' permissiveness of Afshar's actions, including unrestricted mobility with hands in pockets, entry and exit from the vehicle, and secluded conversations with a friend, alludes to a lack of any perceived threat to the officer's safety. When they transitioned to making him back up so they could pick up the license, they created a situation where they felt they needed to protect themselves from the threat of a kick, which was unwarranted based on Afshar's previous behavior.

Again, Afshar was not issued a verbal warning when it was feasible before the officers grabbed his wrist and arms and forced them behind his back, causing injury. Had a

19

warning been provided, it is more likely than not that Afshar would have eventually complied. In this situation, it appears that the force used by officers was intended to punish or retaliate against Afshar because they lacked patience.

I know from consulting with law enforcement agencies and from my experience in law enforcement that providing a warning before using force, when feasible, is standard practice. For example, the Albuquerque Police Department includes this in their policy titled Use of Force Prohibitions: "***Officers shall not engage in actions or tactics or make statements that escalate a situation such that the use of force becomes necessary***." Further, APD policy indicates, "**When feasible, officers shall identify themselves as police officers and announce their intent to detain, search or arrest an individual before using force**."

Mr. Afshar was not issued a verbal warning when it was feasible before the officers grabbed his wrist and arms and forced them behind his back, causing injury. Had a warning been provided, it is more likely than not that Mr. Afshar would have eventually complied.

### Opinion 3 - A reasonably competent police officer acting consistent with typical and standard police practices would have issued Afshar the citation and ended the contact.

In my opinion, based on my experience, education, training, and specialized knowledge and considering the totality of circumstances, a reasonably competent police officer acting consistent with typical police practices would have issued, or handed, Afshar the citation and ended the contact.

I base my opinions on my 32-year law enforcement career. As a police officer and supervisor, I investigated, supervised, and reviewed hundreds of dynamic critical incidents involving the use of force. I further base my opinions on the facts and information below.

20

RPD General Order - **_Community Oriented Policing Procedures_** (p. 3, subsection 2) indicates that "**_Employees will be courteous to the public. They will be tactful in performance of their duties, control their tempers, exercise patience and discretion, and not engage in argumentative discussion. When citizens or visitors request assistance or advice, or lodge a complaint, either by telephone or in person, pertinent information will be obtained in a professional and courteous manner and properly and judiciously acted upon consistent with established departmental procedures._**"

The officers engaged in disrespectful behavior toward Afshar, unsafe tactics, and unprofessional behavior. Subsequentially, prompted by their emotional response to Afshar's comments and continued questioning, they relied upon an unjustified obstructing and resisting charge as grounds for arrest. Instead of employing de-escalation techniques in response to Afshar's inquiries, the officers simply lost patience. They resorted to unprofessional behavior and unwarranted obstructing and resisting arrest charges, resulting in an application of force and his significant injury.

Crawford's statement to Afshar, "**_You are not arguing with me, or you will go to jail_**," (Crawford BWC - 03:22:00) predicted their intent as Afshar asked questions during the encounter.   Officer McCauley's unprofessional remark, suggesting, "**_Here's the deal stud, you can argue with the judge,_**" (Crawford BWC 03:22:36) likely contributed to and prompted Afshar's confusion. Crawford indicated that Afshar must not disrespect her partners when all Afshar was doing was asking questions (03:22:41). All of the officer's actions combined to purposefully accelerate a scenario of failure for Afshar despite the evident and typical resolution of simply answering Afshar's questions, handing him the citation, and departing the scene.

A more suitable approach for recovering the dropped license could have involved employing an alternate tactic, such as using a foot to reposition it outside of his striking

21

range – bearing in mind that concerns about his safety threat were not ever raised before this. Crawford's recurrent nonverbal cues, like raising her hand, and casual language use, such as addressing Afshar several times as "***dude***," worked contrary to establishing a rapport and elevated the potential for conflict.

RPD General Order - ***Citations*** (p. 1–2, Subsection II) indicates, "***Members of the Reno Police Department will make every effort to issue misdemeanor or traffic citations, in lieu of custodial arrest, to suspects who qualify for a citation.***"

   a)   *Have committed a crime that is a non-violent misdemeanor;*

   b)   *Are liable to punishment in accordance with NRS chapter 194;*

   c)   *Present satisfactory evidence of identity. (Satisfactory evidence of identity is the degree of evidence required to reasonably assure the officer that the suspect is who they claim to be.) Whenever practicable, the officer may use police and OMV records to establish one's identity;*

   d)   *Are not intoxicated to the extent that they could be a danger to themselves or other if released;*

   e)   *If for a traffic offense: sign the citation or take physical delivery of a copy of the citation;*

   f)   *If for a non traffic offense: sign the citation;*

   g)   *Do not demand an immediate appearance before a magistrate;*

   h)   *Are not physically combative ;*

   i)   *Are not being charged with an accompanying charge that does not qualify for citation;*

   j)   *Are not likely to resume the conduct that resulted in the citation;*

   k)   *Do not have a warrant for a violent crime;*

Afshar was a candidate for a citation. Analyzing the cause behind the unproductive exchanges between Afshar, Butler, McCauley, and Crawford reveals the creation of a false narrative, which typically influences how people understand, or perceive, an issue.

22

As Crawford focused on completing her paperwork, Afshar directed questions about the investigation to Butler, who advised that Crawford would clarify matters with Afshar once she conducted the investigation.

Butler indicated in his deposition (p. 112) that he deferred answering questions and that Afshar needed to ask Crawford because she was taking over the case.

Q    Now, during your encounter with Mr. Afshar, he was asking a lot of questions of you that you deferred and told him he would need to bring that up with Officer    11:48AM Crawford once she came to talk with him about the citation, correct?

A    Yes, sir.

Q    Do you remember how many times that occurred?

A    No, I don't.    11:48AM

Q    Okay.  And why would -- why were you telling Mr. Afshar he would have to address that with Officer Crawford and not you?

A    Because once I was told that she was taking over the case and she was going to run with it from start to    11:48AM finish for training purposes, it's easier to have that person do the interviews and make all the determinations straight from there versus a phone tag or relay through different people, I thought it was cleaner for the investigation if he spoke to her directly.    11:48AM

Q    Okay.  And so based on your encounter with Mr. Afshar, was it -- did you expect him to ask questions of officers Crawford and McCauley when they came on scene?

A    Yes.    11:49AM

Page 112

*Exhibit 1, Butler Dep. Excerpt 112:3–25*

McCauley indicated in his deposition (p.82) that they (Crawford and McCauley) expected Afshar to be intoxicated, agitated, and uncooperative.

> Q   Were you expecting him to be intoxicated?
> A   Yes.
> Q   Were you expecting him to be, quote, unquote, an asshole?
> A   Uncooperative.
> Q   Uncooperative.
> Were you expecting him to be agitated?
> A   Yes.
> Q   And that was based on the conversations that you had had -- both you and Officer Crawford had had with Officer Butler?
> A   Yes.

*Exhibit 2, McCauley Dep. Excerpt 82:5–16*

Additionally, McCauley indicated in his deposition (p. 90) that he believed Afshar was a "***fucking dick***" although he had previously indicated that Afshar was not being uncooperative or agitated. McCauley indicated that he was not upset that Afshar refused a preliminary breath test (PBT) to determine his level of intoxication.

24

You basically said, "He's a fucking dick."  What was -- why that comment?

A    Mannerisms, just some of the things you could read during our interaction.

Q    Can you explain that to me.

A    Not really.  It's -- you know, you interact with folks and just body language, mannerisms, the way things are said you pick up on.

Q    Because before when I asked you about the interaction, you had said he wasn't uncooperative.

A    No.

Q    And he wasn't very agitated.

A    No.

Q    But you read some body language where you felt he was being rude and in your words was a "fucking dick"?

A    Yes.

Q    Were you upset because he had refused the PBT?

A    No.

Q    Were you upset with him at all at that point in time?

A    No.

*Exhibit 3, McCauley Dep. Excerpt 90:2–24*

Further, McCauley indicated in his deposition (p. 98) that when Meadows advised that Afshar now did want to do a PBT, he responded by saying that "***He can suck your dick***" as they were in the middle of completing the citation.

25

```
        So Officer Meadows comes up to you and advises you
that Mr. Afshar does want to do a PBT; correct?
    A    Yes.
    Q    Your response was, "He can suck your dick."
    A    Yes.
    Q    Why did you say that?
    A    We were already mid-citation.  We're not going
to stop what we're doing to go up and then administer a
PBT, which we've already determined at this point is
not necessary.  He qualifies for a citation.  So we're
```

*Exhibit 4, McCauley Dep. Excerpt 98:15–25*

The incongruent communication between Butler, McCauley, and Crawford laid the foundation for escalating tensions during Crawford and Afshar's interactions.

The false narrative created tension and conflict throughout the encounter. Crawford perceived Afshar as difficult and uncooperative. Conversely, given his interactions with officers, Afshar assumed Crawford could and would address all of his inquiries. When Afshar asked questions, Crawford was dismissive, which caused Afshar to become frustrated. Afshar candidly admitted during his deposition that he "***misbehaved***" (Afshar Deposition, p. 120) with officers.

Crawford used a raised hand gesture to quell his questions while addressing him informally as "***dude***." Recognizing the situation's inadequate progression, McCauley verbally urged Crawford to "***Issue him the citation***." (BWC - Crawford at 03:22:55)

26

The false narrative and mixed messaging escalated the encounter, eventually leading to custody. Crawford's comments escalated and prolonged the encounter instead of simply handing Afshar the citation and finalizing the interaction.

McCauley and Crawford may have been motivated by the fact that they were upset that they did not have sufficient probable cause to arrest Afshar for a DUI charge. For example, McCauley is observed on BWC (X-6031246Z at 03:12:18) walking away alone and having a cigarette. BWC footage reveals him muttering to himself in a frustrated tone, "You beat the DUI, awesome." McCauley immediately mutes his body camera as if he suddenly realizes what he said. The mute doesn't appear based on procedural exceptions to BWC recording.

### Opinion 4 - A reasonably competent police officer acting consistent with standard and typical police practices would not have used force upon Afshar.

In my opinion, based on my experience, education, training, and specialized knowledge and considering the totality of circumstances, a reasonably competent police officer acting consistent with typical and standard police practices would not have used force upon Afshar.

I base my opinions on my 32-year law enforcement career. As a police officer and supervisor, I investigated, supervised, and reviewed hundreds of dynamic critical incidents involving the use of force. I further base my opinions on the facts and information below.

The standard set by *Graham v. Connor* requires that the use of force be judged from the perspective of a reasonable officer on the scene rather than with the benefit of hindsight. The *Graham* case established objective reasonableness as the standard for all force applications in the United States. This guiding precedent directs law enforcement's adherence to appropriate force deployment.

27

RPD policy states, "***It is the Policy of the Reno Police Department that officers use only the force that reasonably appears necessary to effectively bring an incident under control while protecting the lives of the officer and others. The use of force must be objectively reasonable. The officer must only use that force which a reasonably prudent officer would use under the same or similar circumstances***."

Officers must only apply force at a level that conforms to an objectively reasonable standard relative to the circumstances, ensuring effective control and safe attainment of lawful objectives. Afshar's obstructing arrest was unsupported by evidence, and the use of force in this encounter to make the arrest was not reasonable.

There was no immediate threat justifying any use of force. A belief that the suspect might potentially kick Crawford does not equate to the presence of an immediate or imminent threat that, in this case, warranted the rapid arrest and use of force by other officers. The alternative to using force was to allow Afshar to pick up the license after they left, as they initially indicated.

Additionally, the officers failed to inform Afshar that he would be arrested for obstruction and resisting (O and R) and failed to provide him an opportunity to comply before using force. A simple alternative to using force would have been to warn Afshar that he was under arrest and that force may be used against him if he tried to resist.

The crime alleged by officers was obstructing and resisting, a misdemeanor that is not severe. Afshar was not an immediate threat to the officers or other citizens nearby. Afshar was not actively resisting or exhibiting any assaulting behavior toward officers or any physically threatening behavior. Afshar did not get into a fighting stance, close distance. Afshar did not clench his fists or raise his hands. Afshar was only asking Crawford questions and became frustrated and sarcastic, as McCauley had previously assured him his questions would be answered. Afshar was not attempting to evade, run, or physically

28

challenge the officers. The officers had a 3-to-1 tactical advantage over Afshar, and officers could summon a supervisor or reinforcements if needed.

Afshar never made any assaultive comments or physical indications that he would actively attack officers. Nor did he ever threaten the officers with any harm. The officers appeared in good physical shape, whereas Afshar did not appear to possess the training or knowledge to increase his physical fighting abilities. The officers had no information that Afshar had a previous violent history or history of mental illness. Officers were not concerned about Afshar's proximity and availability of weapons as they previously let him move around freely during the encounter, and he was never handcuffed before the use of force. This incident occurred at night in a lit parking lot; however, there was no indication that environmental factors influenced any of the officers' decisions.

A primary issue in the encounter is whether or not the force used was necessary. That is, was it necessary for officers to break Afshar's arm in order to properly place him into custody? In my opinion, it was not necessary to break Afshar's arm to place him into custody. They could have effected an arrest by placing his arms behind his back without causing any injury.

Force should be the last resort, particularly when other methods could resolve the situation without the possibility of injury. A reasonably competent police officer acting consistent with standard police practices would not have perceived an immediate threat justifying force and would have used alternatives to quickly grabbing Afshar, twisting his arms behind his back, and handcuffing him. This situation allowed for the deployment of alternative tactics, an opportunity to de-escalate and gain compliance without applying force.

29

Again, a reasonably competent police officer would have handed Afshar the citation and left the scene. Repositioning, de-escalating the conversation, and continuing to answer his questions were all available as reasonable options to avoid the application of force.

The principle of proportionality requires that the level of force used be appropriate to the threat faced. Afshar's questions frustrated officers but did not involve any threat or direct physical aggression toward them. There was no need to utilize a Reno Municipal Code (RMC) obstructing and resisting arrest. Afshar approached officers at approximately 02:15 to cooperate. He remained at the scene and was told that the other officers would deal with him at approximately 02:34 (Meadows BWC). At approximately 03:24, McCauley and Butler moved rapidly to place handcuffs on Afshar. Although it was entirely feasible, officers never communicated their intent to arrest Afshar for the RMC violation.

The officers failed to provide Afshar with an opportunity to comply. Further, they did not issue any force warning to Afshar that if he did not comply, force would be used against him. Officers' use of force was not reasonable, minimal, necessary, or carefully controlled.

From making arrests during my career, I know that officers could have secured Afshar and placed him in handcuffs without causing injury. BWC footage reveals that Afshar verbally submitted to their authority once they touched him. At the time of the injury, Afshar appeared to be submitting to their authority. BWC footage reveals Afshar saying words to the effect of, "OK, OK, I'm sorry, OK, I'm sorry, OK, OK guys, OK guys, I just, come on." Afshar's statements indicating submission provide objective evidence that he was then compliant with officers.

Even in a situation where it is objectively reasonable to place hands on an individual, it is not necessary to cause injury to put a resistant person into handcuffs. The apprehension undoubtedly surprised Afshar, and his passive resistance reflected his surprise. In his deposition (pp.129-130), McCauley conceded that Afshar's initial actions may have been

30

reflexive. Providing a proper warning of an impending use of force, more likely than not, would have tempered Afshar's reflexive response to the officer's custody attempt. Mere bracing or tensing of the arms is not considered active resistance.

Additionally, BWC footage (X-6031570Y) reveals McCauley talking with Sergeant Blount, the supervisor conducting the use of force investigation after the incident. The video has the sound muted. McCauley appears to be demonstrating to the supervisor how Afshar's arm was twisted up. The demonstration appears inconsistent with the tactic McCauley indicated that they used in his deposition, especially considering Afshar's verbalized submission to the officers once the officers grabbed his arms. Moreover, at the time of Afshar's complaint of pain, BWC indicates that he was pressed up against the car with his hands behind his back.

A reasonably competent police officer acting consistent with standard and typical police practices would not have used force in this manner.

## RIGHT TO AMEND REPORT

The preliminary opinions stated in this report are based on the documents and information available and provided as of the date of this report. Any subsequent information provided may cause me to expand, amplify, or revise my opinions in an amended report. I understand that discovery is ongoing, documents continue to be produced, and additional depositions may occur. If any new evidence arises, I reserve the right to supplement or modify my opinions to reflect that evidence. If the Defendants submit any rebuttal or response to my preliminary report, I reserve the right to respond to any issues raised therein. If called to testify, I reserve the right to make and use any aids and demonstratives to assist in the explanation and/or illustration of my opinions.

31

Respectfully Submitted,

Christopher Darcy                            December 30, 2024

CEO, Fairfax Consulting Group

# EXHIBIT C

# EXHIBIT C



# CHRISTOPHER DARCY

UNDERSHERIFF (RET) I EXPERT WITNESS I CONSULTANT
NV PILB LIC #4101

May 12, 2025

Mr. Kenneth Lyon
Law Offices of Kenneth E. Lyon, III
432 Flint Street
Reno, NV 89501

## <u>FRCP RULE 26 (a)(2)(B) - 1st Supp. Report</u>

In the Matter of:

**MOHAMMADALI AFSHAR,**

**Plaintiff,**

**vs.**

**JEFFREY BUTLER, PATRICK MCCAULEY; SHELBY CRAWFORD; THE CITY OF RENO, a political subdivision of the State of Nevada; and DOES 1–X, inclusive,**

**Defendants.**

## Case No. 3:24-cv-00110

Pursuant to Federal Rule of Civil Procedure 26(1)(2), I hereby submit my report that contains a complete statement of preliminary opinions to be expressed and the bases and reasons therefor; the data and other information I considered in forming the preliminary opinions the exhibits or list of references I used as a summary of or support for the opinions; my qualifications, including a list of all publications authored within the preceding ten years; the compensation to be paid for the review and testimony time; and a listing of any other cases in which I have testified as an expert at trial or by deposition within the preceding four years.

Submitted by:
Mr. Christopher Darcy
Fairfax Consulting Group, LLC
PO Box 371748
Las Vegas, NV 89137
(702) 419-9792
www.chrisdarcy.com

# Table of Contents

INTRODUCTION ............................................................................................................. 2

FOCUS OF ANALYSIS .................................................................................................... 2

BACKGROUND ............................................................................................................... 2

QUALIFICATIONS AND EXPERIENCE FOR REVIEWING THIS INCIDENT ........................... 4

COMPENSATION ............................................................................................................ 7

OPINION STANDARDS/DEGREE OF CERTAINTY ............................................................. 7

FACTS AND DATA CONSIDERED/DOCUMENT REVIEW .................................................. 7

OPINION METHODOLOGY & PROCEDURES ................................................................... 8

SUMMARY OF INCIDENT ............................................................................................... 9

SUMMARY OF MY INITIAL OPINIONS ............................................................................ 9

OPINIONS AND BASIS OF 1ˢᵗ SUPPLEMENTAL REPORT OPINIONS ............................... 10

**Opinion 5 - A reasonably competent police officer and/or supervisor acting consistently with typical and standard police practices would have completed the Use of Force Report (Blue Team report) with relevant information to provide a detailed description of events to support an adequate post-force investigation. .................................................................................................... 10**

RIGHT TO AMEND REPORT ........................................................................................... 21

## INTRODUCTION

As the Chief Executive Officer (CEO) of Fairfax Consulting Group, LLC (FCG), a professional consulting services company based in Las Vegas, Nevada, I am responsible for providing policy reviews, evidence-based evaluations, and expert opinions about police practices, security protocols, and public safety performance.

## FOCUS OF ANALYSIS

On June 29, 2023, I was retained by Mr. Kenneth Lyon, III, Esq., who asked me to examine and evaluate the facts and circumstances surrounding alleged police misconduct and to provide an opinion on the police practices utilized by Reno Police Department officers during a hit-and-run investigation. The conduct and tactics of the police officers during their investigation resulted in Mohammadali Afshar (Afshar) suffering severe injuries. I was tasked with reviewing the case materials and producing a report that would identify my opinions on the reasonableness of the force used and whether it was excessive. Furthermore, I was asked to examine the tactics and police practices employed by the officers and the impact of those tactics on their decision to use force.

On May 6th, I was asked to review a Blue Team Use of Force report from the Reno Police Department obtained through discovery, as well as to evaluate the deposition of Officer Crawford and produce a summary report outlining my opinions.

## BACKGROUND

With an extensive background in public safety, I bring a comprehensive understanding of police practices and operations to this analysis. My extensive background, spanning 31 years as a commissioned police officer for the Las Vegas Metropolitan Police Department (LVMPD), provides me with a unique and in-depth perspective on this subject. In 2022, I

2

retired at the rank of Undersheriff, overseeing the department's daily operations, including the safety and security of the Clark County Detention Center (CCDC).

Throughout my career, I produced, reviewed, and approved numerous department policies. These policies, which encompassed the use of force, internal investigations, and interactions with the public, were instrumental in shaping the police department's operations and practices.

My journey in law enforcement began upon graduating from Shippensburg University in Pennsylvania, where I obtained a bachelor's degree in criminal justice in 1989. My experience in security operations started in 1989 when I entered the field as a security officer for Strawbridge & Clothier Corporation. I was then recruited by the Lower Merion Township Police Department (LMPD) in 1989 and completed the Pennsylvania State Police Municipal Police Academy. I was assigned to the LMPD Patrol Division when I was recruited by LVMPD in early 1991. After graduating from the LVMPD Police Academy and completing the Field Training Program, I officially began my full-time career in Las Vegas as a police officer in September 1991.

During my 31-year career at LVMPD, I have held the following positions:

A.      Undersheriff (Ret. Dec. 28, 2022), 2021–2022

B.      Assistant Sheriff over the Law Enforcement Investigations Support Group, 2020–2021

C.      Deputy Chief of the Homeland Security Division, 2020

D.      Deputy Chief of the Investigative Services Division, 2017–2020

E.      Captain/Director of the Southern Nevada Counter Terrorism Center, 2015–2017

F.      Captain of the Major Violators and Central Narcotics Bureau, 2013–2015

G.      Captain of the Internal Affairs and Employment Diversity Bureau, 2011–2013

H.      Captain of the Northeast Area Command (Patrol), 2007–2011

I.      Lieutenant of Gang Crimes, 2006–2007

3

J.      Lieutenant of the Office of Quality Assurance, 2005–2006

K.      Lieutenant at Northwest Area Command (Patrol), 2004–2005

L.      Sergeant assigned to various detective and patrol assignments, 1999–2004

M.      Detective assigned to Robbery Homicide, General Detectives, 1995–1999

N.      Detective assigned to Vice, 1994

O.      Police Officer I/II assigned to various area commands, 1991–1994

## QUALIFICATIONS AND EXPERIENCE FOR REVIEWING THIS INCIDENT

To support my expertise, I have served in various facets of law enforcement over the course of my three decades in policing. From patrol operations to investigations, area command management, and police administration, I have developed my skills in reviewing critical incidents and evaluating circumstances. Additionally, I have fulfilled crucial responsibilities in policy evaluation and policy development.

I have obtained many certifications to enhance my qualifications. I hold certificates in Basic, Advanced, Management, and Executive Nevada Peace Officers' Standards and Training (POST). Furthermore, I maintained a Department of Justice (FBI) Top Secret/SCI (TS-SCI) security clearance for the last ten years of my career.

As a certified instructor with LVMPD throughout my career, I have actively contributed to the professional development of fellow officers. I have delivered comprehensive training on critical topics, including leadership, de-escalation, and the use of force. Furthermore, I have had the privilege of presenting at esteemed institutions such as the Bureau of Justice Assistance (BJA), where I presented the concepts of Place Network Investigations (PNI). PNI focuses on the core causes of crime and disorder in communities, often multi-family housing complexes, and ways to reduce the occurrence of criminal activity.

4

In 2014, I earned a Master of Arts in Administrative Leadership from the University of Oklahoma, which equipped me with advanced knowledge and skills in leadership, organizational management, and strategic decision-making.

In 2018, I completed the Aspen Institute Executive Course on Leadership, Values, and Good Society to enhance my critical thinking and evaluation capabilities.

During my tenure as Undersheriff, Assistant Sheriff, and Deputy Chief, a significant portion of my responsibilities involved providing leadership and guidance to the LVMPD's Critical Incident Review Process (CIRP). This encompassed overseeing the Force Investigations Team (FIT) and the Critical Incident Review Team (CIRT). As Chairperson of the LVMPD Use of Force and Tactical Review Board, I evaluated FIT and CIRT investigations pertaining to the use of deadly and non-deadly force.

As the Chief of Detectives, I evaluated and provided leadership and guidance on criminal case strategies and investigative methods. Through these roles, I facilitated my competence in completing comprehensive and objective reviews of critical incidents, ensuring transparency, thoroughness, and adherence to established protocols.

As a representative of the LVMPD, I have been deposed in cases involving officer-involved shootings, serving as the person most knowledgeable (NRCP 30(b)(6)) on the use of force. Additionally, I have participated in federal court mediations concerning allegations of the inappropriate use of force by police officers. I have also testified in court proceedings, sharing my knowledge and expertise on police practices. In collaboration with LVMPD's Office of General Counsel and various law firms, I have aided and guided on matters involving allegations of constitutional violations by employees.

I am a member of the American Society for Industrial Security (ASIS) International, an association dedicated to advancing the security management practices of people,

5

property, and information. I am a member of the FBI National Academy Alumni Association, the Nevada Society of Professional Investigators, the International Association of Chiefs of Police (IACP), and the Association of Threat Assessment Professionals (ATAP).

I am a licensed private investigator (PI) NV PILB #4101 and security consultant in the State of Nevada per NRS 648.0155, which defines a security Consultant as "a person licensed as a private patrol officer or private investigator who engages in the business of furnishing advice on the proper methods and equipment for providing security and protection for persons or property."[1]

As a consultant, expert witness, and CEO of Fairfax Consulting Group, LLC, I have delivered comprehensive policy review services and authored evidence-based evaluations of police performance for the Albuquerque Police Department. In my capacity as an independent Monitor of the Use of Force for the City of Albuquerque, New Mexico, I provide analysis and strategic guidance as a subject matter expert (SME) in police use of force. My expertise includes evaluating use-of-force protocols, officer-involved shootings (OIS), in-custody death incidents, training programs, and managing high-profile investigations. Additionally, I have consulted with the Anchorage Police Department on officer-involved shootings and served as an external supervisor for internal investigations related to such incidents.

I have provided numerous expert opinions on police and security practices and have been deposed to support the trier of fact in litigation related to the performance of police officers and security personnel. I have been retained by counsel in Nevada, California, Washington, D.C., and Texas. I last provided police practice trial testimony in 2022.

---

[1]    NRS 648.0155

## COMPENSATION

I am compensated for my work at my usual and customary rate of $400 per hour. My compensation and professional fee structure are outlined in my 2025 Fee Schedule. My opinions are not dependent on, nor related to, the nature or substance of my opinions or the outcome of this case.

## OPINION STANDARDS/DEGREE OF CERTAINTY

The opinions expressed herein are to a reasonable degree of scientific certainty and/or to a reasonable degree of professional certainty.

## FACTS AND DATA CONSIDERED/DOCUMENT REVIEW

I utilized the materials listed below to assist in forming my opinion:

1. Deposition of Jeffrey Butler
2. Deposition of Mohammadali Afshar
3. Deposition of Patrick McCauley
4. Citation
5. Officer Crawford's Report ORG
6. Officer McCauley's Supplemental Report #1
7. Officer Butler's Supplemental Report #2
8. Officer Crawford's Supplemental Report #3
9. Traffic Accident Report
10. Axon_Body_3_Video_2022-03-16_0152_X6031246Z
11. Axon_Body_3_Video_2022-03-16_0152_X6031627D
12. Traffic_Accident_Citation_O_And_R
13. Traffic_Accident_O_AND_R
14. Axon_Body_3_Video_2022-03-16_0433_X6031246Z

7

15. Axon_Body_3_Video_2022-03-16_0423_X6031627D
16. Axon_Body_3_Video_2022-03-16_0338_X6031570Y
17. Axon_Body_3_Video_2022-03-16_0145_X6030597V
18. Accident_Investigation
19. Axon_Capture_Photo_2022-03-16_035133_9721(1)
20. Axon_Capture_Photo_2022-03-16_035133_9721
21. Axon_Capture_Photo_2022-03-16_035156_9721(1)
22. Axon_Capture_Photo_2022-03-16_035156_9721
23. Axon_Capture_Photo_2022-03-16_040532_9721
24. **Blue Team Use of Force Review**
25. **Deposition of Shelby Crawford**

## OPINION METHODOLOGY & PROCEDURES

The opinions expressed in this report were based on an analysis of the specific case information provided, employing methodologies and policy standards widely accepted in police practice and critical incident reviews. The benefits of such standards included providing consistency of services, codifying best practices and policies, and sharing lessons learned. Any cited resources supported these methodologies.

In evaluating the facts of this case, I employed a case study methodology, as the incident was bounded by time, location, and specific events. I utilized both qualitative and quantitative content analysis, drawing on my specialized knowledge, skills, education, experience, and training. Furthermore, I reviewed the case information to understand the facts. I conducted a document review, examining all documents for relevance and establishing facts related to the issues at hand. I reviewed all available video evidence, examining it for any pertinent information relevant to the issue, which was used to analyze and compare officer statements about the incident. I reviewed and analyzed the officers' actions based on all relevant evidence, testimony from witnesses, departmental and/or

8

external investigations, physical evidence, and any other relevant information to determine the actions taken by the officers, their justification for those actions, and the reasons behind them.

I utilized a comparison with widely accepted and nationally recognized police training and practices. This step in the methodology involved comparing what the officers did and why, then applying an objective standard to various police training and accepted practices. Nationally accepted training and practices included relevant Supreme Court cases, departmental policies and procedures, training, and research. I focused on understanding the participants' perspectives when evaluating this incident; however, my opinions were based on the facts presented by the material and avoided explicitly drawing conclusions based on the credibility issues of the parties.

In summary, I formed my opinions by reviewing all case-specific materials, drawing on my extensive experience in law enforcement, and adhering to consensus-based police practices, procedures, and typically accepted standards in the production of my opinions.

## SUMMARY OF INCIDENT

SEE INITIAL RULE 26 INITIAL EXPERT REPORT

## <u>SUMMARY OF MY INITIAL OPINIONS</u>

**Opinion 1. A reasonably competent police officer acting consistently with typical and standard police practices would have reduced the likelihood of using force by de-escalating, using the principles of contact cover, command and control, and proper handcuffing tactics..**

**Opinion 2. A reasonably competent police officer acting consistent with typical police practices would have informed Afshar that he was under arrest, provided an opportunity to comply, and issued a force warning before using force.**

9

**Opinion 3. A reasonably competent police officer acting consistent with typical and standard police practices would have issued Afshar the citation and ended the contact.**

**Opinion 4. A reasonably competent police officer acting consistently with standard and typical police practices would not have used force upon Afshar.**

## 1st SUPPLEMENTAL REPORT INFORMATION

Upon receiving the Blue Team report and the Deposition of Officer Crawford (CRAWFORD), I reviewed and incorporated both items into my analysis, using the same methodology as previously employed in my initial expert report.

## OPINIONS AND BASIS OF 1st SUPPLEMENTAL REPORT OPINIONS

**NOTE:** *My report and testimony are intended to provide professional, fair, objective, and nonpartisan opinion evidence. My opinions are intended to inform the trier of fact, assist the court as reasonably required, and support and respect the jury's responsibility to determine the matter.*

The additional information reviewed reinforces my initial opinions. (SEE MY INITIAL EXPERT REPORT)

> **Opinion 5 - A reasonably competent police officer and/or supervisor acting consistently with typical and standard police practices would have completed the Use of Force Report (Blue Team report) with relevant information to provide a detailed description of events to support an adequate post-force investigation.**

10

<u>I base my opinions on my 32-year career in law enforcement. As a police officer and supervisor, I have investigated, supervised, and reviewed hundreds of dynamic, critical incidents involving the use of force, as well as associated Blue Team reports.</u>

<u>I further base my opinions on the facts and information below.</u>

## **Blue Team Use of Force Report**

My analysis will be presented in the order it was presented in the Blue Team Use of Force report, rather than in chronological order of the event.

Upon reviewing the Blue Team report, I found it to be significantly lacking in information and clarity regarding the investigation of the use of force and its justifications. A supervisor, typically a Sergeant, is the first level of review, and the report is generally elevated to a Lieutenant and a Captain for their review. Higher-level reviewers are generally not present at the scene and lack firsthand knowledge of the event. Thus, it is essential and appropriate for officers and supervisors to complete use of force investigation reports with considerable clarity, so that higher-level and executive staff reviewers can make informed determinations about the report's veracity, identify future training needs, and assess whether the use of force complied with their policies, training, and the law.

On page 1, in the middle of the page, there is a section titled "Involved citizen" that lists Mohammad Ali Afshar. A subsection is titled "Resistance," with a written response from the officer that states, "physical resistance." However, nowhere in the rest of the report, nor this section, is there an articulation of what "physical resistance" by Afshar entailed. The term "physical resistance" is too vague and encompasses a range of actions, from passive resistance to a full-blown physical altercation involving punches and kicks. This

11

section should provide more details about the resistance encountered by the officers. An example of this, <u>not related to this incident</u>, would be:

> *John Doe resisted officers' attempts to place him in custody by yelling profanities, threatening officers verbally, and refusing to comply with lawful commands to put his hands behind his back." At one point, Doe threw several closed-fist punches at the officer. After a brief struggle, the officers were able to take Doe into custody.*

Just underneath that subsection is a section titled "Injuries/Conditions." In this section, the officer wrote, "Claimed Injury-Hospital." There should be a more detailed description of the nature of the injury. An example of this, <u>not related to this incident</u>, would be:

> *John Doe claimed an injury to his right shoulder, claiming pain in that area.  The injury may have been caused or exacerbated by the struggle with the officers when Doe refused to comply with lawful orders to stop resisting.  There was no physical evidence of the injury (bruising, etc.).  Paramedics were at the scene and provided medical attention to Doe. Doe was taken to the hospital at his request for further medical attention.*

On page 2, under the "Officers Involved" section, the individual officers pertinent to the incident are listed. Under each officer listed, in the last subsection under Use(s) Of Force, the first two officers wrote, "Physical Control: effective." The last officer wrote, "Other: Effective." Each officer should provide more details on the type of force used (control hold, closed fist strike, physically restrained on the ground, etc.). As it currently stands, there is no way to determine from this report what force each officer employed. If there is BWC footage, the individual officers should include the timestamp of the recording where the use of force occurred. This would assist reviewers in the future and ensure the officer has reviewed the BWC, especially if this incident involves potential for a lawsuit or criminal charges.

Within the "Officers Involved" section, there is a part that asks, "Age, Years of Employment, Years with Unit." Officer Butler answered "0" for years with the unit, and Officer Crawford answered "0" for years of employment. This section should be revised to read, "Years/months of employment and years/months with unit." This change would clarify the information for the reviewer.

On the bottom of page 2 is a section titled "Witnesses." Amir Hassan Zahiri is listed along with his phone number. However, there are no identifying details about this person. At a minimum, the following information should be included: date of birth, physical address, SCOPE ID#, NV DL information, and so on. Sometimes witnesses provide inaccurate information, either intentionally or accidentally. The identifying information that is captured in the report will assist reviewers in recontacting the witnesses if necessary.

The incident summary of the UOF report begins on page 3. There is a section titled "Involved Citizen/s injuries/treatment." The officer wrote, "Afshar right arm, treated by REMSA and Renown Medical Center (id)." This section should provide more detail, in line with the information presented on page 1 under the "Involved Citizen" section. At a minimum, the officer should include the suspect's claim of injury, specify the body part, describe how the injury occurred (if known), and outline the treatment provided by paramedics. An example of this, <u>not related to this incident</u>, would be:

> *Doe complained of an injury to his right shoulder caused during the struggle. Doe claimed the officer caused the injury when he was taken forcibly to the ground. There was no physical bruising that I saw at the scene. Paramedics arrived and diagnosed Doe with a possible sprain and put his arm in a sling. Doe was transported to Renown Hospital for further treatment.*

On page 4, at the top of the page, there is a section titled "Witness citizen/statement." The officer wrote, "Hassan Zahiri, Amir verbal statement given. Did not want to complete

13

a written statement." If the statement was captured on BWC, there should be a timestamp of the recording when this took place, and it should be put in this section. This will assist UOF reviewers in the future.

Under the section titled "Conclusion," the reviewing lieutenant entered a three-sentence conclusion. There should be more information and articulation in this section. An example of this, not related to this incident, would be:

I, Lieutenant Smith P#1234, reviewed this UOF report, connecting crime reports, BWC, available third-party video footage, and witness statements. Officers gave Doe several lawful commands to put his hands behind his back and stop resisting. Doe did not comply. Doe showed physical resistance by throwing several closed-fist punches at the officer. The officer used empty-handed techniques to physically control Doe and take him to the ground. Doe was placed into custody with the help of several officers. Afterward, Doe complained of an injury to his shoulder. My review of BWC and speaking with the officers on site did not reveal when this injury may have occurred. I spoke with Doe, who told me his version of the event, but did not want to complete a statement. Doe was taken to Renown Hospital for further treatment.

Upon my review of the information known at the time of the call, the facts and circumstances as articulated by the officers on the scene, the available witnesses, and my interview with Doe, it is my opinion that the officers acted within Reno PD policy, training, NRS, and Graham v. Conner. Officers gave Doe several opportunities to comply with their commands. After the refusal, officers attempted to place Doe in custody. Doe appeared to resist by throwing several punches. Officers had to forcibly take Doe to the ground, which Doe claims caused an injury to his shoulder. Doe's injuries were addressed by responding paramedics and by physicians at Renown Hospital. The level of force used by the involved officers was justified and lawful.

14

In my opinion, drawing from my experience, education, training, and specialized knowledge, and considering the totality of the circumstances, a reasonably competent police officer and supervisors, acting in accordance with typical police practices, would have completed the form with the necessary information to adequately review the use of force. This report is incomplete and inadequate.

## Deposition of Officer Crawford

Officer Crawford's deposition testimony reveals several aspects of the incident that support my previous opinions and highlight the unreasonable and unnecessary nature of the arrest. Crawford, a relatively new officer (having served only three and a half months) at the time, was dispatched to the scene of a hit-and-run accident involving Afshar's vehicle, which had struck two parked cars. At that point in her training, Crawford was in phase C, which is about three-quarters of the way through.

```
          Can you just explain to me what phase C
encapsulated?
     A    A lot of it was a lot more of like interview
investigation-type calls.  Your training officer isn't
guiding you as much as you're being a lot more of the
independent work.
          So you're kind of having to struggle through
the call, and work through like your tools, like the
Brazos on our phone, kind of try to figure out what
happened.
          And you would still discuss it with your
training officer and say this is what I believe happened.
This is what I want to do within reason.  And your
training officer would say, yep, perfect.  Or, well, what
about this.
```

15

Crawford confirmed that she was designated as the investigating officer, a role she accepted after being asked to do so by Officer McCauley (pp. 36-37). The video evidence clearly shows that Crawford is new and relies heavily on the assistance of the experienced officers.

Crawford's investigation never determined the cause of the accident. It did not identify DUI as a factor due to Afshar's departure from the scene and his vehicle for an unknown duration (p. 41). Despite this, Crawford anticipated that Afshar was intoxicated based on the circumstances, such as leaving the scene after striking two vehicles (p. 49). However, during her initial encounter with Afshar, she recognized that he was experiencing a panic attack (p. 50) and observed that he did not appear intoxicated (p. 51).

Also, Crawford (p. 22) indicated a lack of specific training about anxiety, but she knew it was similar to mental health issues, and that they were taught to de-escalate. Crawford felt anxiety was to be treated like schizophrenia and bipolar disorder.

> A     I don't feel like we had a lot of training with
> anxiety.  I think anxiety comes hand-in-hand with like
> schizophrenia, bipolar disorder.  But just being like
> AM-dub you're -- you are taught to like try and
> de-escalate and just explain to them what's going on.
> Q     And how about like, you know, what -- I guess
>
>                                              Page 22

If Crawford believed that de-escalation was appropriate for addressing issues like schizophrenia and anxiety, why did she indicate that she wasn't arguing with Afshar, raise her hands, and refrain from communicating with him as she was trained to do?

16

Crawford additionally testified (p. 26) that you can attempt to persuade a person to turn around; however, if they are uncooperative, you should proceed immediately to hands-on intervention.

> Q      Is there protocol or procedure that you are trained on to effectuate an arrest prior to going hands-on?
>
> A      The minimum amount of force necessary to affect an arrest.
>
> Q      Are there techniques for arrest that -- and/or control that don't involve going hands-on?
>
> A      You could try, say, turn around, face away from me.  But if they're being uncooperative, you don't.  You immediately go hands-on.
>
> Q      All right.  And I assume in your experience both before the incident with Mr. Afshar and since then the term uncooperative probably is a pretty broad -- encompasses a pretty broad scope of behavior, would you agree with that?
>
> A      Yes.

Crawford misses the entire point of de-escalation, which is that this type of situation is precisely when de-escalation tactics are most beneficial. There is no rush. Time is on the officer's side. Crawford did not provide an explanation to Afshar about the citation when he asked, and she did not attempt to de-escalate the situation by explaining the need for him to back up before his arrest (pp. 65-69).

She acknowledged that she could not legally arrest him for the charges considered, such as hit-and-run and failure to maintain lane (p. 61).

17

No warning was given to Afshar that he might be arrested if he did not comply, and Crawford did not explain the reason for the order to Afshar (p. 70). Officer McCauley decided to take a hands-on approach, and Crawford assisted in the physical arrest by applying handcuffs (p. 73).

```
            Were you expecting him to be an asshole?
     A      Just given the information that he was getting
agitated and irate.
     Q      And can you arrest somebody for being an
asshole?
     A      No, you cannot.
     Q      And would you attribute that comment to kind of
your newness on the job?
     A      One hundred percent.
     Q      You probably don't hold that same feeling as
you sit here today having some years under your belt?
     A      No, I don't.
```

Crawford's decision to issue a citation for hit-and-run followed discussions with Officer McCauley, but she expressed a desire to arrest Afshar instead (p. 60).

Overall, Crawford's deposition testimony supports and amplifies my initial opinions that the arrest of Mohammadali Afshar was unreasonable and unnecessary, relying on assumptions rather than concrete evidence of wrongdoing. Additionally, there was a significant lack of communication and de-escalation efforts by the officers involved.

18

Crawford's depositional testimony (p. 69) bolsters my opinion that they could have provided him with further explanation, de-escalation, and time as a tactic. They should have let him pick up the driver's license after they left, as Crawford told him. Crawford confirms that there was no need for her to pick it up. Yet this is the basis for the obstruction and resisting charge that led to the use of force by officers.

        Q    Did you ever hear an explanation provided to
Mr. Afshar as to why he needed to back up?
        A    No.
        Q    Why not?
        A    I don't have a reason.
        Q    You could have just left the driver's license
on the ground?  Issued him the citation, true?
        A    True.
        Q    There was no need for you to pick it up.
        A    Correct.

Upon reviewing the Use of Force report and the Deposition of Shellby Crawford, I maintain the following opinions:

**Opinion 1. A reasonably competent police officer acting consistently with typical and standard police practices would have reduced the likelihood of using force by de-escalating, using the principles of contact cover, command and control, and proper handcuffing tactics.**

19

**Opinion 2.  A reasonably competent police officer acting consistent with typical police practices would have informed Afshar that he was under arrest, provided an opportunity to comply, and issued a force warning before using force.**

**Opinion 3. A reasonably competent police officer acting consistent with typical and standard police practices would have issued Afshar the citation and ended the contact.**

**Opinion 4. A reasonably competent police officer acting consistently with standard and typical police practices would not have used force upon Afshar.**

And add:

**Opinion 5. A reasonably competent police officer and/or supervisor acting consistently with typical and standard police practices would have completed the Use of Force Report (Blue Team report) with more relevant information to provide an accurate depiction of events to support an adequate post-force investigation.**

This report is based on the information provided to me and listed above. I will review any additional documentation as it becomes available. Any subsequent documents, depositions, or other evidence provided will require further analysis.

20

**RIGHT TO AMEND REPORT**

The preliminary opinions stated in this report are based on the documents and information available as of the date of this report. Any subsequent information may lead me to expand, amplify, or revise my opinions in an amended report. I understand that discovery is ongoing, documents continue to be produced, and additional depositions may occur. If any new evidence arises, I reserve the right to supplement or modify my opinions to reflect that evidence. If the Defendants submit any rebuttal or response to my preliminary report, I reserve the right to respond to any issues raised therein. If called to testify, I reserve the right to create and use any aids and demonstratives to assist in the explanation and/or illustration of my opinions.

Respectfully Submitted,

Christopher Darcy                                 May 12, 2025
CEO, Fairfax Consulting Group

21